# IN THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

STATE OF MAINE,

*Plaintiff-Appellee*,

v.

3M COMPANY,

*Defendant-Appellant*,

E.I. DUPONT DE NEMOURS & COMPANY, f/k/a E.I. Dupont De Nemours & Company; CHEMOURS COMPANY; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; DOW INC.; CHEMOURS COMPANY FC, LLC,

*Defendants*.

On Appeal from the United States District Court for the District of Maine
No. 2:23-cv-00210 (Hon. John A. Woodcock, Jr.)

## BRIEF OF APPELLEE STATE OF MAINE

Scott Boak
Robert Martin
Assistant Attorneys General
OFFICE OF THE MAINE
ATTORNEY GENERAL
6 State House Station
Augusta, MA 04333
(207) 626-8566
Scott.Boak@maine.gov
Robert.Martin@maine.gov

Kyle J. McGee
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
(302) 622-7000
kmcgee@gelaw.com

Matthew F. Pawa
Benjamin A. Krass
SEEGER WEISS LLP
1280 Centre Street, Suite 230
Newton, MA 02459
(617) 641-9550
mpawa@seegerweiss.com
bkrass@seegerweiss.com

*Counsel for Plaintiff-Appellee,
State of Maine*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ......................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................ 3

STATEMENT OF THE ISSUES .................................................................... 4

STATEMENT OF THE CASE ....................................................................... 5

   I.  Maine Files Suit and Expressly Disavows Seeking Relief for AFFF
      Contamination.......................................................................................... 5

   II.  3M Removes This Case by Alleging "Upon Information and Belief"
       That the Case Includes Sites Where AFFF May Be Commingling with
       Non-AFFF Contamination....................................................................... 7

   III. The State Moves to Remand Based on Its AFFF Disclaimer and on
       Unrebutted Evidence That "Commingling" Did Not Occur. ......................... 8

   IV. The District Court Remanded the Case Based on the State's Express and
       Unambiguous AFFF Disclaimer. ............................................................ 10

SUMMARY OF THE ARGUMENT ............................................................. 13

ARGUMENT ............................................................................................. 15

   I.  Legal Standard. ...................................................................................... 15

   II. The State's Express Disclaimer of Any Relief for Injuries Caused by
       AFFF Precludes Federal Officer Jurisdiction................................................ 16

      A. This Court and Many Others Have Remanded Cases Based on
         Similar Disclaimers. ....................................................................... 17

      B. 3M's Arguments to Ignore the State's Disclaimer Are Unfounded...... 21

   III. The Evidence Shows That 3M's AFFF Has Not Reached Any Sites Even
       Arguably Included in This Action. ......................................................... 26

CONCLUSION .......................................................................................... 35

CERTIFICATE OF COMPLIANCE ............................................................ 36

CERTIFICATE OF FILING AND SERVICE .............................................. 37

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Aguilar v. U.S. I.C.E.*,
  510 F.3d 1 (1st Cir. 2007) ...................................................................26

*Albert v. Oshkosh Corp.*,
  47 F.4th 570 (7th Cir. 2022) .............................................................33

*Arlington Cnty. v. Express Scripts Pharmacy, Inc.*,
  996 F.3d 243 (4th Cir. 2021) ...........................................................26

*Baker v. Atlantic Richfield Co.*,
  962 F.3d 937 (7th Cir. 2020) ..................................................... 21, 22

*Batchelor v. Am. Optical Corp.*,
  185 F. Supp. 3d 1358 (S.D. Fla. 2016) ................................. 20, 22, 24

*City of Hoboken v. Chevron Corp.*,
  45 F.4th 699 (3d Cir. 2022) ........................................................ 18, 32

*Cnty. of San Mateo v. Chevron Corp.*,
  32 F.4th 733 (9th Cir. 2022) ......................................... 13, 15, 31, 32

*Cuomo v. Crane Co.*,
  771 F.3d 113 (2d Cir. 2014) .............................................................32

*Curiale v. A. Clemente, Inc.*,
  2023 WL 4362722 (D.N.J. July 5, 2023) ..........................................22

*Dart Cherokee Basin Operating, LLC v. Owens*,
  574 U.S. 81 (2014) ...........................................................................32

*Dougherty v. A O Smith Corp.*,
  2014 WL 3542243 (D. Del. July 16, 2014) .......................................24

*Farrow v. Foster Wheeler Energy Corp.*,
  2008 WL 11508373 (W.D. Wash. Aug. 28, 2008)..............................20

*Franchise Tax Bd. of State of Cal. v. Constr. Laborers*
  *Vacation Tr. for S. Cal.*, 463 U.S. 1 (1983) ............................... 16, 34

*Grosch v. Tyco Fire Prods. LP*,
  2023 WL 5993548 (D. Ariz. Sept. 15, 2023) ....................................23

*Hayden v. 3M Co.*,
  2015 WL 4730741 (E.D. La. Aug. 10, 2015) ............................. 20, 24

*Hilbert v. Aeroquip, Inc.*,
  486 F. Supp. 2d 135 (D. Mass. 2007) ...............................................29

*Hopkins v. Buffalo Pumps, Inc.*,
  2009 WL 4496053 (D.R.I. Dec. 1, 2009) ...........................................20

*Illinois ex rel. Raoul v. 3M Co.*,
  2023 WL 6160610 (C.D. Ill. Sept. 21, 2023) .................................. 19, 20, 21, 23

*In re Montreal, Maine & Atl. Ry.*,
  888 F.3d 1 (1st Cir. 2018) ..................................................................26

*Isaacson v. Dow Chem. Co.*,
  517 F.3d 129 (2d Cir. 2008) ...............................................................32

*Kelleher v. A.W. Chesterton Co.*,
  2015 WL 7422756 (S.D. Ill. Nov. 23, 2015) ................................... 20, 24

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ...........................................................................15

*Leite v. Crane Co.*,
  749 F.3d 1117 (9th Cir. 2014) ............................................................15

*Lockwood v. Crane Co.*,
  2012 WL 1425157 (C.D. Cal. Apr. 25, 2012) ....................................20

*Lu Junhong v. Boeing Co.*,
  792 F.3d 805 (7th Cir. 2015) ..............................................................33

*Madden v. A.H. Voss Co.*,
  2009 WL 3415377 (N.D. Cal. Oct. 21, 2009) .....................................24

*Maguire v. A.C.&S., Inc.*,
  2015 WL 4934445 (S.D.N.Y. Aug. 18, 2015)....................................20

*Marley v. Elliot Turbomachinery Co.*,
  545 F. Supp. 2d 1266 (S.D. Fla. 2008) ...............................................22

*Mayor & City Council of Baltimore v. BP P.L.C.*,
  31 F.4th 178 (4th Cir. 2022) ..............................................................32

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006)..............................................................................34

*Moore v. Elec. Boat Corp.*,
  25 F.4th 30 (1st Cir. 2022)........................................................... 26, 29

*Nessel v. Chemguard, Inc.*,
  2021 WL 744683 (W.D. Mich. Jan. 6, 2021) ................................ 22, 23

*Nevada v. Bank of Am. Corp.*,
 672 F.3d 661 (9th Cir. 2012) ..................................................................16

*New Hampshire v. 3M Co.*,
 2023 WL 2691376 (D.N.H. Mar. 29, 2023) .................... 2, 18, 19, 21, 23, 29, 31

*Pratt v. Asbestos Corp. Ltd.*,
 2011 WL 4433724 (N.D. Cal. Sept. 22, 2011) ....................................................20

*Puerto Rico v. Eli Lilly & Co.*,
 2023 WL 4830569 (D.P.R. July 13, 2023) .........................................................16

*Rhode Island v. Shell Oil Prods. Co.*,
 35 F.4th 44 (1st Cir. 2022)........................................................................... 11, 14

*Rhode Island v. Shell Oil Prods. Co.*,
 979 F.3d 50 (1st Cir. 2020)...................................... 13, 15, 16, 17, 18, 23, 25, 31

*Sheppard v. Northrop Grumman Sys. Corp.*,
 2007 WL 1550992 (E.D. La. May 24, 2007) .....................................................20

*State ex rel. Tong v. Exxon Mobil Corp.*,
 83 F.4th 122 (2d Cir. 2023) ...............................................................................32

*United Food & Com. Workers Union, Loc. 919, AFL-CIO v. CenterMark
 Props. Meriden Square, Inc.*, 30 F.3d 298 (2d Cir. 1994)............................ 15, 16

*Watson v. Philip Morris Cos., Inc.*,
 551 U.S. 142 (2007)...........................................................................................15

*Westbrook v. Asbestos Defs. (BHC)*,
 2001 WL 902642 (N.D. Cal. July 31, 2001) .....................................................20

**STATUTES**

28 U.S.C. § 1442 ........................................................................................... 1, 3, 4

28 U.S.C. § 1442(d) ...............................................................................................3

**OTHER AUTHORITIES**

14C FED. PRAC. & PROC. JURIS. § 3733 (Rev. 4th ed.) ...........................................32

**INTRODUCTION**

PFAS chemicals are among the most toxic substances known to science. They are now found in public and private drinking water wells and natural resources throughout Maine. The State of Maine brought this case against 3M Company ("3M") and other manufacturers of PFAS and PFAS-containing products, seeking damages to clean up this contamination across the state.

Because one PFAS product, known as Aqueous Film Forming Foam ("AFFF"), was allegedly developed at the military's behest to extinguish fires, lawsuits seeking relief for AFFF contamination have been removed to federal court under the federal officer statute. *See* 28 U.S.C. § 1442. But lawsuits over *other* PFAS contamination— *e.g.*, from non-stick pans and textile coatings—do not involve products developed for the federal government, and these "non-AFFF" cases properly proceed in state court. Maine's complaint in this action was firmly in this second category: it sought relief exclusively for non-AFFF contamination, and even expressly disclaimed seeking any relief related to AFFF contamination.

But 3M simply ignored the disclaimer and removed the case on federal officer grounds, thereby bringing this case to a standstill. 3M's theory is that there might be AFFF contamination commingled with the non-AFFF contamination at four sites in Maine. 3M goes on to say that the complaint pleads claims connected to these four sites, even though the complaint does not in fact name any of these sites when

describing the State's injuries from non-AFFF PFAS contamination. But 3M is wrong: since the State expressly disavowed any recovery for injuries caused by AFFF in the complaint, 3M's allegations of commingling cannot serve as a basis of removal. Moreover, the State has submitted evidence to demonstrate that, in fact, either there is no AFFF contamination at the sites in question, or the alleged AFFF came from a manufacturer that is not a party to this case. 3M failed to submit any evidence in rebuttal—leaving 3M to rely on little more than a skewed reading of the complaint at odds with its express disclaimer, and on speculative "commingling" allegations that have been comprehensively negated by the evidence.

Relying in part on a similar remand decision in another non-AFFF case brought by New Hampshire, *see New Hampshire v. 3M Co.*, 2023 WL 2691376, at *8 (D.N.H. Mar. 29, 2023), *appeal pending*, No. 23-1362 (1st Cir.), the District Court remanded this case, because it agreed with the State that its express disclaimer of any AFFF recovery eliminated any nexus between 3M's allegations and its purported government contractor defense. This Court should affirm.

# JURISDICTIONAL STATEMENT

3M removed this case to federal court alleging federal officer jurisdiction, 28 U.S.C. § 1442, and federal enclave jurisdiction, A12-13 ¶¶ 2, 3, 5.[1] The District Court correctly ruled that there is no federal subject matter jurisdiction and thus granted the State's motion to remand on July 26, 2023. Add. 21-22. This Court has jurisdiction to review the remand order. *See* 28 U.S.C. § 1442(d).

---

[1] "A" followed by page numbers refers to relevant portions of the appendix filed by 3M. "Add." refers to the addendum attached to 3M's brief. "State Add." refers to the State's Addendum.

## STATEMENT OF THE ISSUES

Because 3M is no longer pursuing its federal enclave theory of jurisdiction, the two issues on appeal relate exclusively to federal officer jurisdiction:

1. Whether there is subject matter jurisdiction under 28 U.S.C. § 1442 over a private party contending it served as an agent of the federal government in producing a product even though the plaintiff's complaint expressly disclaims all relief for harms arising from that product.

2. Whether there is subject matter jurisdiction under 28 U.S.C. § 1442 over a private party contending it served as an agent of the federal government in producing a product where the private party has failed to rebut evidence that its product is not at issue in the case.

## STATEMENT OF THE CASE

### I.  Maine Files Suit and Expressly Disavows Seeking Relief for AFFF Contamination.

PFAS are highly toxic chemicals that build up in the human body over time and are associated with cancers and other dangerous health effects. A38-39, 49, 54 ¶¶ 1-2, 44, 64-66. To address statewide PFAS contamination, Maine simultaneously filed two lawsuits against 3M and other defendants in state court, pleading only state-law claims in each one. A38-127; A128-224. This lawsuit seeks to recover for contamination caused by the hundreds of consumer and industrial products *other than AFFF* that were made with (or that degrade into) PFAS. A43-44 ¶ 15. This "non-AFFF" case seeks damages for cleaning up contamination of drinking water supplies and at various sites including landfills, hazardous waste sites, wastewater treatment facilities, and biosolid land application sites. Maine's other PFAS lawsuit seeks relief for injuries caused by AFFF, a firefighting foam purportedly developed at the behest of the federal government. The State's purpose in filing the two lawsuits was to ensure that the State's non-AFFF case, over which there is no federal jurisdiction, would remain in state court, as any federal officer defense applies only to claims relating to AFFF, and not to contamination originating from non-AFFF products (*e.g.*, non-stick pans, textile coatings). In fact, the non-AFFF complaint expressly disclaims any relief for AFFF-related contamination: "The State is not

seeking to recover through this Complaint any relief for contamination or injury related to Aqueous Film Forming Foam." A43 ¶ 15.

Both the non-AFFF complaint and the AFFF complaint list "exemplar" sites—*i.e.*, specific sites contaminated by PFAS of the relevant type, and for which the State intends to seek relief in each case.[2] These lists of exemplar sites are not intended to be a full listing of all the sites at issue in each case; the full compilation will occur only in discovery. Nonetheless, it is notable that (a) the site lists from the two complaints do not overlap,[3] and (b) the AFFF complaint explicitly seeks relief for AFFF contamination at the Naval Air Station in Brunswick, the Portsmouth Naval Shipyard in Kittery, Loring Air Force Base, and the Bangor Air National Guard Base. A166, 168, 169, 170 ¶¶ 210, 224, 225, 232, 236, 239. These four military sites are relevant to this appeal because 3M's federal officer argument is that AFFF contamination from these four sites is somehow included in the State's non-AFFF case—even though the four sites are mentioned explicitly in the AFFF complaint, but are not mentioned at all in the non-AFFF complaint.

---

[2] 3M asserts that the State's non-AFFF complaint merely alleged general PFAS contamination "'in locations throughout Maine,'" and "did not list any specific contamination sites," 3M Br. at 9 (citing A38 ¶ 133), but this is not correct. *See* A69-72 ¶¶ 134, 141, 146, 149, 152.

[3] *Compare* A166, 168, 169, 170 ¶¶ 210, 224, 225, 232, 236, 239 *with* A69-72 ¶¶ 134, 141, 146, 149, 152.

3M removed the State's AFFF complaint to federal court on federal officer grounds and it was transferred to the AFFF MDL in the U.S. District Court for the District of South Carolina. The State did not object to the removal of the AFFF complaint—which means that 3M will be able to present its federal officer defense to that action in federal court.

## II. 3M Removes This Case by Alleging "Upon Information and Belief" That the Case Includes Sites Where AFFF May Be Commingling with Non-AFFF Contamination.

3M also removed the non-AFFF case, asserting federal officer jurisdiction and federal enclave jurisdiction. A11-13 ¶¶ 2-5. 3M's removal notice asserted that, "upon information and belief," AFFF from the four federal AFFF sites listed above "possibly" or "plausibly" may be commingled with non-AFFF contamination. A21-23 ¶¶ 26-30. According to 3M:

- AFFF from the Bangor Air National Guard Base may be commingled with non-AFFF contamination at the Bangor Wastewater Treatment Facility;

- AFFF from former Loring Air Force Base may be commingled with non-AFFF contamination in the environment and drinking water wells;

- AFFF from the Brunswick Naval Air Station may be commingled with non-AFFF contamination at sludge areas adjacent to the station; and

- AFFF from the Portsmouth Naval Shipyard may be commingled with non-AFFF contamination at the Kittery Landfill.

The non-AFFF complaint does not list any of these adjacent areas (*e.g.*, the Bangor Wastewater Treatment Facility) that have supposedly been contaminated by AFFF from the four federal sites, just as it does not mention the four federal sites themselves (*e.g.*, the Bangor Air National Guard Base).

In its removal notice, 3M pointed to evidence of alleged or actual PFAS contamination at these four adjacent areas, emphasized that AFFF and non-AFFF PFAS have the same chemistries and are mobile in the environment, and noted that the non-AFFF complaint includes general references to contamination in wastewater, at landfills, in sludge, and the like. From these premises, 3M surmises that (1) AFFF from the four federal sites may have commingled with non-AFFF contamination in the adjacent wastewater, landfills, and sludge, and (2) any such contaminated wastewater, landfills, and sludge must be part of the State's non-AFFF case, since the non-AFFF complaint refers in general terms to non-AFFF contamination in wastewater, landfills, and sludge. A20-23 ¶¶ 25, 26, 28-29, 30.

## III. The State Moves to Remand Based on Its AFFF Disclaimer and on Unrebutted Evidence That "Commingling" Did Not Occur.

Maine moved to remand. A225-240. The State argued that 3M failed to meet its burden to establish the elements of federal officer jurisdiction for three reasons.

*First*, the State pointed out that 3M's evidence did not in fact show any commingling of PFAS from AFFF and non-AFFF sources. A231-232. Instead, 3M's

evidence showed that the alleged releases are not known to have migrated at all from the relevant federal facilities (Loring and Brunswick), were caused by AFFF made by someone else (*i.e.*, were not a 3M product) (Bangor), or were not releases of AFFF at all (Portsmouth). A231-232.

*Second*, the State noted that none of the four adjacent areas that 3M identified as potential "commingling" sites were identified in the non-AFFF complaint as sites for which Maine seeks relief in this action. A232-233.

*Third*, the State relied on its disclaimer of relief for any AFFF-related injuries in this action. A233-237. The State reaffirmed this AFFF disclaimer in its motion: "Simply put, if it does turn out that contamination in *any* particular site or location is related to AFFF, then the State has disclaimed seeking a recovery in this action for that site or location." A233.

In its opposition to the remand motion, 3M offered no evidence to support its conjectural "commingling" theory and continued to rest on the conclusory assertion that "the use of MilSpec AFFF at military facilities in Maine *plausibly* contributed to the alleged PFAS contamination."[4]

In its reply papers, the State submitted a declaration from Victoria Eleftheriou, the Deputy Director of the Maine Department of Environmental Protection's

_____

[4] *See* Defendant 3M Company's Objection to State of Maine's Motion to Remand at 4 (June 15, 2023), ECF No. 34. "MilSpec" AFFF means AFFF manufactured to comply with military specifications.

("DEP's") Bureau of Remediation and Waste Management. Her declaration confirmed that the State had investigated PFAS contamination of sludge near the Brunswick Naval Air Station and at the Kittery municipal landfill, and this investigation found "no evidence of AFFF sources to the PFAS contamination" there. State Add. 7 ¶¶ 20-21.[5]

3M moved to strike the State's evidence (the Eleftheriou declaration). A9. The District Court denied 3M's motion to strike but provided 3M the opportunity to respond to it in a sur-reply. Order on Motion to Strike or to File Surreply and Motion for Expedited Briefing at 8 (July 5, 2023), ECF No. 44. 3M's sur-reply acknowledged that "removing defendants must rebut a plaintiff's proffer of evidence that putatively negates jurisdictional facts,"[6] but did not come forward with any evidence or facts to support its commingling allegations.

## IV. The District Court Remanded the Case Based on the State's Express and Unambiguous AFFF Disclaimer.

The District Court granted the State's motion to remand. Add. 22. First, the District Court held that the State had made an "express and enforceable disclaimer

---

[5] Since 3M's own evidence stated that the Bangor facility discharged AFFF made by another corporation and was silent on whether the Loring contamination has traveled off base, the declaration did not address those allegations.

[6] 3M Company's Surreply in Opposition to Motion to Remand at 3 (July 12, 2023), ECF No. 45.

against seeking recovery in this lawsuit from the defendants for claims relating to aqueous film-forming foam" in both its complaint and its motion to remand filings. Add. 1, 17, 22. The District Court held that this disclaimer was "express, unambiguous, and plain." Add. 21. The District Court therefore held that the "federal officer defense is not applicable":

> [T]he State has taken upon itself the burden as part of its case to demonstrate that the source of contamination in its Non-AFFF lawsuit is not a AFFF source. If the factfinder concludes that the State has failed to meet its burden concerning the source, 3M will prevail. This effectively means that the federal officer defense will not be applicable in the State's Non-AFFF lawsuit because the State by its express disclaimer has imposed upon itself a burden to demonstrate that its claim involves Non-AFFF sources.

Add. 21-22.[7]

Separately and concurrently with the motion to remand briefing, 3M sought to persuade the Judicial Panel on Multi-District Litigation ("JPML") to transfer the State's non-AFFF case to the AFFF MDL—which was effectively an attempt to get the case transferred to the MDL before the District Court in Maine could rule on the State's remand motion. The day after the State filed its remand motion in the District Court, 3M filed a notice asking the JPML clerk to transfer the non-AFFF case to the

---

[7] The District Court also found that "federal enclave jurisdiction does not plausibly exist because 'the doctrine of federal enclave jurisdiction generally requires that *all* pertinent events take place on a federal enclave.'" Add. 22 (quoting *Rhode Island v. Shell Oil Prods. Co.*, 35 F.4th 44, 58 (1st Cir. 2022) ("*Rhode Island II*")). 3M does not appeal this part of the District Court's decision.

MDL as a "tag-along" action. MDL No. 2873 ECF No. 1923. After the JPML's clerk declined to transfer the case because it "was not appropriate for inclusion in this MDL," 3M moved the JPML for a transfer notwithstanding the Clerk's decision.[8] A few weeks later—and a few days after the District Court's decision remanding the case to state court—the JPML denied transfer because of the District Court's remand order. A10, Order Denying Transfer (J.P.M.L. Aug. 3, 2023), MDL No. 2873, ECF No. 2021.

---

[8] *See* A7 (Notice to Counsel, *In re AFFF*, MDL No. 2873 (J.P.M.L May 24, 2023)); Defendant 3M Company's Motion to Transfer Tag-Along Action *State of Maine v. 3M Co., et al*., MDL No. 2873, ECF No. 1933.

# SUMMARY OF THE ARGUMENT

The District Court properly remanded this case to state court because the State's complaint expressly and unambiguously disclaimed seeking relief for AFFF contamination. Add. 21-22. This Court has held that such a disclaimer means there is "simply no nexus between anything for which [the plaintiff] seeks damages and anything the [defendant] allegedly did at the behest of a federal officer." *See Rhode Island v. Shell Oil Prods. Co.*, 979 F.3d 50, 60 (1st Cir. 2020) ("*Rhode Island I*"), *vacated on other grounds*, 141 S. Ct. 2666 (2021). Many other federal courts have reached the same result.

3M also has failed to carry its burden to prove that there is AFFF at any locations for which the State seeks relief in this action. This is for at least two reasons. First, none of the four federal sites on which 3M relies is identified in the State's non-AFFF complaint—instead, these sites are listed in the State's AFFF complaint. *Compare* A69-72 ¶¶ 134, 141, 146, 149, 152 *with* A166, 168, 169, 170 ¶¶ 210, 224, 225, 232, 236, 239. And even the areas adjacent to these four federal sites are not listed in the non-AFFF complaint. Even if there were AFFF at these adjacent locations, they are not part of the State's non-AFFF case.

Second, 3M has failed to satisfy its burden to show by a preponderance of the evidence that 3M's AFFF has in fact contaminated these four adjacent areas. *See Cnty. of San Mateo v. Chevron Corp.*, 32 F.4th 733, 760 (9th Cir. 2022) (defendants

"have not carried their burden of proving by a preponderance of the evidence that they were 'acting under' a federal officer"), *cert. denied sub nom. Chevron Corp. v. San Mateo Cnty., California*, 143 S. Ct. 1797 (2023); *Rhode Island II*, 35 F.4th at 50 ("leaning hard" on *San Mateo*). The AFFF released at the Bangor National Guard Facility was not made by 3M, so 3M cannot possibly use its purported federal officer defense there. And although there was an AFFF spill at Loring Air Force Base, there is no evidence that it migrated offsite to the adjacent area that supposedly could be included in the State's non-AFFF case. A231-232. With respect to two sludge-spreading sites south of Brunswick Naval Air Station, the State submitted sworn testimony from DEP that it "is not aware of any PFAS contamination" of any kind at those spreading sites. State Add. 7 ¶ 20. And finally, there is no evidence that the Portsmouth Naval Shipyard sent any AFFF to the Kittery landfill; in fact, DEP has confirmed that "there is no evidence of AFFF sources" of any kind at the landfill. State Add. 7 ¶ 21.

In short, 3M's removal is based on a fictional defense to claims that the State has disavowed, and on speculation about AFFF contamination in places where *all* the evidence shows clearly that no relevant AFFF contamination exists. The Court should affirm the District Court's decision to remand this case to state court.

**ARGUMENT**

## I.   Legal Standard.

Federal courts are "courts of limited jurisdiction" that "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The federal officer removal statute's "broad language is not limitless" even though it may be liberally construed. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007). To establish federal officer jurisdiction, 3M has the burden to establish that it was "acting under a federal officer's authority," that it "will assert a colorable federal defense to the lawsuit," and that there is "a nexus between the allegations in the complaint and conduct undertaken at the behest of a federal officer." *Rhode Island I*, 979 F.3d at 59 (quotation marks and citation omitted). 3M must satisfy this burden by a preponderance of the evidence. *See Cnty. of San Mateo*, 32 F.4th at 760 (defendants "have not carried their burden of proving by a preponderance of the evidence that they were 'acting under' a federal officer"); *Leite v. Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014) (defendant has burden of proving federal officer jurisdiction by a preponderance of the evidence); *United Food & Com. Workers Union, Loc. 919, AFL-CIO v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994) (jurisdictional allegations must be

supported by "competent proof" and justified by a "preponderance of the evidence") (internal quotation marks omitted).[9]

"Considerations of comity make [courts] reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 21 n.22 (1983); *accord Puerto Rico v. Eli Lilly & Co.*, 2023 WL 4830569, at *1 (D.P.R. July 13, 2023) (applying *Franchise Tax Board* in federal officer removal), *appeals pending* Nos. 23-1612, 23-1613 (1st Cir.). Indeed, when a state brings a claim in its own courts alleging only state law claims, "the claim of sovereign protection from removal arises in its most powerful form." *Nevada v. Bank of Am. Corp.*, 672 F.3d 661, 676 (9th Cir. 2012) (quotation marks omitted).

The Court reviews *de novo* a "district court's decision to remand a case to state court." *Rhode Island I*, 979 F.3d at 59 (quotation marks omitted).

## II. The State's Express Disclaimer of Any Relief for Injuries Caused by AFFF Precludes Federal Officer Jurisdiction.

The District Court properly granted remand because of the State's express disclaimer of any recovery for contamination related to AFFF. This disclaimer

_____

[9] 3M argues that this Court must accept at face value 3M's jurisdictional allegations, regardless of whether the plaintiff submits evidence (as the State has done here) showing that the allegations are unfounded. 3M Br. at 17-19. But this is not the law, as the cases cited here show and as further discussed below. *See* § III, *infra*.

negates any nexus between the complaint and 3M's purported production of AFFF for the federal government, making 3M's government contractor defense irrelevant. This "express, unambiguous and plain" disclaimer stated: "The State is not seeking to recover through this Complaint any relief for contamination or injury related to Aqueous Film Forming Foam." A43 ¶ 15; Add. 21.[10]

## A. This Court and Many Others Have Remanded Cases Based on Similar Disclaimers.

This Court and other federal courts have repeatedly recognized and enforced such disclaimers. For example, in *Rhode Island I*, a state sued oil and gas companies in state court under state tort law for contributing to climate change through their production and sale of fossil fuel products. 979 F.3d at 54. Defendants sought to base federal officer jurisdiction on various contracts with the federal government, including a contract to sell oil on U.S. Naval bases. *Id.* at 59. This Court held that the contract did not give rise to federal officer jurisdiction because the plaintiff disclaimed relief for sales of fossil fuels on federal lands. The "contract only

---

[10] The State repeated this disclaimer twice more as part of its motion to remand. A233 ("Simply put, if it does turn out that contamination in *any* particular site or location is related to AFFF, then the State has disclaimed seeking a recovery in this action for that site or location."); State of Maine's Reply in Support of its Motion to Remand (June 22, 2023) at 4 ("To the extent that, after any investigation, there might be evidence of commingling between AFFF and non-AFFF PFAS at a specific site, the State would not be able to recover damages for those sites *in this case*."), ECF No. 38.

implicates [activities] on Naval bases, which are explicitly not a part of Rhode Island's case," and so "[t]here is simply no nexus between anything for which Rhode Island seeks damages and anything the oil companies allegedly did at the behest of a federal officer." *Id*. at 60. 3M's brief does not address *Rhode Island I* at all, but it is right on point.

The Third Circuit reached the same conclusion in similar climate litigation. *See City of Hoboken v. Chevron Corp.*, 45 F.4th 699, 713 (3d Cir. 2022). There the oil and gas companies invoked various business connections to the federal government, including operation of the Strategic Petroleum Reserve and the production of specialty fuels for the military. But the court rejected these purported bases for federal officer jurisdiction because the plaintiffs' complaints "insist that they are not suing over emissions caused by fuel provided to the federal government." *Id*.

The New Hampshire federal district court also reached this conclusion in a case very much like this one, *i.e.*, a PFAS case against 3M by a state that sought relief only with respect to non-AFFF claims. *New Hampshire*, 2023 WL 2691376, at *8. New Hampshire "expressly disclaimed any recovery for contamination caused by AFFF." *Id.* at *3. The court held that "3M has not shown that a 'nexus' exists between the State's claims in this case and 3M's alleged acts under federal authority," because New Hampshire "has consistently disclaimed any recovery for contamination resulting from 3M's production of AFFF." *Id.* at *8. Because of the

disclaimer, "there is no scenario under which 3M could be found liable for any damages caused by AFFF." *Id.* The court explained:

> If the evidence, for example, shows that AFFF caused any of the damages in this case, the portion attributable to AFFF would be subtracted from any damages awarded the State. And if no apportionment is possible, no damages could be awarded. 3M would prevail without any need to assert a defense premised on its acts under federal authority. To the extent AFFF is relevant, its presence in the contamination could eliminate recovery for the State—regardless of why or for whom 3M made it.

*Id.* 3M argues that the *New Hampshire* court improperly required a "causal connection" between the state's injury and AFFF, whereas the current version of the federal officer statute has been interpreted merely to require a "nexus" between the relevant injury and the federal product. 3M Br. at 40. But the court in *New Hampshire* plainly stated that remand was warranted "because 3M has not shown that a 'nexus' exists between the State's claims in this case and 3M's alleged acts under federal authority." 2023 WL 2691376, at *8. The court applied the correct standard, and it concluded that the disclaimer precluded federal officer jurisdiction.

More recently, another federal court remanded a non-AFFF PFAS case by a state against 3M where the complaint disclaimed recovery for AFFF. *Illinois ex rel. Raoul v. 3M Co.*, 2023 WL 6160610, at *6 (C.D. Ill. Sept. 21, 2023), *appeal pending* No. 23-3031 (7th Cir.). The complaint disclaimed recovery for "any PFAS that have contaminated Illinois' environment or natural resources from [AFFF] PFAS." *Id.* at *1. The court held that there was no nexus: "once Defendant shows that a certain

portion of the contamination stemmed from MilSpec AFFF released from [a source], that contamination is eliminated from the case, whether or not that MilSpec AFFF was produced according to rigorous military specifications and the government was warned of any dangers of which it was unaware." *Id.* at *6.

This conclusion in *Rhode Island I*, *Hoboken*, *New Hampshire*, and *Illinois* has been echoed in many other cases where courts have held that there is no federal officer jurisdiction when a plaintiff has specifically limited its claims to injuries from products other than those allegedly made at the direction of a federal officer.[11] As these decisions have reasoned, to allow removal of such cases "would affirm [the] right to assert a defense against a claim that does not exist." *Kelleher*, 2015 WL 7422756, at *2. In short, under Maine's "express, unambiguous and plain" disclaimer, if the evidence connects an AFFF source to the State's damages at a specific location, 3M would prevail on that part of the State's claim without needing to assert a federal officer defense. Add. 21. Put differently, 3M is not entitled to

---

[11] *See, e.g.*, *Batchelor v. Am. Optical Corp.*, 185 F. Supp. 3d 1358, 1363-65 (S.D. Fla. 2016); *Kelleher v. A.W. Chesterton Co.*, 2015 WL 7422756, at *2-3 (S.D. Ill. Nov. 23, 2015); *Maguire v. A.C.&S., Inc.*, 2015 WL 4934445, at *2 (S.D.N.Y. Aug. 18, 2015); *Hayden v. 3M Co.*, 2015 WL 4730741, at *3-4 (E.D. La. Aug. 10, 2015); *Lockwood v. Crane Co.*, 2012 WL 1425157, at *2 (C.D. Cal. Apr. 25, 2012); *Pratt v. Asbestos Corp. Ltd.*, 2011 WL 4433724, at *1 (N.D. Cal. Sept. 22, 2011); *Hopkins v. Buffalo Pumps, Inc.*, 2009 WL 4496053, at *6-7 (D.R.I. Dec. 1, 2009); *Farrow v. Foster Wheeler Energy Corp.*, 2008 WL 11508373, at *2 (W.D. Wash. Aug. 28, 2008); *Sheppard v. Northrop Grumman Sys. Corp.*, 2007 WL 1550992, at *7 (E.D. La. May 24, 2007); *Westbrook v. Asbestos Defs. (BHC)*, 2001 WL 902642, at *3 (N.D. Cal. July 31, 2001).

demand a federal forum to adjudicate a defense to a claim that the plaintiff has disavowed any intention of bringing in a particular case.

### B. 3M's Arguments to Ignore the State's Disclaimer Are Unfounded.

3M says the disclaimer is ineffective, but 3M is wrong on both the facts and the law. 3M's arguments fall into five categories:

*First*, 3M argues that, if the case is remanded, it will have to assert what is effectively an AFFF causation defense in state court, to show that the State's PFAS contamination came from AFFF sources. 3M Br. at 20-24. But that is simply not true. If the State fails to prove that the PFAS contamination came from a non-AFFF source at a particular location, then it cannot recover for that location, without the need for 3M to mount any kind of government contractor defense. *See* Add. 21-22; *Illinois*, 2023 WL 6160610, at *6; *New Hampshire*, 2023 WL 2691376, at *8. 3M does not get to demand a federal forum to hear a defense to a claim that the State has disclaimed in the first place.

*Second*, 3M relies on cases where a disclaimer was found to be ineffective, *see* 3M Br. at 21-23, but (unlike the State) the plaintiffs in those cases made allegations that contradicted their disclaimers. For example, in *Baker v. Atlantic Richfield Co.*, 962 F.3d 937 (7th Cir. 2020), which 3M says is "on all fours with this case," 3M Br. at 22, the plaintiffs contradicted their own disclaimer: "Although the Residents purport to disclaim that their lawsuit is about DuPont's manufacture of Freon-12 for

the government during this time, the fact is that DuPont alleges that its Freon-12

production resulted in waste streams that contained lead and arsenic. Those are the

two main toxins the Residents claim harmed them. The Residents cannot have it both

ways." *Id.* at 945 n.3. 3M's other cases are similar.[12] Where a disclaimer is

unambiguous and does not contradict other allegations in the complaint, "federal

courts have consistently granted motions to remand based on a plaintiff expressly

disclaim[ing] the claims upon which federal officer removal was based." *Batchelor*,

185 F. Supp. 3d at 1363 (internal quotation marks omitted). That is the situation

here, where the District Court properly found Maine's disclaimer to be

"unambiguous." Add. 21.

**Third**, 3M relies on *Nessel v. Chemguard, Inc.*, 2021 WL 744683 (W.D. Mich.

Jan. 6, 2021), but that case is also very different. In *Nessel*, the plaintiffs explicitly

sought to recover for injuries caused by "commercial" AFFF used by civilians

(allegedly not subject to a federal contractor defense), but disclaimed seeking relief

for contamination connected to "MilSpec" AFFF used by the military (allegedly

subject to the federal defense). By contrast, in this action Maine disclaims relief from

---

[12] *See Curiale v. A. Clemente, Inc.*, 2023 WL 4362722, at *6 (D.N.J. July 5, 2023)
("Plaintiff did not disclaim allegations related to the chemicals that are subject to the
government contract."); *Marley v. Elliot Turbomachinery Co.*, 545 F. Supp. 2d 1266,
1274 (S.D. Fla. 2008) ("disclaimer was circular"); *Batchelor*, 185 F. Supp. 3d at 1364
n.1 (S.D. Fla. 2016) (disclaimer in *Marley* was contradictory because plaintiff "asserted
general disclaimers with respect to *all* federal claims while, at the same time,
pursuing asbestos claims based on plaintiff['s] naval service").

*any* kind of AFFF contamination, whether commercial or MilSpec. 3M says this difference is irrelevant, 3M Br. at 32, but other courts have disagreed, including the District Court in this case. *See* Add. 20-21; *New Hampshire*, 2023 WL 2691376, at *9. Critically, the plaintiffs in *Nessel* provided "no evidence in support" of their allegation that the injuries from commercial AFFF and MilSpec AFFF would be distinguishable. *Nessel*, 2021 WL 744683, at *3. But in this case, the State submitted evidence that AFFF and non-AFFF PFAS contamination sites *are* distinct and that it is a "standard practice" to distinguish between them. State Add. 3-5 (Decl. of V. Eleftheriou) at ¶¶ 9, 13. More fundamentally, *Nessel* contradicts the many decisions in which disclaimers have been given effect, including this Court's decision in *Rhode Island I*, and cases like *New Hampshire* and *Illinois* where 3M's attempt to ignore an AFFF disclaimer was specifically rejected. On this basis, two courts have concluded that *Nessel* is simply incorrect. *See Illinois*, 2023 WL 6160610, at *6 (rejecting *Nessel*); *Grosch v. Tyco Fire Prods. LP*, 2023 WL 5993548, at *5, *7 n.6 (D. Ariz. Sept. 15, 2023) (same; remanding commercial AFFF case that disclaimed recovery for MilSpec AFFF). *Nessel* is distinguishable and should not be followed here.

**Fourth**, 3M tries but fails to distinguish several cases on which the District Court relied in which asbestos plaintiffs disclaimed damages from exposure during their military careers. According to 3M, those decisions do not consider the situation here,

where the defendant seeks "to show that a plaintiff's injury was caused by a product developed for the military." 3M Br. at 34. But in fact they considered exactly that, which was the whole point of the attempted removals.[13]

***Finally***, 3M argues that Maine's disclaimer is not sufficiently effective or unambiguous because Maine "may" try to hold it liable for both AFFF and non-AFFF contamination at the same site under a theory of joint-and-several liability. 3M Br. at 24-30. 3M posits two variations of this theory. In one version, 3M argues that Maine "may" assert that the non-AFFF and AFFF contamination at a specific site is an indivisible injury and seek to hold 3M jointly and severally liable for its contribution of non-AFFF PFAS to that site, notwithstanding the presence of AFFF.

---

[13] *See Batchelor*, 185 F. Supp. 3d at 1362 ("In its Notice of Removal, Westinghouse states that this Court has jurisdiction under 28 U.S.C. § 1442(a)(1) because Plaintiff could have been exposed to asbestos on the U.S.S. Gato, thereby providing a basis for Westinghouse to assert a colorable federal defense based on its role as a government contractor."); *Hayden*, 2015 WL 4730741, at *2 ("Carrier removed the case to this Court on the grounds that [plaintiff's] testimony indicates the intent to pursue a claim against Carrier for exposure resulting from contact with the 'force draft blowers' while he served aboard the USS EDSON."); *Kelleher*, 2015 WL 7422756, at *1 (Boeing removed based upon plaintiff's exposure to asbestos during his military career); *Madden v. A.H. Voss Co.*, 2009 WL 3415377, at *1 (N.D. Cal. Oct. 21, 2009) (Defendant "removed this matter on the grounds that Plaintiff's alleged occupational exposure to asbestos occurred aboard various United States Naval ships . . . "); *see also Dougherty v. A O Smith Corp.*, 2014 WL 3542243, at *16 (D. Del. July 16, 2014) (agreeing with defendant that disclaimer ineffective because complaint sought "to hold Crane liable for the alleged asbestos exposure relating to [plaintiff's] work for the Navy" but recommending remand on other grounds when plaintiff issued new disclaimer after removal), *report and recommendation adopted*, 2014 WL 4447293 (D. Del. Sept. 8, 2014).

*Id.* In the other version of 3M's argument, 3M says Maine "may" seek to recover only for injuries caused by non-AFFF contamination at a location where there is both AFFF and non-AFFF PFAS. *Id.* But either way, Maine's disclaimer was not "vague" on these points, 3M Br. at 28, but (as the District Court found, Add. 21) "express, unambiguous, and plain" that the State cannot recover at all in this case for any specific site where the State does not meet its burden to prove that the PFAS contamination is from non-AFFF sources. The State has said it before and will say it again here: it does not seek to recover in this case for any damages resulting from AFFF contamination.[14]

The bottom line is that the overwhelming weight of authority supports the District Court's decision to give effect to the State's disclaimer in this action, including this Court's decision in *Rhode Island I* and multiple decisions in other non-AFFF cases against 3M specifically. 3M's arguments to disregard this authority are based on distinguishable case law and a vain quest for loopholes in a disclaimer that is unambiguous. The Court should affirm the remand order.

_____

[14] 3M asserts that the state of New Hampshire is seeking to hold 3M jointly and severally liable in its non-AFFF case for all PFAS at any sites where there is commingled PFAS from both AFFF and non-AFFF and implies that Maine will adopt the same position. 3M Br. at 29-30. But even if 3M's recitation of New Hampshire's position is correct, Maine's position would not be identical to that position: subject to this Court's ruling in *New Hampshire*, Maine is excluding from its non-AFFF case any PFAS site that has commingled AFFF and non-AFFF PFAS contamination.

## III. The Evidence Shows That 3M's AFFF Has Not Reached Any Sites Even Arguably Included in This Action.

An alternative basis for affirmance is that 3M has failed to meet its evidentiary burden, which is to show (not simply allege) that it is plausible that AFFF has commingled with PFAS from non-AFFF sources at any site included in this lawsuit.

The District Court did not reach this objection to federal jurisdiction, but, like 3M, the State submits that this Court should decide this issue now in the event the Court for any reason does not find the disclaimer dispositive. *See* 3M Br. at 35. The Court may affirm an order finding a lack of subject matter jurisdiction "on any ground made apparent by the record (whether or not relied upon by the lower court)."[15] Where the "issues have been fully briefed" and to avoid the possibility of "another appeal based solely on jurisdictional grounds," it is appropriate for this Court to resolve the State's other objection to federal jurisdiction rather than ask the District Court to decide the issue on remand. *See Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 254 (4th Cir. 2021); *see also Moore v. Elec. Boat Corp.*, 25 F.4th 30, 34 (1st Cir. 2022) (deciding federal officer removal ground not addressed by the district court).

---

[15] *Aguilar v. U.S. I.C.E.*, 510 F.3d 1, 8 (1st Cir. 2007); *see also In re Montreal, Maine & Atl. Ry.*, 888 F.3d 1, 8 n.4 (1st Cir. 2018) (under *de novo* review the Court is "at liberty to affirm a district court's judgment on any ground made manifest by the record.") (quotation marks omitted).

3M's attempt to connect this case to sites with purportedly "commingled" contamination should be rejected for four reasons, over and above the disclaimer discussed above.

*First*, none of the four locations with supposedly "commingled" contamination —the Bangor wastewater treatment facility, former Loring Air Force Base, two sludge areas "adjacent" to the Brunswick Naval Air Station, and a municipal landfill in Kittery—is even identified in the State's non-AFFF complaint. A69-72 ¶¶ 134, 141, 146, 149, 152. The complaint does refer to non-AFFF contamination at waste-water treatment plants and sludge sites generally, *see* A50-51 ¶¶ 50, 54, with the specific sites to be identified in discovery, but does *not* allege that 3M is liable in this action for contamination at the Bangor wastewater treatment facility specifically, or for any sludge sites in Brunswick. The complaint also alleges non-AFFF contamination at specific landfills in Maine (*e.g.*, the Augusta Landfill, the Juniper Ridge Landfill, and various landfills associated with the paper industry), but makes no allegation about the Kittery landfill. *See* A69 ¶ 134(e). There is also no reference in the complaint to any contamination at sites near the Loring Air Force Base. A69-72 ¶¶ 134, 141, 146, 149, 152. And, in fact, all four locations *do* feature prominently in the State's AFFF complaint. A166 ¶ 210. If the four areas with allegedly commingled contamination have a "nexus" to any lawsuit, it is to the State's AFFF lawsuit, and not to this one. 3M says, incorrectly, that the non-AFFF

complaint should be read to include these areas because the complaint does "not list any specific contamination sites." 3M Br. at 9 (citing A38 ¶ 133). Jurisdiction cannot be based on contamination at locations that are not even identified in the complaint.

*Second*, 3M has failed to identify Maine locations where commingling of its AFFF and non-AFFF contamination has *in fact* occurred. The State demonstrated that there is no plausible commingling at any of the four locations, including by submitting a sworn affidavit from a DEP witness. 3M did not come forward with any evidence to support its jurisdictional facts after they were contested by the State and does not even bother to defend them in any detail in its brief. *See* 3M Br. at 36-37. What 3M is left with is the allegations and exhibits from its notice of removal, which in fact fail to show any relevant AFFF contamination:

- **Bangor.** 3M's Notice of Removal alleged that 1,200 gallons of AFFF were released from an Army National Guard facility to Bangor's wastewater treatment plant in 2011. A21-22 ¶ 28. But the report 3M relies on states that this AFFF was made by another company called Buckeye, which is a defendant in the State's AFFF action (but not here). *See* A22 ¶ 28; State Add. 11, *Final Preliminary Assessment Report Bangor Training Site, Bangor, Maine* (Jan. 2020), at 17. There is no nexus between Buckeye's AFFF and the State's claims against 3M (and against its co-defendants) here. 3M

cannot establish that it has a colorable federal defense to this action when the "defense" in question belongs to another corporation, as 3M admits.[16]

- *Loring.* 3M next relies on a preliminary environmental analysis that identifies 21 areas at the former Loring Air Force Base where AFFF may have been released. A22 ¶ 28. But the study did not connect any of these potential releases to sites with non-AFFF contamination.

- *Brunswick.* 3M's removal notice alleges that there are two sites where PFAS-contaminated sludge may have been deposited (*e.g.*, as a soil additive), and which are supposedly "adjacent" to the Brunswick Naval Air Station. A22 ¶ 28. But this assertion appears to be based on nothing more than a crude estimate from a Maine Department of Environmental Protection mapping tool—and the map seems to show that the sites are at least a mile away from the former air station. *See Maine DEP PFAS Investigation*

---

[16] *See Moore*, 25 F.4th at 34 (removing party "bears the burden under § 1442(a)(1)" to establish that "*it was acting* under a federal officer's authority") (emphasis added; internal citations and quotation marks omitted); *New Hampshire*, 2023 WL 2691376, at *7 ("removing party" must show that "*it* acted under a federal officer") (emphasis added; internal quotation marks omitted); *Hilbert v. Aeroquip, Inc.*, 486 F. Supp. 2d 135, 143 n.5 (D. Mass. 2007) ("removing defendant must be a federal officer or a person acting under a federal officer") (internal quotation marks omitted). For 3M's concession on this point, *see* A16 ¶ 17 (removal is appropriate where "*the removing defendant* establishes" that "*its* actions taken pursuant to a federal officer's direction have a causal nexus") (emphasis added); A27 ¶ 38 (alleging that State's claims "are for or relate to (at least in part) *3M's* design, manufacture, and sale of MilSpec AFFF") (emphasis added).

*(Formerly the "Septage and Sludge Map")*, https://tinyurl.com/523d323y. DEP's sworn testimony states that it "is not aware of any PFAS contamination" at what appear to be the relevant sludge spreading sites. State Add. 7 ¶ 20. In addition, sludge sites typically become contaminated because PFAS enters the sludge *before* it is trucked in and applied onsite. *Id.*; A49 ¶ 47 (describing sludge application). 3M provides no basis (and there is none) for believing that any PFAS contamination at these sites is a result of AFFF migration from a federal facility a mile or more away.

- **Kittery.** Finally, 3M asserts that the Portsmouth Naval Shipyard sent waste including "solvents" and "paints" to a municipal landfill in Kittery where PFAS has been detected. *See* A22-23 ¶ 29; State Add. 17, *PFAS Kittery Landfill Letter* (Dec. 14, 2021) at 4. From this premise, 3M asserts that the shipyard "plausibly" sent AFFF to the landfill. A22-23 ¶ 29. But there is no evidence that the federal facility sent any AFFF to the Kittery landfill; 3M's assertion is pure speculation. DEP's investigation of the sources of PFAS at the Kittery landfill found "no evidence of AFFF sources to PFAS contamination" there, as the Kittery landfill "does not accept liquid waste such as AFFF concentrate or AFFF concentrate mixed with water." State Add. 7 ¶ 21. 3M has come forward with no evidence to dispute these facts.

- ***General "migration" allegations.*** 3M also points to its assertions that "MilSpec AFFF has migrated from military facilities in Maine to elsewhere in the state" and that PFAS "migrate[s] long distances through soil and groundwater." 3M Br. at 38. But these highly generalized and conclusory assertions do not demonstrate a plausible, evidentiary connection between the non-AFFF contamination alleged in the complaint and actual contamination from AFFF. *See New Hampshire*, 2023 WL 2691376, at *8 (AFFF "disclaimer is effective and eliminates the connection between the State's broad statewide claims and 3M's production of MilSpec AFFF").

In short, 3M's allegations and exhibits from its notice of removal plainly fail to show any relevant AFFF "commingling."

***Third***, 3M is wrong about its evidentiary burden. 3M argues that once it makes plausible allegations in support of federal officer removal, it need not introduce any evidence of its own, regardless of how much the State's evidence undercuts the original allegations. 3M Br. at 37. But where (as here) a plaintiff contests a defendant's factual allegations, the defendant must establish federal officer jurisdiction with competent evidence and by a preponderance of the evidence. *See Rhode Island I*, 979 F.3d at 59 (rejecting federal officer jurisdiction when evidence presented only had "the flavor of federal officer involvement"); *Cnty. of San Mateo*, 32 F.4th at 760 (applying preponderance of the evidence standard and holding that defendants failed

to establish they were "acting under" a federal officer).  And other courts have, at a minimum, considered extrinsic evidence negating the defendant's allegations.[17]

Many of 3M's authorities confirm that 3M has the burden of proof—at least, where the plaintiff (like the State here) submits evidence rebutting the defendant's jurisdictional allegations *See Dart Cherokee Basin Operating, LLC v. Owens*, 574 U.S. 81, 88 (2014) ("when a defendant's assertion of the amount in controversy is challenged," then "both sides submit proof and the court decides, by a preponderance of the evidence, whether the amount-in-controversy requirement has been satisfied"); *Cuomo v. Crane Co.*, 771 F.3d 113, 117 (2d Cir. 2014) (court must "ensure the existence of some competent evidence supporting a 'colorable' federal defense"); *§ 3733 Procedure for Removal—Content and Amendment of the Notice of Removal*, 14C FED. PRAC. & PROC. JURIS. § 3733 (Rev. 4th ed.) (evidence "is required" for jurisdiction "when the plaintiff contests, or the district court questions, the defendant's allegations"); 3M Br. at 19 (relying on these authorities).[18]

---

[17] *City of Hoboken*, 45 F.4th at 713 (rejecting federal officer removal jurisdiction based on estimate by scientist *amicus curiae* that federal officers were responsible for a tiny fraction of the world's energy consumption); *State ex rel. Tong v. Exxon Mobil Corp.*, 83 F.4th 122, 145 (2d Cir. 2023) (same, citing the scientist from *Hoboken*); *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 231 (4th Cir. 2022) (rejecting federal officer jurisdiction based on close reading of underlying federal contracts).

[18] 3M cites *Isaacson v. Dow Chem. Co.*, 517 F.3d 129 (2d Cir. 2008), Br. at 36, but the plaintiffs there did not submit evidence to contest the jurisdictional facts.

The one case that is even arguably to the contrary is *Lu Junhong v. Boeing Co.*, 792 F.3d 805 (7th Cir. 2015), but even in that case the court considered extrinsic evidence. 3M seizes on the court's statement that "[j]urisdictional allegations control unless it is legally impossible for them to be true." *Id.* at 815. But the court said this about statements supporting admiralty jurisdiction, not federal officer jurisdiction. Moreover, 3M ignores that the court in *Lu Junhong* actually *did* consider record evidence (an NTSB governmental report), which made it "possible for Boeing to show that this accident was caused by, or became inevitable because of, events that occurred over navigable water." *Id.* Since *Lu Junhong*, the Seventh Circuit has emphasized the general rule that, "[w]hen considering a factual challenge to jurisdiction, courts may properly look beyond the jurisdictional allegations of the [pleading asserting jurisdiction] and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022) (quotation marks omitted). In short, neither *Lu Junhong* nor any of 3M's other cases stand for the remarkable proposition that this Court has no choice but to accept at face value jurisdictional allegations that the State has comprehensively disproven based on evidence that 3M has not even tried to rebut.

**Fourth**, 3M's policy arguments about duplicative litigation are both untrue and insufficient to create federal jurisdiction. 3M says that affirming the remand order

would result in wasteful, duplicative litigation because it would be forced to simultaneously defend "identical claims" in separate courts. 3M Br. at 40. But this is certainly not a situation where there are "different standards governing claims asserted on identical facts." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006). Instead, the AFFF and non-AFFF cases both seek to apply the same Maine law, but to different sites, different products, different defendants (albeit with some overlap) and different facts. More fundamentally, 3M's policy argument is irrelevant to whether 3M has satisfied the test for federal officer removal and accepting it would make a mockery of federal courts' obligation to avoid "snatch[ing] cases which a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Bd.*, 463 U.S. at 21 n.22. 3M's desire to litigate both cases in federal court does not remotely constitute a "clear rule" authorizing jurisdiction. And if anyone has wasted judicial resources, it is 3M, which has cooked up conjectural allegations to remove a case that manifestly has no connection to 3M's AFFF sales to the federal government.

# CONCLUSION

The State respectfully requests that this Court affirm the District Court's remand

of this action to state court.

Dated: January 31, 2024

Respectfully submitted,

*/s/ Scott Boak*
Scott Boak
(First Circuit Bar No. 84894)
Robert Martin
(First Circuit Bar No. 1206428)
Assistant Attorneys General
OFFICE OF THE MAINE
ATTORNEY GENERAL
6 State House Station
Augusta, MA 04333
(207) 626-8566
Scott.Boak@maine.gov
Robert.Martin@maine.gov

*/s/ Kyle J. McGee*
Kyle J. McGee
(First Circuit Bar No. 1209227)
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
(302) 622-7000
kmcgee@gelaw.com

*/s/ Matthew F. Pawa*
Matthew F. Pawa
(First Circuit Bar No. 98995)
Benjamin A. Krass
(First Circuit Bar No. 1203920)
SEEGER WEISS LLP
1280 Centre Street, Suite 230
Newton, MA 02459
(617) 641-9550
mpawa@seegerweiss.com
bkrass@seegerweiss.com

*Counsel for Plaintiff-Appellee,*
*State of Maine*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(1) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 8324 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f), and

(2) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word and set in Times New Roman font in a size equivalent to 14 points or larger.

Dated: January 31, 2024

Respectfully submitted,

*/s/ Matthew F. Pawa*
Matthew F. Pawa
(First Circuit Bar No. 98995)

*Counsel for Appellee State of Maine*

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on the undersigned date, I caused a copy of the foregoing document to be filed with the Clerk of the Court of the United States Court of Appeals for the First Circuit via the Court's Electronic Filing System, which will electronically serve a copy on the counsel of record for all parties.

Dated: January 31, 2024

Respectfully submitted,

*/s/ Matthew F. Pawa*
Matthew F. Pawa
(First Circuit Bar No. 98995)

*Counsel for Appellee State of Maine*

# ADDENDUM

**APPELLEE ADDENDUM ("STATE ADDENDUM")**
**TABLE OF CONTENTS**

Declaration of Victoria Eleftheriou in Support of Plaintiff's Opposition to
Defendant 3M Company's Motion to Stay, and in Support of the State
of Maine's Motion to Remand (June 15, 2023)..........................................State Add.1


Army Corps of Engineers, *Final Preliminary Assessment Report Bangor
Training Site,* Bangor*, Maine*, Excerpts (January 2020) ...........................State Add.8


PFAS Kittery Landfill Letter, Excerpts (December 14, 2021).................State Add.14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

STATE OF MAINE,

Plaintiff,

v.

3M COMPANY, EIDP, INC., *formerly known as* E. I. DU PONT DE NEMOURS AND COMPANY, THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, CORTEVA, INC., DUPONT DE NEMOURS, INC., and DOW INC.,

Defendants.

Civil Action No.: 2:23-cv-00210-JAW

**DECLARATION OF VICTORIA ELEFTHERIOU IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT 3M COMPANY'S MOTION TO STAY AND IN SUPPORT OF THE STATE OF MAINE'S MOTION TO REMAND**

I, Victoria Eleftheriou, hereby declare as follows:

1.      I am the Deputy Director of the Maine Department of Environmental Protection's ("DEP's") Bureau of Remediation and Waste Management which is responsible for investigating PFAS contamination at sludge and septage land application sites, active and closed solid waste landfills, hazardous waste sites, and other remediation-type sites.[1]  I have worked at DEP for almost 30 years and have been actively involved in DEP's PFAS investigations since PFAS emerged as contaminants of concern.  I am a Maine Licensed Professional Engineer.

2.      I submit this declaration in support of the opposition to Defendant 3M's Motion to Stay filed by the State of Maine ("State") concurrently with this declaration and in support of the State's Motion to Remand (May 25, 2023), ECF No. 10.

---

[1] "PFAS" refers to per- and polyfluoroalkyl substances.

**State Add. 1**

3.      PFAS contamination of drinking water and State natural resources including groundwater, surface waters, soils, and wildlife is a serious and urgent public health and environmental threat to Maine's citizens and environment.  PFAS are human-made chemicals that are toxic at extremely low levels and are so persistent in the environment that they are known as "forever chemicals."  Thus, PFAS will remain in the environment for an indefinite (and very long) period of time unless PFAS are cleaned up from State natural resources and property at great difficulty and expense.  Similarly, there is treatment that can be used to remove PFAS from drinking water, but it is expensive to do so.

4.      Certain PFAS contamination in Maine is associated with the manufacture and use of Aqueous Film Forming Foam ("AFFF"), a firefighting material that contains PFAS.  AFFF was used to control and extinguish Class B fuel fires and is used at sites such as military bases, airports, petroleum refineries, and fire training centers.

5.      However, there is widespread contamination of drinking water, State natural resources, and State property with PFAS from consumer, household, and industrial uses that is not related to AFFF.  PFAS contamination from non-AFFF sources has been found at many more locations in Maine than PFAS contamination related to the use of AFFF.  There are hundreds and potentially thousands of locations in Maine with PFAS contamination that is unrelated to AFFF.

6.      There is non-AFFF PFAS contamination of drinking water, groundwater, surface water, soil, compost, sludge and other residuals, milk, fish, and other resources in Maine, and at locations including hazardous waste sites, landfills, wastewater treatment plants, and farm fields.

7.      The State has been proactively addressing PFAS contamination since PFAS emerged as contaminants of concern and is investigating the scope, extent, and sources of PFAS contamination to address the risks to public health and State natural resources.  It is extremely

**State Add. 2**

important to protect drinking water and the food supply from PFAS, although Maine will need substantial amounts of money to do so.

8.      DEP is the primary agency leading the State's investigation of the sources of PFAS contamination and is responsible for protecting and restoring Maine's natural resources from PFAS contamination.  DEP has taken proactive actions to address the evolving public health threat caused by PFAS pollution, including investigating sources of PFAS pollution at sludge and septage land application sites, active and closed solid waste landfills, hazardous waste sites, and other remediation-type sites and installing treatment on PFAS-contaminated drinking water wells to remove PFAS.

9.      When the State becomes aware of PFAS contamination at any particular location, DEP has primary responsibility for investigating the source of the contamination.  It is a high priority for DEP to evaluate and have a thorough understanding of the source(s) of the PFAS pollution so that DEP may address PFAS at the source and prevent further releases of PFAS to the environment.  DEP's standard practice for investigating the source of PFAS contamination is to research available files concerning the contaminated location, review DEP's map of remediation-type sites in the vicinity of the PFAS contamination,[2] consult the owners/operators of the impacted public water systems and properties, develop a conceptual site model to understand the source of the contamination and how it is moving through the environment, create a sampling and analysis plan, conduct sampling and laboratory analysis, evaluate data results, and outline recommendations and conclusions.  As part of this process, DEP consults a statewide database of

---

[2] This map includes sites that have been licensed by DEP, remediated, or investigated by DEP for discharges of oil and hazardous materials.

**State Add. 3**

PFAS information and a listing of reported discharges of AFFF to which PFAS have been intentionally added.

10.     I have reviewed the factual statements in this case in the State's Complaint and in 3M's Notice of Removal as well as the relevant portions of 3M's Motion to Transfer the case filed before the Judicial Panel on Multidistrict Litigation, which was attached as Exhibit 1 to 3M's Motion to Stay this case.

11.     In its Motion to Transfer, 3M points to two complaints in separate lawsuits filed by the Kennebunk, Kennebunkport, & Wells Water District ("KKW") and Kennebec Water District ("Kennebec") and notes that both of these complaints say that, "[u]pon information and belief, Defendants' Fluorochemical Products, including but not limited to PFAS containing fluorochemical/intermediates and AFFF were used at fire training facilities, fire departments, and airports within the groundwater catchment area, such that those compounds traveled by stormwater, surface water, groundwater, and other pathways toward Plaintiff's Contaminated Wells."

12.     3M states that the State's Complaint encompasses the following locations that are at issue in the KKW lawsuit: (1) drinking water supply for the Kennebunk, Kennebunkport, & Wells Water District wells ("KKW well") and the groundwater that is the source of water for the KKW well; and (2) a dairy farm in Arundel.  3M states that the State's Complaint encompasses the following locations that are at issue in the Kennebec lawsuit: (1) drinking water supplies, soils, and fish in Fairfield; and (2) the China Middle School.  3M then says that those lawsuits have alleged that PFAS contamination at these locations has derived at least in part from AFFF.

13.     DEP has followed its standard practice to investigate the sources of the PFAS contamination, *supra* ¶ 9, at all of the locations identified in paragraphs 12 and 21, and has

**State Add. 4**

concluded that there is no evidence that AFFF contributed to the PFAS contamination at any of these locations.  I address the source of the PFAS contamination for each of these locations in further detail below.

**KKW**

14.    The State is aware of PFAS contamination of one KKW drinking water well.  Based upon DEP's investigation, DEP has concluded that there are no AFFF sources for the PFAS contamination in the KKW well.  The preliminary conceptual site model developed for the site indicates that the land application of wastewater treatment plant sludges at a dairy farm in Arundel (Stoneridge Farm) and at a nearby property in Kennebunk are the most likely sources of PFAS in the KKW well.

15.    DEP investigated PFAS contamination at the Stoneridge Farm, and has concluded that the PFAS contamination at Stoneridge Farm was most likely caused by prior land application of wastewater treatment plant sludges and that there is no evidence of AFFF sources to PFAS contamination in the sludges.

**Kennebec system**

16.    The Kennebec system obtains its supply of water from China Lake and not from groundwater sources.  Based upon DEP's investigation, DEP concluded that there is no evidence of AFFF sources to PFAS contamination of the Kennebec system.

17.    The preliminary conceptual site model developed for the site indicates that the most likely source of PFAS impacts to the Kennebec system is from dense human development in the watershed of China Lake, specifically and most likely from PFAS contamination in residential septic systems and the residential use of fertilizers.  There is no evidence of AFFF sources to PFAS

**State Add. 5**

contamination associated with this dense human development or residential septic systems or fertilizers in the watershed of China Lake.

18.    The China Middle School public water system sources its water from groundwater and not from China Lake, which is the source for the Kennebec system.  Thus, there is no evidence that the PFAS contamination of the China Middle School public water system is caused by PFAS contamination of China Lake.  There is no evidence of AFFF sources to PFAS contamination at China Middle School.  Instead, DEP has concluded that the most likely source of the PFAS contamination of the China Middle School public water system is from the use of products containing PFAS such as floor strippers, floor waxes, and cleaners, and leaching from the school's subsurface wastewater disposal system.

19.    DEP has investigated PFAS contamination from sludge containing PFAS in private drinking water wells in Fairfield, dairy farms in Fairfield, groundwater, and soils in Fairfield near sludge application sites along Middle Road, Ohio Hill Road, and Ridge Road, the surface waters of the Fairfield Police Athletic League ponds and Fish Brook from the headwaters to the confluence with Messalonskee Stream in Fairfield, and in fish in Fish Brook in Fairfield (collectively, "Fairfield contamination").  There is no evidence that the PFAS contamination in Fairfield is linked to the PFAS contamination of China Lake based on the distance between the sites, concentrations of PFAS, types of PFAS detected, and volumes and years of direct sludge application in Fairfield.  There also is no evidence of AFFF sources to PFAS contamination at these locations in Fairfield.  Instead, DEP has concluded that the most likely source of the Fairfield contamination is sludge containing PFAS and that there is no evidence of AFFF sources to PFAS contamination in the sludges.

**Brunswick Naval Air Station and Portsmouth Naval Shipyard**

**State Add. 6**

20.     3M in its Notice of Removal states that PFAS from AFFF use at the Brunswick Naval Air Station "plausibly migrated to off-site areas of sewage sludge application and would thus be commingled with PFAS in the sewage sludge from non-AFFF sources."  There are two licensed sludge spreading sites located south of the site in Brunswick and Harpswell and DEP is not aware of any PFAS contamination at those sludge spreading sites.  In addition, PFAS typically contaminates sludge before the sludge is applied to a location and not through migration from an adjacent property.

21.     3M also states that AFFF-related waste from the Portsmouth Naval Shipyard in Kittery plausibly was shipped off-site to a nearby municipal landfill in Kittery where PFAS has been detected.  Based upon DEP's investigation, there is no evidence of AFFF sources to PFAS contamination in the Kittery municipal landfill.  The Kittery solid waste landfill does not accept liquid waste such as AFFF concentrate or AFFF concentrate mixed with water.  Instead, the most likely source of PFAS contamination at the Kittery landfill is leaching from municipal and commercial solid wastes.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated at Augusta, Maine, this 15th day of June, 2023.

By:  /s/ Victoria Eleftheriou
Victoria Eleftheriou
Deputy Director
DEP Bureau of Remediation and
Waste Management

**State Add. 7**

# Final
# Preliminary Assessment Report
# Bangor Training Site
# Bangor, Maine

Perfluorooctane-Sulfonic Acid (PFOS) and Perfluorooctanoic Acid
(PFOA) Impacted Sites
ARNG Installations, Nationwide

January 2020

Prepared for:



Army National Guard Headquarter
111 S. George Mason Drive
Arlington, VA 22204



U.S. Army Corps of Engineers, Baltimore District
2 Hopkins Plaza
Baltimore, MD 21201

Prepared by:

AECOM
12420 Milestone Center Drive, Suite 150
Germantown, MD 20876
aecom.com

Contract Number: W912DR-12-D-0014
Delivery Order: W912DR17F0192

**State Add. 8**

# Table of Contents

Executive Summary ................................................................................................................. 1

1.    Introduction .................................................................................................................... 5
    1.1  Authority and Purpose .......................................................................................... 5
    1.2  Preliminary Assessment Methods ........................................................................ 5
    1.3  Report Organization ............................................................................................. 6
    1.4  Facility Location and Description .......................................................................... 6
    1.5  Facility Environmental Setting .............................................................................. 7
        1.5.1  Geology ..................................................................................................... 7
        1.5.2  Hydrogeology ............................................................................................ 8
        1.5.3  Hydrology .................................................................................................. 9
        1.5.4  Climate .................................................................................................... 10
        1.5.5  Current and Future Land Use .................................................................. 10

2.    Fire Training Areas ...................................................................................................... 15
3.    Non-Fire Training Areas .............................................................................................. 16
    3.1  Bangor Training Site Eastern Properties ............................................................ 16
        3.1.1  Building 254 (Cold Storage Hangar) ....................................................... 16
        3.1.2  Building 260 (Army Aviation Support Facility) ......................................... 16
        3.1.3  Building 250 (FMS #3) ............................................................................. 18
        3.1.4  Building 262 (Covered Fuel Truck Building) ............................................ 18
    3.2  Bangor Training Site Western Properties ........................................................... 18
        3.2.1  Armed Forces Reserve Center (AFRC) .................................................. 18
        3.2.2  Regional Training Institute (RTI) .............................................................. 19
        3.2.3  Baffled Small Arms Range ....................................................................... 19

4.    Emergency Response Areas ....................................................................................... 21
5.    Adjacent Sources ........................................................................................................ 22
    5.1  Bangor Air National Guard Base ........................................................................ 22
    5.2  Fuel Strike Incident Location – Bangor International Airport ............................... 23
    5.3  Former Dow Air Force Base FTA ....................................................................... 23
    5.4  Waste Water Treatment Plant ............................................................................ 23
    5.5  Landfills .............................................................................................................. 23

6.    Preliminary Conceptual Site Model ............................................................................ 26
    6.1  AOI 1 Building 260 (AASF) ................................................................................ 26
    6.2  AOI 2 Building 254 (Cold Storage Hangar) ....................................................... 27

7.    Conclusions and Data Uncertainty ............................................................................. 31
    7.1  Conclusions ....................................................................................................... 31
    7.2  Uncertainty ........................................................................................................ 32
    7.3  Potential Future Actions ..................................................................................... 33

8.    References .................................................................................................................. 36

**State Add. 9**

# 3.    Non-Fire Training Areas

Non-FTAs on both the eastern and western properties of the Bangor Training Site were investigated during the PA. A description of each non-FTA is presented below, and they are shown on **Figure 3-1**, with photographs appearing in **Appendix C**.

## 3.1    Bangor Training Site Eastern Properties

### 3.1.1    Building 254 (Cold Storage Hangar)

Building 254 is an aircraft hangar currently used for the cold storage of rotary wing aircraft located in the southeastern portion of the Bangor Training Site eastern property. The building was historically used for aviation maintenance but was transitioned to a cold storage hangar in the 1980s. It contains a fire suppression system, including a 300-gallon tank containing Ansul Jet-X 2% High Expansion Foam Concentrate, powered by diesel fire pumps and diesel fuel tanks. Additionally, five 55-gallon drums also containing Ansul Jet-X 2% High Expansion Foam Concentrate are stored within the building's fire suppression system room. The Safety Data Sheet for the Ansul product stored in Building 254 (**Appendix A**) does not include PFAS in its composition, but only lists hazardous components. The Data Sheet for the product (**Appendix A**) states that it uses a hydrocarbon surfactant; however, no material information definitively states that Ansul Jet-X 2% High Expansion Foam Concentrate does not include PFAS. Additional dry chemical handheld fire extinguishers are stored within the building.

Building 254 is protected via a linear heat wire detection system. Triggering the heat wire detection system results in flooding the hangar bays with high expansion foam from the fire suppression system via overhead shafts. Annual, quarterly, and other regularly scheduled maintenance is performed on the fire suppression system that does not result in suppression system contents releases.

According to the MEARNG Building Control Supervisor and Operations Officer, the building fire suppression system was tested once between 2013 and 2018. The test involved the full release of the 300-gallon high expansion foam tank and resulted in approximately 4 ft of standing foam inside the building. The test was completely enclosed, and sprayed foam was left to dry in place. After the foam dried, it was collected, containerized, and disposed of as municipal trash. MEARNG personnel stated that the Jet-X 2% High Expansion Foam did not escape the building to site media during the release.

Floor drains in fire suppression room of the Building 254 discharge to the municipal sanitary system (CES, Inc., 2017). Stormwater runoff from areas west and south of Building 254 flows to catch basins south and west of the building. The catch basins direct stormwater via drainage pipes towards the southwest side of Building 260 and discharge to the Domestic Channel.

### 3.1.2    Building 260 (Army Aviation Support Facility)

Building 260 comprises the AASF on the Bangor Training Site eastern property, and it consists of hangars and landing pads for helicopters along with flight operations offices. Maintenance and repair on rotary wing aircraft are conducted in the three hangars at the AASF; helicopter refueling is conducted on the tarmac to the north and west of the AASF. Paved tarmac/apron areas along the south-southwest and north-northeast sides of the AASF serve as exterior staging/parking areas for rotary and fixed wing aircraft. The fire suppression system that serves the AASF hangars comprises two 1,200-gallon AFFF tanks: one tank contains National Foam Centurion 3% AFFF concentrate, the other contains Buckeye BFC-3.1 Platinum 3% AFFF concentrate. The deluge fire suppression system was installed in 2003 during the construction of new hangar space and is the only AFFF fire suppression system on the MEARNG property. Safety Data Sheets for

16

National Foam Centurion 3% AFFF concentrate and Buckeye BFC-3.1 Platinum 3% AFFF concentrate are included in **Appendix A**. Two 55-gallon storage drums that contain residual AFFF are also kept in the AASF fire suppression room. Water sprinklers service the AASF office and supply areas. The city of Bangor public water supply hydrant serves as the firefighting water source for the AASF. More than 100 dry chemical fire extinguishers are also staged throughout the AASF.

During the 2003 installation of the AFFF fire suppression system at the AASF, a small quantity of AFFF concentrate was inadvertently released from the AFFF tanks to pipes within the building. The exact volume of the release is unknown. MEARNG staff stated during interviews that AFFF did not migrate further than the building confines, and that the pipes AFFF was released to were replaced.

In 2011, an incidental release of AFFF resulted from the malfunction of a gasket on one of the AFFF tank isolation valves. Approximately 1,200 gallons of Buckeye BFC-3.1 Platinum 3% AFFF concentrate were released, resulting in 7 ft of standing foam inside the fire suppression pump room. The AFFF drained into the fire suppression room floor drains and traveled via city sanitary system pipes to the city of Bangor treatment plant. No AFFF was observed to have escaped the fire suppression room. City sanitary system piping received all the released AFFF not captured in the fire suppression room.

In 2016, another incidental release from the AFFF tanks caused by triggering an incorrectly identified solenoid resulted in 30 gallons of Buckeye BFC-3.1 Platinum 3% AFFF solution spilling across the ramp outside the fire suppression room and into a sump designed to capture runoff. The AFFF solution escaped the suppression room through the 2-inch main drain line to the exterior ramp. According to MEARNG staff, the standing foam reached an approximate height of 1 ft on the ramp outside the fire suppression room. The sump does not have an outlet or discharge drain. The AFFF solution in the sump did not reach a height capable of migrating to the main stormwater sewer. All AFFF was captured and contained within the ramp area and the sump, and the released AFFF was subsequently vacuumed out of the sump in a controlled manner.

Additionally, MEARNG staff confirmed that AFFF Tri-Max™ fire extinguishers were previously stored on the parking areas at the AASF. Testing and maintenance of the mobile Tri-Max™ fire extinguishers were performed off facility by private contractors. The Tri-Max™ extinguishers were returned to the MEARNG Camp Keyes in 2012 under the purview of the US Property and Fiscal Office (USPFO). All AFFF procurement for the Bangor Training Site occurs through the USPFO.

A Flammable and Combustible Storage Building is present to the northeast of the AASF and is used for storage of POLs and small quantities of hazardous materials including alcohols, paints, and corrosives used at the AASF. As such, the AASF is considered a small quantity hazardous waste generator and has been assigned an individual hazardous waste generator.

The majority of AASF stormwater runoff is collected in catch basins and a storm drain southwest of the AASF, which discharges to a drainage channel. A small amount of storm water flows to the north of the AASF and is collected in a catch basin at the northwest corner of the AASF, which also flows to the drainage channel.

Oil water separators (OWSs) at the facility serve as secondary containment for spills associated with the AASF. Three 1,000-gallon OWSs are located outside of the AASF. The first OWS is located west of Hangar B and receives water from Hangar B's floor drain system. The second OWS is located north of Hangar C and receives water from Hangar C's floor drains and the indoor wash rack. The third OWS is located at the southeast corner of the AASF and receives water from the floor drains in Hangar A and the exterior helicopter engine wash rack. All three OWS's discharge to the sanitary sewer.

**State Add. 11**

There are also two wash racks at the AASF. An exterior helicopter engine wash rack is located south of the AASF. Wash water generated at this wash rack flows through the OWS located near the southeast corner of the building prior to discharge to the sanitary sewer. An indoor wash rack located in the northwest corner of Hangar C drains to the OWS located north of Hangar C prior to discharge to the sanitary sewer system.

### 3.1.3   Building 250 (FMS #3)

Building 250 comprises the FMS #3 at the Bangor Training Site and is located on the eastern property. Building 250 is used primarily for vehicle storage and maintenance. Unit-level maintenance is performed on engineering equipment, wheeled vehicles, material handling equipment, and power generators. Maintenance activities include filter and fluid changes, Preventative Maintenance Checks and Service, battery service, parts cleaning, and repairs. The FMS #3 is served by a water sprinkler fire suppression system. No AFFF is used or stored at Building 250. FMS #3 fire alarms alert the contracted local security company, which in turn evaluates the severity of the emergency and contacts the Bangor Fire Department as needed. Dry chemical fire extinguishers are staged inside the building as well as outside in the fuel pump island area (CES, Inc., 2017).

Stormwater runoff at the FMS #3 is directed to a series of catch basins and storm drains east and south of Building 250. An under-drained soil filter northwest of FMS #3 receives stormwater runoff. This flow, along with aboveground flow and the storm drains, converge at a manhole-covered catch basin immediately west of FMS #3. Storm water flow is then discharged offsite into a drainage channel (CES, Inc., 2017).

Three OWSs are associated with FMS #3. One 350-gallon OWS is located inside FMS#3, near the interior, eastern wall. The two trench drains from the western section of the building flow into the OWS, which discharges to the sanitary sewer. A second 350-gallon OWS is located on the southwest exterior of the building. Trench drains in the eastern section of the building flow into this OWS before discharging to the sanitary sewer.

There is one wash rack at FMS #3 located outside and immediately south of the building. Wash water generated at this wash rack discharges directly to the sanitary sewer (CES, Inc., 2017).

### 3.1.4   Building 262 (Covered Fuel Truck Building)

The Covered Fuel Truck Building is located northeast of the Building 260 and includes a containment berm with an 8,000-gallon capacity and no drain outlet. The building accommodates up to six vehicles. Vehicles loaded with fuel are parked under cover and within a containment berm. The tankers are moved outside for fueling aircraft and then are moved back in the containment area. There is no fire suppression system at the Covered Fuel Truck Building; fire alarms notify the Bangor International Airport Crash Fire Department for emergency response.

## 3.2      Bangor Training Site Western Properties

### 3.2.1   Armed Forces Reserve Center (AFRC)

The AFRC complex (approximately 4.5 acres) is located southwest of the Bangor International Airport runway, on the MEARNG Bangor Training Site western property. The AFRC includes the AFRC main building (classrooms and administrative offices), vehicle parking compounds, fueling pad, a covered wash rack, and a cold storage building. According to MEARNG staff, the covered wash rack has never been used for vehicle maintenance. The AFRC complex was constructed in 1992, and according to MEARNG staff, has never been used for AFFF training or storage. No incidents have occurred at the AFRC complex that would require emergency response or fire

**State Add. 12**

suppression. The City of Bangor Fire Department is responsible for responding to emergencies at the Bangor Training Site western property. The fire suppression system at the AFRC complex uses only water. No mobile AFFF fire extinguishers are stored at the complex, and the kitchen is supplied with Ansul K-Guard Fire Extinguishers. The Ansul K-Guard fire extinguisher is a Class A fire extinguisher that uses Ansulex Low pH Liquid Fire Suppressant. The data sheet for Ansulex Low pH Liquid Fire Suppressant is included in **Appendix A**.

## 3.2.2   Regional Training Institute (RTI)

The RTI complex (approximately 10 acres) is also located on the Bangor Training Site western property and includes the RTI building and associated paved parking areas. Construction of the RTI was completed in 2012, and similarly to the AFRC, MEARNG staff stated during interviews that the RTI has never been used for AFFF training or storage, nor have any incidents occurred requiring AFFF fire suppression. The fire suppression system at the RTI uses only water. No mobile AFFF fire extinguishers are stored at the complex, and the kitchen is supplied with compressed nitrogen fire extinguishers. The City of Bangor Fire Department is responsible for responding to emergencies at the RTI.

## 3.2.3   Baffled Small Arms Range

The MEARNG Bangor Training Site western property includes a baffled small arms range east of the AFRC complex, along the MEARNG property boundary with the Bangor International Airport runway. The area includes storage buildings, a storage container, a dry vault, and restroom, in addition to the range. The firing range was previously constructed as a wood-baffled range but has been reconstructed with steel baffles. MEARNG staff stated during interviews that no fire suppression system exists at the baffled small arms range, and that it has never been used for the AFFF training or storage. No information gathered during the VSI and interviews indicates that PFAS have been released to the environment at the baffled small arms range.

**State Add. 13**





JANET T. MILLS
GOVERNOR

MELANIE LOYZIM
COMMISSIONER

December 14, 2021

Town of Kittery
200 Rogers Road
Kittery, Maine 03904
Attn: Kendra Amaral - Town Manager

RE:  PFAS Sampling Associated with Kittery's Closed Municipal Landfill

Dear Kendra;

I am writing as notification that sampling conducted recently by the Maine DEP at the Town of Kittery (Town) municipal landfill showed high enough levels of  Per- and Polyfluoroalkyl Substances (PFAS) in the monitoring well groundwater that further sampling in the vicinity of the Town's closed municipal landfill for the presence of PFAS is warranted.  The overall goal of this request is to determine whether PFAS is present in groundwater and, if so, whether it presents a risk to public health or the environment.  Of primary concern is whether any drinking water wells are impacted at levels that exceed DEP's Interim Drinking Water Standard for PFAS (Resolve 2021, ch. 82, Resolve, To Protect Consumers of Public Drinking Water by establishing Maximum Contaminant Levels for Certain Substances and Contaminants, Emergency, effective June 21, 2021).

PFAS are an emerging contaminant of concern at closed municipal landfills and municipalities, as owner/operators, are ultimately responsible for contamination that is associated with their closed landfills.  To that end, in 1998, the Maine Legislature created the Landfill Closure and Remediation Program (38 M.R.S. §§ 1310-C to 1310-H-1.).  One of the Program's objectives is to remediate hazards posed by closed municipal solid waste landfills.  The legislation provides a cost-sharing component that generally covers 90% of approved remediation that may be necessary to mitigate impacts resulting from contamination associated with such a landfill.  As an example, if residential wells were impacted with elevated levels of PFAS associated with a closed landfill, the municipality can generally be reimbursed for 90% of the costs of the initial sampling and installation of such a residential filter system.

Regardless, the initial step in this process is to determine whether there are PFAS related impacts associated with the landfill in the groundwater drinking water supply wells in the area, which requires the collection of samples.  The DEP is planning to collect the initial groundwater supply well samples at no cost to the Town.  I hope the above answers some of the Town's questions, but I would be glad to provide additional information or to discuss further.

AUGUSTA
17 STATE HOUSE STATION
AUGUSTA, MAINE 04333-0017
(207) 287-7688 FAX: (207) 287-7826

BANGOR
106 HOGAN ROAD, SUITE 6
BANGOR, MAINE 04401
(207) 941-4570 FAX: (207) 941-4584

PORTLAND
312 CANCO ROAD
PORTLAND, MAINE 04103
(207) 822-6300 FAX: (207) 822-6303

PRESQUE ISLE
1235 CENTRAL DRIVE, SKYWAY PARK
PRESQUE ISLE, MAINE 04769
(207) 764-0477 FAX: (207) 760-3143

website: www.maine.gov/dep

**State Add. 14**

I have attached the sample and analysis plan, and the analytical data from the landfill monitoring wells collected in late August, along with the planned sampling work to evaluate the drinking and process water supply wells in the vicinity of the landfill.

Additional information related to PFAS can be found on the Department's website (https://www1.maine.gov/dep/spills/topics/pfas/index.html)

Please feel free to reach out to me with any questions or if you need clarification regarding this issue.

Best Regards,

Matthew R. Young
Project Manager - Landfill Closure and Remediation Program
Division of Remediation
Maine Department of Environmental Protection
Ph: (207) 215-7841/email: matthew.r.young@maine.gov
www.maine.gov/dep

CC: Patricia Moore (Kittery), David Rich (Kittery), Jessa Kellogg (Kittery), and File (DEP)

Enc: SAP-Kittery Monitoring Well PFAS 2021, alpha analytical result reports from the October sampling work completed by the DEP.

# PFAS
# Residential Sampling and Analysis Plan
for the
Kittery Municipal Landfill Site
Kittery, Maine

**Prepared by:**

*Maine Department of Environmental Protection*
*Landfill Closure and Remediation Program*
*December 2021*

Projected Dates of Sampling: Fall 2021
Organization: Maine DEP

## 1.0 Introduction

This SAP identifies the data collection activities and associated Quality Assurance/Quality Control (QA/QC) measures specific to the Kittery Municipal Landfill site located in Kittery, Maine, relative to the planned supplemental sampling for perfluorinated alkylated substances (PFASs). The purpose of this SAP is to describe site-specific tasks that will be performed in support of the stated objectives.

Closed in 1993 as required by the Maine DEP.  It is a 5-acre landfill. Closed by the reduced procedure. The reduced procedure consisted of covering the waste with six inches of topsoil over eighteen inches of 10E-6 CM/S glacial till over six inches of borrow. This site accepted wastes from Portsmouth Naval Shipyard the wastes included solvents, paints, exc.  There is a leachate to the north of the MSW covered landfill that has been sampled in the past, and there are five monitoring wells that were installed to monitor impacts from the Construction and Demolition Debris landfill to the southeast.  There are no groundwater monitoring wells dedicated to the closed municipal landfill that are known to the Department. There is a leachate seep to the North of the landfill that has been identified in past site inspections,

There are residiential drinking water supply wells in the area of the landfill to the North and to the South East.

## 3.0 Contaminants of Concern

Potential contaminants of concern (COCs) at the site for this sampling event, relative to Perfluorinated Alkylated Substances (PFASs) (Specific PFAS molecules of concern are PFOA, PFOS, PFHxS, PFHpA, PFNA, and PFDA).

## 4.0 Project Description and Schedule

One set of samples each will be collected from the identified residential drinking water supply wells in close proximity to the Kittery landfill system.  The samples will be analyzed for PFAS and landfill parameters.  The sample locations can be seen on Figure 1&2.  The sample team will mobilize to the site and will collect samples from the designated sample locations.  Sampling will take approximately one full working day with travel included.

## 5.0 Project Data Quality Objectives

Analysis Laboratory will be Alpha Laboratories: Project Manager – Michael Chang
Ph: 508-4395124 mchang@alphalab.com

Analysis method will be the Modified EPA method 537 (holding time 14 days at <6º C)
 There are six drinking water samples targeted to be sampled for this project.  There will be one field reagent blank sample taken for this project.

**State Add. 17**

**5.1 Project Objectives**

The following project objectives apply to this site investigation:

To assess the potential of whether PFOA/PFOS are contaminants in the ground water via sampling groundwater in the area.

**5.2 Measurement and Performance Criteria**

Standard data quality measurement and performance criteria will be used to ensure that data are sufficiently sensitive, precise, accurate, and representative to support site decisions.

**6.0 Sampling Design**

Once a sampling schedule is established, sampling personnel will mobilize to the site to collect a sample from each of the selected monitoring wells adjacent to the Landfill and the porewater location if it can be located. Table 1 presents the wells to be sampled; a map showing the targeted wells and landfill can be found on Figure 1. The monitoring wells will be sampled in accordance with standard operating procedure (SOP) MEDEP SOP RWM-DR-001: Drinking Water Sampling. Samplers will follow the protocols for prohibited and acceptable items found in Table 3. All water samples will be collected using dedicated sampling equipment. Prior to sampling each location, the sample handler must rinse their hands and don nitrile gloves. PFAS contamination during sample collection can occur from many common sources, including food packaging and certain foods and beverages. Proper hand rinsing and wearing nitrile gloves will help to minimize this type of accidental contamination of the samples. Samples collected for PFAS analysis do not have to be headspace free.

**7.0 Sample Handling, Tracking, and Custody Procedures**

All samples will be identified, handled, shipped, tracked, and maintained under chain of custody in accordance with SOP MEDEP SOP-RWM-DR-012: Chain of Custody Protocol.

**8.0 Fixed Laboratory Analytical Methods and Procedures.**

**8.1 Fixed Laboratory Analytical Parameters**

Water samples collected will be analyzed for the following analytical parameters:
-    Perfluorinated Alkylated Substances Perfluorinated Alkylated Substances (PFASs) (Specific PFAS molecules of concern are PFOA, PFOS, PFHxS, PFHpA, PFNA, and PFDA to total 26 perfluorinated compounds) see attachment 1 for more information on the specific compounds to be analyzed.

State Add. 18

## 8.2 Fixed Laboratory Methods and Standard Operating Procedures

The following procedures and methods will be used:

- Modified EPA Method 537

## 8.3 Fixed Laboratory

The contracted analytical laboratory must be Maine certified to perform the aforementioned methods. The contract lab will be able to accommodate the sample load and perform the analyses within holding times. The contract lab must be able to achieve PQLs, for all analyses, which are below the associated regulatory guideline value.

## 9.0 Quality Control Activities

## 9.1 Field Quality Control

A field reagent blank will be made in the field, and the temperature blank will be used that is to be kept in the cooler always.

## 9.2 Analytical Quality Control

There will be a Method Blank, a Laboratory Control Spike, and isotope dilutions run at the laboratory.

## 9.3 Performance Evaluation Samples

No performance evaluation (PE) samples (Duplicates) are to be collected during the sampling event.

## 10.0 Documentation, Records and Data Management

Documentation, record keeping, and data management activities will be conducted in accordance with MEDEP SOP DR013: Documentation of Field Activities and Development of a Trip Report.

**State Add. 19**