# Clement & Murphy
### PLLC

<div align="center">September 26, 2025</div>

**VIA CM/ECF**

Anastasia Dubrovsky
Clerk of Court
U.S. Court of Appeals for the First Circuit
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 2500
Boston, MA 02210

     Re:     *State of Maine v. 3M Company*, No. 23-1709

Dear Ms. Dubrovsky:

On September 9, 2025, 3M filed a 28(j) letter apprising the Court of its second removal petition filed in District Court the day before. That second removal petition was prompted by ongoing discovery in the remanded and unstayed state-court litigation, which revealed at least one site, the Brunswick/Topsham Water District water system, where Maine, despite its purported disclaimer, was seeking recovery in this lawsuit for alleged PFAS contamination plausibly linked to MilSpec AFFF. Further review of the ongoing discovery has revealed at least six additional sites plausibly linked to MilSpec AFFF where Maine seeks recovery in this lawsuit despite its purported disclaimer. As a consequence, on September 24, 2025, 3M filed a supplemental removal petition highlighting those six sites based on this new information. *See* Ex.A (3M Supp. Removal Pet.).

Maine's overlength response to 3M's 28(j) letter of September 9, 2025, suggested that apprising this Court of these ongoing developments in the District Court was an inappropriate effort to supplement the record. It is anything but. As 3M emphasized in its reply brief, Maine's Complaint has always sought recovery for statewide PFAS contamination that Maine itself repeatedly characterized as "indivisible," and has never limited itself to specific sites. 3M.Reply.5-6. Thus, the fact that ongoing discovery has revealed specific additional sites (now seven and counting) where Maine seeks recovery for alleged PFAS contamination plausibly linked to MilSpec AFFF does not fundamentally change the issues or record on appeal. But the ongoing revelations do underscore the folly of filing two lawsuits and purporting to disclaim liability for sites where the PFAS is attributable to a particular source. Maine presumably will contest whether the alleged PFAS contamination at the six sites addressed in 3M's supplemental removal notice is really attributable to MilSpec AFFF. But, at bottom, that is a dispute about which sites within Maine are subject to a colorable federal defense, and that is an issue that belongs in federal court. *See Maryland v. 3M Company*, 130 F.4th 380, 391-92 (4th Cir. 2025).

Respectfully,

s/Paul D. Clement

Paul D. Clement

*Counsel for Defendants-Appellants*

Cc:  All Counsel of Record

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

|  |  |
|---|---|
| STATE OF MAINE,<br><br>　　　　　　　　Plaintiff,<br><br>　v.<br><br>3M COMPANY, ET AL.,<br><br>　　　　　　　　Defendants. | Civil Action No. 25-cv-00453<br><br>**SUPPLEMENTAL NOTICE OF REMOVAL** |

Defendant 3M Company ("3M"), by undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the State of Maine Business and Consumer Docket ("Business Court") to the United States District Court for the District of Maine. As grounds for removal, 3M alleges as follows:

### PRELIMINARY STATEMENT

1.     Plaintiff State of Maine ("State") seeks to hold 3M and other Defendants liable for their alleged conduct in designing, manufacturing, and/or selling per- and polyfluoroalkyl substances ("PFAS") and PFAS-containing products, which purportedly have resulted in alleged contamination of the State's natural resources and property, including drinking water supplies.

2.     However, at least some of the PFAS that plausibly gives rise to the State's claims was released by the use, storage, or disposal of PFAS-containing aqueous film-forming foam ("AFFF") that was manufactured for and sold to the U.S. military and other users by a select group of suppliers (including 3M) in accordance with the military's rigorous specifications ("MilSpec"). AFFF is a firefighting foam that is highly effective for extinguishing fuel-based fires. Over time, 3M's MilSpec AFFF products have been used by personnel at military facilities (among others) across the United States, including in Maine.

3.      In a sworn response to an interrogatory requesting that the State provide information about each location for which it is asserting a claim against any of the Defendants in this action, the State produced a spreadsheet identifying hundreds of Claimed Sites,[1] including public water systems, a number of which are linked to AFFF exposure. And at least one of these public water systems, the Brunswick/Topsham Water District ("BTWD") water system, is reported to have been contaminated by MilSpec AFFF.

4.      Further investigation by 3M has revealed that the alleged contamination of at least six additional sites that the State is seeking recovery for in this action plausibly derived at least in part from use of MilSpec AFFF.

5.      Under the federal government contractor defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), 3M is not subject to tort liability for its design and manufacture of MilSpec AFFF and its provision of warnings for the product. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is entitled to remove this action in its entirety to have its federal defense adjudicated in a federal forum. *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016). Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *See Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

6.      Although the State purports to disclaim damages related to AFFF in this case, the State's responses to Defendants' interrogatories demonstrate that the State *does* seek damages for

---

[1] The First Set of Interrogatories served by 3M and Defendants ("3M's Interrogatories") defined "Claimed Site" as "each and every location for which the State asserts a claim against any of the Defendants in this Action." *See* 3M's Interrogatories at 1. A true and correct copy of 3M's Interrogatories is available at ECF No. 1-7. Unless otherwise specified, references to ECF No. refer to the specific docket and/or exhibit entry in this action, *State of Maine v. 3M Company et al.*, No. 2:25-cv-00453-JAW.

PFAS contamination from AFFF, including MilSpec AFFF, in this case. The State's disclaimer is a pretense, and artful pleading should not permit the State to deprive 3M of the federal forum to which it is entitled.

7.    As discussed below, 3M previously removed this case on similar grounds in May 2023, and the Court's decision to remand the case back to state court is the subject of a pending appeal. *Infra* ¶¶ 11–12. While a favorable ruling by the First Circuit on that appeal would moot the present removal, 3M is filing the present Notice of Removal to preserve its right to a federal forum based upon the new facts presented by the State's responses to Defendants' interrogatories in the event the First Circuit affirms the original remand order.

## **BACKGROUND**

8.    This action is one of two actions filed by the State against 3M and other Defendants based on substantially similar allegations concerning PFAS contamination of natural resources and property across Maine, both of which were filed on March 29, 2023.

9.    In this action, which is proceeding in the early stages of written discovery in the Business Court, Docket No. BCD-CIV-2023-00065, the State generally alleges that Defendants, including 3M, have designed, manufactured, marketed, distributed, and/or sold PFAS and PFAS-containing products, including in Maine. *See, e.g.*, Complaint ¶¶ 1, 5, 20–21, 66–77.[2] The State further alleges that Defendants' PFAS have caused contamination of the State's natural resources and property in Maine, including the State's groundwater, surface waters, soils, sediments, and wildlife "throughout Maine." *Id.* ¶ 133; *see also id.* ¶¶ 134–158. The Complaint asserts that "there is PFAS contamination in public water systems, private drinking water wells, at many dairy farms where sludge containing PFAS have been spread, [and] in leachate from municipal and industrial

---

[2] A true and correct copy of the Complaint ("Compl.") is available at ECF No. 1-1.

landfills . . . ." *Id.* ¶ 11; *see also id.* ¶ 134 (alleging PFAS contamination of "drinking water," "private drinking wells," "wastewater treatment plants," "many dairy farms," "landfill leachate at municipal, state-owned, and other landfills," and "landfill leachate at landfills associated with the paper industry"). The State brings claims against 3M and other Defendants for public nuisance, private nuisance, statutory nuisance, trespass, strict liability for design defect and/or defective product, strict liability for failure to warn, and negligence. *Id.* ¶¶ 243–321.2 Among other relief, the Complaint seeks "compensatory damages, including natural resources restoration and loss-of-use damages, and costs to investigate, monitor, abate, contain, prevent, treat, and remove PFAS from the State's natural resources and property." *Id.* ¶ 14; *see also id.* at pp. 87–88.

10.    In addition to this action, the State previously filed a separate action that is now proceeding in the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation ("MDL") based on substantially similar allegations of PFAS contamination of natural resources throughout Maine (the "Maine AFFF Action"), and it asserts the same causes of action and requests for relief. *See, e.g.*, Maine AFFF Action Amended Complaint ("AFFF Compl.") ¶¶ 206–249, 357–428.[3] The State generally alleges that Defendants, including 3M, have designed, manufactured, marketed, distributed, and/or sold PFAS-containing AFFF products which have caused contamination of the State's natural resources and property. *Id.* ¶¶ 2, 9–13. The AFFF Complaint explicitly alleges that Defendants (including 3M) sold AFFF for use by the U.S. military in Maine, *id.* ¶¶ 106, 110, and that sites of AFFF-related PFAS contamination in the State include military installations. *Id.* ¶ 212. The AFFF Complaint specifically identifies military installations in Maine where there is allegedly PFAS contamination from AFFF, including "the Naval Air Station in Brunswick, the Portsmouth Naval Shipyard in Kittery, Loring Air Force Base

_____

[3] A true and correct copy of the operative complaint filed in the Maine AFFF Action is available at ECF No. 1-2.

in Limestone, the Cutler Navy radio facility, and the Maine Air National Guard Base in Bangor." *Id.* ¶ 207.

11.     Both actions seek to recover for damages from six of the same PFAS chemicals that the State alleges to have been used by Defendants in the manufacture of AFFF: perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorononanoic acid ("PFNA"), perfluorohexanesulfonic acid ("PFHxS"), perfluoroheptanoic acid ("PFHpA"), and perfluorodecanoic acid ("PFDA"). *See* Compl. ¶ 1; AFFF Compl. ¶ 2. Critically, PFOS and PFOA from AFFF are chemically indistinguishable in the ground from PFOA or PFOS from other sources.

12.     3M originally removed this action to this Court on May 17, 2023, asserting federal officer jurisdiction and federal enclave jurisdiction. *See* Notice of Removal, No. 2:23-cv-00210-JAW, ECF No. 1 (D. Me. May 17, 2023). As relevant to 3M's instant notice of removal, 3M alleged that PFAS from MilSpec AFFF and non-AFFF sources comingled across Maine, so the State's claims "encompass[ed] alleged PFAS contamination that plausibly derives at least in part from MilSpec AFFF use." *See id.* at 10–14.

13.     The State moved to remand this action to state court. *See* Mot. to Remand, No. 2:23-cv-00210-JAW, ECF No. 10 (D. Me. May 25, 2023). The State argued that no federal officer jurisdiction existed because 3M failed to identify any sites where commingling occurred and because, even if 3M had identified such sites, the State had "expressly disclaim[ed] seeking relief for any AFFF-related injuries." *See id.* at 2–9. Indeed, in its reply brief in support of remand, the State sought to bolster its disclaimer argument with what it claimed was a "sworn declaration from the state demonstrating that [AFFF products] are not" at issue. Reply in Supp. of Mot. to Remand, No. 2:23-cv-00210-JAW, ECF No. 38 at 1–3 & at n.1 (D. Me. June 22, 2023). This Court granted the State's motion to remand, reasoning that "because of the State's express disclaimer, the Court

concludes that this case must be remanded to the state of Maine Superior Court since the federal officer defense is not applicable." Order on Mots. to Stay and Remand, No. 2:23-cv-00210-JAW, ECF No. 47 at 22 (D. Me. July 26, 2023).[4]

14.    On August 12, 2025, the State served its responses to Defendants' First Set of Interrogatories (the "Interrogatory Responses"). In response to a request to identify certain information about "each Claimed Site and Resource at Issue in Your Complaint," the State responded by "producing a spreadsheet bates stamped as MEPLTF_NonAFFF_001595698 . . . that identifies by location sites where the State is aware of PFAS contamination and for which it seeks recovery in this case."[5] That spreadsheet, in turn, identified "BRUNSWICK/TOPSHAM WATER DISTRICT" with PWSID #ME0090260 on a tab entitled "CLAIMED PUBLIC WATER SYSTEMS."[6] On September 5, 2025, the State served supplemental responses to Defendants' First Set of Interrogatories ("Supplemental Responses") and produced a "supplemental spreadsheet at MEPLTF_NonAFFF_002764615" to replace MEPLTF_NonAFFF_00159568.[7] In the Supplemental Responses and accompanying spreadsheet, the State continues to identify BTWD as a site for which it seeks recovery in this case. BTWD is reported to have been contaminated with PFAS from MilSpec AFFF. The State's responses and supplemental responses make clear that the disclaimer upon with the prior remand order was based is pretextual at best. Based on this new information, 3M once again removed this case to federal court on September 8, 2025.

---

[4] 3M has appealed the remand order, with oral argument set for October 6, 2025.

[5] A true and correct copy of the Interrogatory Responses and relevant excerpts of MEPLTF_NonAFFF_001595698 are available at ECF Nos 1-3 and 1-4.

[6] *See* ECF No. 1-3 at 5.

[7] A true and correct copy of the Supplemental Responses and relevant excerpts of MEPLTF_NonAFFF_002764615 are available at ECF Nos 1-5 and 1-6.

15.     Following further investigation of the State's list of Claimed Sites, 3M has since become aware of at least six additional sites where the alleged PFAS contamination is plausibly attributable, at least in part, to MilSpec AFFF: Androscoggin River – ARB (Maine Environmental and Geographic Analysis Database ("EGAD") ID number 65321); Aroostook River – API (EGAD ID # 148571); Hawk Ridge Compost Facility (EGAD ID # 30018); Juniper Ridge Landfill (EGAD ID # 31339); Little Madawaska River – LMU (EGAD ID # 148550); and Penobscot River – PBV (EGAD ID # 65408); (collectively, the "Additional MilSpec AFFF Sites").[8]   While 3M continues its investigation of sites the State claims are at issue in this litigation, the revelation of plausible MilSpec AFFF commingling at the Additional MilSpec AFFF Sites further supports 3M's removal of this action.

## THE PROCEDURAL REQUIREMENTS FOR REMOVAL
## UNDER 28 U.S.C. §§ 1442(a)(1) AND 1446 ARE MET

16.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 99 and 1442(a) because the Business Court is located within the District of Maine

17.     3M is not required to notify or obtain the consent of any other defendant to remove this action under § 1442(a)(1). *See, e.g.*, *Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 357 n.9 (1st Cir. 2009) ("Removal under [§ 1442(a)(1)] does not require that all defendants agree to removal."); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187, 195 (D. Mass. 2008).

18.     Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of the operative complaint in this action is available at ECF No. 1-1, and true and correct copies of the documents on file in this case prior to the filing of this notice of removal are attached to the Prior Case Record Affidavit

---

[8] True and correct copies of the relevant excerpts of MEPLTF_NonAFFF_001595698 and MEPLTF_NonAFFF_002764615 that pertain to the Additional MilSpec AFFF Sites are attached as Exhibit 1 and 2, respectively.

available at ECF Nos. 4–15. True and correct copies of the documents subsequently filed in the Business Court are attached as Exhibits 3, 4, and 5.

19.    Removal is timely under 28 U.S.C. § 1446(b). A defendant removing a case is required to file a notice of removal within thirty days of service on it by the plaintiff of an initial pleading (28 U.S.C. § 1446(b)(1)) or other paper (*id.*, § 1446(b)(3)) that, considering "the four corners" of the document, "informs the reader, to a substantial degree of specificity, [that] all the elements of federal jurisdiction are present." *McLaren v. UPS Store, Inc.*, 32 F.4th 232, 236 (3d Cir. 2022). Although neither the Complaint nor any other paper served by the State (including the Interrogatory Responses), separately or together in combination, contain the information necessary to inform 3M that all of the elements of federal jurisdiction are present, 3M has nevertheless filed this notice of removal within 30 days of service of Plaintiff's Interrogatory Responses. Thus, this Notice of Removal is timely.

20.    Pursuant to 28 U.S.C. § 1446(d), 3M is serving a copy of this Notice of Removal upon all other parties to this case and is also filing a copy with the Clerk of the Business Court.

21.    By filing a Notice of Removal in this matter, 3M does not waive the rights of any Defendant to object to service of process, the sufficiency of process, and/or jurisdiction over the person, or venue, and 3M specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

22.    3M reserves the right to further amend or supplement this Notice of Removal.

23.    If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

## REMOVAL IS PROPER UNDER THE FEDERAL
## OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

24.    Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at

the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) its actions taken pursuant to a federal officer's direction have a causal nexus with plaintiff's claims or injuries or are otherwise related to the lawsuit; and (d) it can assert a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *see also Moore v. Elec. Boat Co.*, 25 F.4th 30, 34 (1st Cir. 2022); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson*, 517 F.3d at 135.

25.    Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, § 1442 as a whole must be "liberally construe[d]" in favor of removal. *Durham*, 445 F.3d at 1252 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); *Maryland v. 3M Co.*, 130 F.4th 380, 388 (4th Cir. 2025) (noting that "'the ordinary presumption against removal does not apply' to federal officer removal" and that "[g]eneral removal principles are . . . inverted when § 1442(a)(1) is at issue") (*quoting Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021)).

26.    All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's injuries are—at least in part—caused by or related to

MilSpec AFFF. *See, e.g.*, *Nessel*, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in PFAS case against AFFF manufacturers because, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF, . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against AFFF manufacturers of MilSpec AFFF); *The City of Irondale v. 3M Company, Inc., et al.*, No. 2:23-cv-01327-AMM, 2025 WL 2419238, at *6 (N.D. Ala. Aug. 19, 2025) (denying motion to remand and noting that for federal officer removal purposes, removal is proper so long as 3M has "put forth a **plausible** case that MilSpec AFFF is a **potential** source of [the plaintiff's] complained-of injury") (emphasis in original). The court overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation ("MDL") has also found on multiple occasions that removal under § 1442 is proper where the notice of removal alleges that the plaintiff's injuries are caused, at least in part, by MilSpec AFFF. *See In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *2–3 (D.S.C. May 24, 2019) ("MDL Order 1"); Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3"), at 3–6. Given its experience with the claims and defenses in the AFFF litigation, the MDL Court's holdings demonstrate that this case, too, has been properly removed to federal court.[9]

A.    **MilSpec AFFF**

27.    Since the late 1960s/early 1970s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. In fact, the United

---

[9] Following removal, 3M intends to designate this action for transfer to the MDL.

States Naval Research Laboratory developed AFFF—its researchers were granted the first AFFF patent in 1966.[10] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[11]

28.    The design and manufacture of MilSpec AFFF are governed by rigorous military specifications created and administered by Naval Sea Systems Command, part of the Department of Defense ("DoD"). The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised several times since.[12] All MilSpec AFFF products must be "qualified for listing on the applicable Qualified Products List" prior to military procurement.[13] Prior to such listing, a "manufacturer's . . . products are examined, tested, and approved to be in conformance with specification requirements."[14] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.[15] After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[16] Naval Sea Systems Command "reserves the right to perform any of the

---

[10] U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[11] U.S. Navy, NRL/MR/1001-06-8951, U.S. Naval Research Lab., *The U.S. Naval Research Laboratory (1923-2005): Fulfilling the Roosevelts' Vision for American Naval Power*, at 37 (June 30, 2006) ("*Fulfilling the Roosevelts' Vision*"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[12] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[13] MIL-PRF-24385F(4) § 3.1 (2020).

[14] DoD SD-6, Provisions Governing Qualification at 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[15] *See, e.g.*, MIL-PRF-24385F(4) at 18 (2020). The cited MilSpec designates Naval Sea Systems Command as the "Preparing Activity." The "Preparing Activity" is responsible for qualification. (*See* DoD SD-6, *supra* n.14, at 3.)

[16] DoD SD-6, *supra* n.14, at 1.

[quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[17]

29.    From its inception until 2019, the MilSpec for AFFF included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their precursors—among the compounds expressly alleged to be at issue in this action.[18] *See* Compl. ¶¶ 62, 64, 103–04. The current MilSpec expressly contemplates the presence of PFOA and PFOS (subject to recently imposed limits) in AFFF formulations.[19] Indeed, the current MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS "while still meeting all other military specification requirements."[20]

30.    3M manufactured and sold PFAS-containing MilSpec AFFF to the U.S. military for over three decades pursuant to contracts with the United States. One or more of 3M's AFFF products were on the Navy's Qualified Products List for AFFF from 1970 until 2010 (even though 3M had phased out production of AFFF beginning in 2000).[21] Over time, the U.S. military used MilSpec AFFF manufactured by 3M throughout the United States, including in Maine.

---

[17] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

[18] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

[19] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[20] MIL-PRF-24385F(4) § 6.6.

[21] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014) & MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

**B.** **MilSpec AFFF Plausibly Contributed to PFAS Contamination Alleged By The State.**

31.    As set forth below, the contamination of natural resources alleged by the State was plausibly caused by MilSpec AFFF, including at the BTWD water system and the Additional MilSpec AFFF Sites. The State's claims thus relate to or arise in part from PFAS-containing MilSpec AFFF.

32.    Since this Court granted the State's motion to remand, the parties have litigated this action in Maine state court. On June 13, 2025, 3M and other Defendants served 3M's Interrogatories to the State. 3M's Interrogatories consisted of a single interrogatory that requested the State provide certain information "about each Claimed Site and Resource at Issue in Your Complaint."[22]

33.    In response to 3M's Interrogatories, on August 12, 2025, the State "produc[ed] a spreadsheet bates stamped as MEPLTF_NonAFFF_001595698 contemporaneous with this response that identifies by location sites where the State is aware of PFAS contamination and for which it seeks recovery in this case."[23] The spreadsheet identifies 910 sites, which include "claimed public water systems."

34.    One of the "claimed public water systems" that the State identified in response to 3M's Interrogatories is the BTWD water system. In connection with its identification of the BTWD water system, the State also identified drinking water as the "resource at issue" and provided a public water system ID number: ME0090260.

---

[22] 3M's Interrogatories at 4.

[23] *See* Interrogatory Responses at 5.

13

35.    The BTWD water system is reported to have been contaminated by MilSpec AFFF. In the fall of 2024, BTWD released a "Special Edition Water Quality Report" (the "Report").[24] The Report was provided "as a recap and update of the Brunswick & Topsham Water District's (BTWD) ongoing work on PFAS (Per- and polyfluoroalkyl substances)."[25] The Report identifies the BTWD water system with the same public water system ID number that Maine disclosed in its spreadsheet in response to 3M's Interrogatories.[26]

36.    The Report contains PFAS testing results, noting that both PFOS and PFOA have been detected in water at its Jordan Avenue Station.[27] According to the report, BTWD "undertook an investigation that ultimately cost more than $600,000" that "included collaboration with the MEDWP, US Navy, USEPA and Maine Department of Environmental Protection (MEDEP)."[28] This investigation ultimately determined "that the source was coming from the former Naval Air Station Brunswick (NASB)." In turn, the U.S. EPA explains that the PFAS found at NASB "were used in the formation of aircraft firefighting foams that were historically used by the Navy when Brunswick was an active air station."[29]

37.    On September 5, 2025, in further response to 3M's Interrogatories, the State served its Supplemental Responses and produced a new spreadsheet to replace the original spreadsheet it

---

[24] *See Special Edition Water Quality Report Fall 2024*, Brunswick & Topsham Water District, available at https://www.btwater.org/special-edition-wq-report (the "Report").

[25] *Id.* at 2.

[26] *Id.* at 2.

[27] *Id.* at 3.

[28] *Id.* at 3.

[29] *Brunswick Naval Air State Brunswick, ME*, United States Environmental Protection Agency, available at https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0101073.

had produced contemporaneously with its Interrogatory Responses. Like the old spreadsheet, the new spreadsheet identifies BTWD as a "claimed public water system," identifies drinking water as the "resource at issue," and provides the same public water system ID number: ME0090260. The State's Supplemental Responses confirm its intent to recover for AFFF-related injuries.

38.    Moreover, in the AFFF Complaint, the State alleges that "[n]umerous locations in Maine are contaminated and injured by AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA, including . . . the Naval Air Station in Brunswick." AFFF Compl. ¶ 207. The State specifically alleges that the levels of PFAS found in the groundwater at Brunswick Naval Air Station are "extremely high." *Id.*

39.    The State alleges that the U.S. military created MilSpec requirements beginning in the late 1960s and that, "3M sold AFFF products containing PFAS to the United States Department of Defense (DOD) and others from approximately 1964 through at last 2000." *See Id.* ¶¶ 106–108. The State further alleges that the Department of Defense "purchased AFFF *exclusively* from 3M" and another company from the 1960s through 2001. *Id.* ¶ 110 (emphasis added).

### 1.    *Subsequent Investigation Of Claimed Sites Has Revealed Additional MilSpec AFFF Sites Beyond the BTWD.*

40.    After filing its Notice of Removal on September 8, 2025, 3M's ongoing investigation of the State's list of Claimed Sites indicated that the alleged PFAS contamination of the Additional MilSpec AFFF Sites plausibly stems at least in part from MilSpec AFFF use at the Naval Air Station in Brunswick, Loring Air Force Base, and the Maine Air National Guard Base in Bangor, despite the State's purported disclaimer.

### a.    **Additional MilSpec AFFF Sites Plausibly Attributable to AFFF from the Naval Air Station in Brunswick.**

41.    Water from BTWD that has reportedly been contaminated with PFAS from MilSpec AFFF use at the Naval Air Station in Brunswick has also plausibly contributed to the alleged PFAS

contamination of additional Claimed Sites, including the Hawk Ridge Compost Facility and the Juniper Ridge Landfill. When water from BTWD that has been reportedly contaminated with PFAS from MilSpec AFFF is used by the consumers of Brunswick and Topsham, it then flows into the Brunswick Sewer District ("BSD") wastewater treatment system,[30] ultimately resulting in BSD's production of allegedly PFAS-contaminated sludge that is plausibly attributable at least in part to MilSpec AFFF. *Cf.* Compl. ¶ 47. According to a 2022 report, BSD disposed of sludge from its wastewater system at both the Hawk Ridge Compost Facility and the Juniper Ridge Landfill.[31] Hawk Ridge Compost Facility (EGAD ID # 30018) and the Juniper Ridge Landfill (EGAD ID # 31339) are both identified as Claimed Sites in the State's Interrogatory Responses and Supplemental Responses.[32] Consequently, the State is seeking recovery for alleged damages at these two Claimed Sites that plausibly stem from, at least in part, PFAS from MilSpec AFFF.

42.    The State also seeks recovery for alleged PFAS contamination of the Androscoggin River (identified as Androscoggin River – ARB with EGAD ID # 65321), which is partially located downstream from the allegedly MilSpec AFFF-contaminated Navy Air Station at Brunswick. It is plausible that the groundwater from the Navy Air Station at Brunswick at issue in the State's AFFF Complaint, *see* AFFF Compl. ¶ 207, contributed to the alleged PFAS contamination of the nearby Androscoggin River. The Androscoggin River is identified as a Claimed Site in both the State's Interrogatory Responses and Supplemental Responses, with the State identifying "fish fillet" as the "resource at issue" at the Claimed Site. Because fish can travel

---

[30] *See About Us*, Brunswick Sewer District, available at https://www.brunswicksewer.org/ ("The Brunswick Sewer District serves the communities of Brunswick and Topsham").

[31] *See* 2022 Annual Report at 6, Brunswick Sewer District, available at https://www.brunswicksewer.org/2022%20BSD%20Annual%20Report%201.pdf ("While BSD had stopped land spreading in 2019, this legislation ended the use of compost, so BSD had to change from sludge disposal at Hawk Ridge to landfilling at Juniper Ridge.").

[32] *See* Exhibit 1; Exhibit 2.

both up and downstream, the alleged PFAS contamination of the Androscoggin River plausibly derived, at least in part, from MilSpec AFFF. Therefore this is yet another MilSpec AFFF-related site at issue in this case, despite the State's assertions to the contrary.

**b.    Additional MilSpec AFFF Sites Potentially Attributable to AFFF from Loring Air Force Base.**

43.    Besides sites related to the Navy Air Station in Brunswick, the State also seeks recovery for alleged contamination from Loring Air Force Base in its AFFF Action. AFFF Compl. ¶ 207. Specifically, the State alleges that "PFOS, PFOA, PFNA, PFHxS, PFHpA, and/or PFDA found within Defendants' AFFF products and/or manufactured by Defendants for use in AFFF have contaminated and injured fish, including, for example, in streams and brooks in Limestone near Loring Air Force Base." *Id.* ¶ 236. The State also asserts that the groundwater at Loring Air Force Base is contaminated with PFAS from AFFF at "extremely high levels." *Id.* ¶¶ 207, 221.

44.    Two of the Claimed Sites identified in the State's Interrogatory Responses in this case, the Aroostook River (identified as Aroostook River – API with EGAD ID # 148571) and the Little Madawaska River (identified as Little Madawaska River – LMU with EGAD ID # 148550)[33] are located downstream from Loring Air Force Base. Groundwater and surface water from the military site plausibly flows into the two rivers through the brooks and streams surrounding the base. The State's discovery responses indicate that "fish fillet" are the "resources at issue" for these two sites.[34] Accordingly, it is plausible that PFAS from MilSpec AFFF migrated from Loring Air Force Base, as the State alleges in its AFFF Complaint, and subsequently contributed to the alleged PFAS contamination of the fish in the Aroostook River and Little Madawaska River that the State seeks to recover for in this action.

---

[33] *Id.*

[34] *Id.*

### c.    Additional MilSpec AFFF Sites Potentially Attributable to AFFF from the Maine Air National Guard Base in Bangor.

45.    The State also seeks recovery in its AFFF Action for alleged PFAS contamination of groundwater from the Maine Air National Guard Base in Bangor. AFFF Compl. ¶ 221. MilSpec AFFF from this location has plausibly contributed to the alleged PFAS contamination of two Claimed Sites. The Penobscot River (identified as Penobscot River – PBV with EGAD ID # 65408 in the State's Interrogatory Responses and Supplemental Responses)[35] is located partially downstream from the Maine Air National Guard Base in Bangor. Groundwater and surface water plausibly flow from the Maine Air National Guard Base in Bangor into the Penobscot River through an adjacent stream. The alleged contamination of the river plausibly stems at least in part from MilSpec AFFF releases at the Maine Air National Guard Base in Bangor.

46.    In addition, Juniper Ridge Landfill (EGAD ID # 31339) also received biosolids that plausibly contain MilSpec AFFF from the Maine Air National Guard Base in Bangor. Wastewater from the Maine Air National Guard Base in Bangor is treated at the Bangor Wastewater Treatment Plant, which has reported PFAS contamination stemming from the military facility.[36] The biosolids generated from the treatment of this allegedly contaminated wastewater were sent to the Juniper Ridge Landfill.[37] As noted above, the State is seeking recovery for alleged contamination at Juniper Ridge Landfill, despite the site plausibly containing PFAS from MilSpec AFFF.

---

[35] *Id.*

[36] *See Where 'forever chemicals' are highest in Bangor*, Bangor Daily News, available at https://www.bangordailynews.com/2024/09/17/bangor/bangor-environment/bangor-water-pfas-test-high-concentration-locations-joam40zk0w/ (noting that "PFAS in the city's wastewater were coming from . . . the Bangor Air National Guard and Bangor Army National Guard.").

[37] *See Biosolids and PFAS questions are rippling to other states after Maine's land application ban*, Waste Dive, available at https://www.wastedive.com/news/biosolids-disposal-pfas-epa-maine-casella-michigan/718500/ (reporting that the Bangor Wastewater Treatment Plant's contract with Casella Waste Systems for biosolid processing was canceled when the company stopped accepting sludge at the Juniper Ridge Landfill); *Id.* (noting that "Casella and other landfill

47.     For those reasons, the alleged contamination of the State's natural resources plausibly derived from use of MilSpec AFFF. Because the alleged PFAS exposure at issue in this action is, at least in part, plausibly attributable and/or related to MilSpec AFFF use at the former Naval Air Station in Brunswick and the Additional MilSpec AFFF Sites described above, 3M is entitled to remove this case as a whole pursuant to federal officer jurisdiction and can satisfy each of the elements of federal officer jurisdiction as set forth below.

### C.     All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied.

#### 1.     *The "Person" Requirement Is Satisfied.*

48.     The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) meets the definition of "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes corporations. *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *accord Isaacson*, 517 F.3d at 135-36.

#### 2.     *The "Acting Under" Requirement Is Satisfied.*

49.     The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 152 (2007); *Papp*, 842 F.3d at 812.  The phrase "acting under" is to be "liberally construed in favor of the entity seeking removal." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) (internal quotation marks omitted). "[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Id.*

50.     The requirement of "acting under" a federal officer is met here because the alleged PFAS contamination at issue in this action stems in part from MilSpec AFFF, a vital product

---

operators" "describe themselves as passive receivers of PFAS-containing waste" from wastewater treatment plants and other waste generating facilities).

provided by 3M that otherwise "the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations." [38] Accordingly, the military has long depended upon outside contractors like 3M to develop and supply AFFF. *See Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *see also* MDL Order 1, 2019 WL 2807266, at *2 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL Order 2, at 3–5; MDL Order 3, at 3–6.

51.    In designing, manufacturing, and supplying the MilSpec AFFF at issue, 3M acted under the direction and control of federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, MilSpec AFFF products were subject to various tests by the U.S. Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD. [39] 3M

---

[38] Fulfilling the Roosevelts' Vision, *supra* note 11, at 37.

[39] *See* DoD, SD-6, *supra* note 14, at 1.

has satisfied the "acting under" requirement. *See, e.g.*, *Nessel*, 2021 WL 744683, at *3; *Ayo*, 2018 WL 4781145, at *8–9.

### 3.    The "Under Color Of Federal Office" Requirement Is Satisfied.

52.    The third requirement, that the defendant's actions were taken "under color of federal office," is satisfied where there is a "nexus" between "the allegations in the complaint and conduct undertaken at the behest of a federal officer." *Moore*, 25 F.4th at 34 n.2 (quoting *R.I. v. Shell Oil Prods. Co., L.L.C.*, 979 F.3d 50, 59 (1st Cir. 2020)). As with the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137. To meet this requirement, "there need be only *a connection or association* between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (internal quotation marks omitted).[40]

53.    Here, the State's claims against 3M for alleged PFAS contamination of natural resources and property are for or relate to (at least in part) 3M's design, manufacture, and sale of MilSpec AFFF—which was designed and manufactured according to DoD military specifications, and which has been used, stored, and/or released at military facilities (and elsewhere) in Maine. *See supra* ¶¶ 22–36. As a result, the State's claims against 3M relate to their acts taken under color of federal office. *See Maryland*, 130 F.4th at 391 (nexus element satisfied where 3M "plausibly alleged that PFAS intermingled to the point that it is impossible to identify their source," such that MilSpec AFFF "contributed to at least" part of the contamination); *Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); MDL Order 1, 2019 WL 2807266, at *3 (nexus element satisfied where "[Plaintiff]'s claims arise out of use of AFFF products . . . for which the

---

[40] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

U.S. military imposes MilSpec standards"); MDL Order 2, at 5 (nexus element satisfied where AFFF products, "for which the military imposes MilSpec standards," were the alleged cause of plaintiff's injuries); MDL Order 3, at 5–6 (same).

54.     It is immaterial that the State disclaims recovery for alleged contamination stemming from AFFF. Courts "credit Defendants' theory of the case when determining whether [the] causal connection exists." *Isaacson*, 517 F.3d at 137; *see also Maryland*, 130 F.4th at 389; *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 192 (1st Cir. 2024); *Nessel*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present"); Case Management Order No. 36, *In re: Aqueous Film-Forming Foams Prod. Liab. Litig.*, No. 2:18-mn-02873-RMG, ECF No. 7891 (D.S.C. Aug. 22, 2025) (finding efforts "to avoid the MDL and/or federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF" to be "contrary to law" under *Maryland*). In any case, the State undermined the veracity of its disclaimer—upon which this Court relied in remanding this action after the first removal—when it identified the BTWD water system and the Additional MilSpec AFFF Sites for which it is seeking damages in this case.

55.     As averred in this Notice of Removal, the alleged injuries arise at least in part from alleged exposure to MilSpec AFFF. Accordingly, the State's claims are "for or relating to" 3M's actions under color of federal office (28 U.S.C. § 1442(a)(1)), and 3M is entitled to remove this case as a whole pursuant to § 1442(a)(1). *See, e.g.*, *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.6 (6th Cir. 2010) ("[S]ection 1442(a)(1) authorizes removal of the entire case even if only one of the controversies it raises involves a federal officer or agency.").

### 4.        *The "Colorable Federal Defense" Requirement Is Satisfied.*

56.     The fourth requirement ("colorable federal defense") is satisfied by 3M's assertion of the government contractor defense.

57.    At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted). "A defendant 'need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court.") (citation omitted); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 54 (D. Mass. 2008) (upon removal, defendant must raise "colorable federal defense"). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116; *see also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.") (internal citation omitted). Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

58.    Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the

supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

59.    The requirement of "reasonably precise specifications" can be met by evidence showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not a mere "rubber stamping." It created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling.[41] Those specifications are "reasonably precise," including in requiring the use of PFAS.[42] In addition, in the past and continuing to the present, the DoD has purchased and used MilSpec AFFF with awareness of the product's PFAS content and of the alleged risks associated with PFAS in the product. *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

60.    With respect to the second requirement, 3M's products have appeared on the DoD Qualified Products List,[43] which could have happened only if Naval Sea Systems Command had

---

[41] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 12, supra.

[42] As noted earlier, until 2019 the specification expressly required that MilSpec AFFF contain "fluorocarbon surfactants," all of which are members of the PFAS family. Even since that express requirement was removed from the specification, the use of PFAS has been implicitly mandated because PFAS-containing surfactants are the only kind that enable AFFF to meet the performance requirements of the specification.

[43] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014); MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (both available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at *13 ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); MDL Order 1, 2019 WL 2807266, at *3 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

61.    Regarding the third requirement, the U.S. government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues.[44] For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered to have adverse effects environmentally."[45]  In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental impact," including "soil contamination" and the "potential" for "groundwater contamination."[46] By no later than 2001, DoD was aware of

---

[44] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1-6 (Nov. 4, 2002).

[45] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[46] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."[47] In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer.[48] More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[49] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants,"[50] and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[51] *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); MDL Order 1, 2019 WL 2807266, at *3 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water").

---

[47] EPA Presentation on Activities/Issues on Fluorosurfactants, March 16, 2001 (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1971-2 (D.S.C.)).

[48] *See* EPA, Revised Draft Hazard Assessment, *supra* note 50.

[49] DoD, *Aqueous Film Forming Foam Report to Congress* 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[50] MIL-PRF-24385F(4) § 3.2 (2020).

[51] *Id.* § 6.6 & Tables I, III; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

62.     At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

63.     3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries to the State that were caused at least in part by 3M's compliance with military specifications, the State is attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

64.     The MDL Court, based on an extensive record, has found that the government contractor defense asserted by 3M and other AFFF manufacturers presents genuine issues of fact for trial. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues necessarily is "colorable."

65.     Accordingly, 3M is entitled to remove this action to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

WHEREFORE, 3M hereby removes this action from the Business Court to this Court.

Dated: September 24, 2025

Respectfully submitted,

/s/ *Daniel L. Ring*

Daniel L. Ring
Jenner & Block LLP
353 N. Clark St.
Chicago, Illinois 60654
(312) 222-9350
dring@jenner.com
*Admitted Pro Hac Vice*

Jay S. Geller (Maine Bar No. 9022)
LAW OFFICE OF JAY S. GELLER
Lunt Professional Building
74 Lunt Road, Suite 206
Falmouth, ME 04105
(207) 899-1477
jgeller@jaysgellerlaw.com

*Counsel for 3M Company*

## CERTIFICATE OF SERVICE

I hereby certify that on September 24, 2025, I caused the foregoing to be filed with the Clerk of the Court via electronic mail, and I also caused a true and correct copy of the foregoing to be served on the following parties by Mail and Email as indicated below:

By Mail and Email:

Aaron M. Frey
Scott Boak
Robert Martin
Mark Bower
Office of the Maine Attorney General
6 State House Station
Augusta, Maine 04333
(207) 626-8566
Email:
Aaron.Frey@maine.gov
Scott.Boak@maine.gov
Robert.Martin@maine.gov
Mark.Bower@maine.gov

Matthew F. Pawa
Benjamin A. Krass
Gillian C.A. Cowley
PAWA LAW GROUP P.C.
1280 Centre Street, Suite 230
Newton Centre, MA 02459
(617) 641-9550
Email:
mp@pawalaw.com
bkrass@pawalaw.com
gcowley@pawalaw.com

Kyle J. McGee
Viola Vetter
Jason H. Wilson
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
(302) 622-7000
Email:
kmcgee@gelaw.com
vvetter@gelaw.com
jwilson@gelaw.com

Steven J. Daroci
SEEGER WEISS LLP
55 Challenger Road 6th Floor
Ridgefield Park, NJ 07660
(973) 639-8656
Email:
sdaroci@seegerweiss.com

*Attorneys for Plaintiff*

Sigmund D. Schutz
Alexandra A. Harriman
PRETI, FLAHERTY
One City Center
P.O. Box 9546
Portland, ME 04112
(207) 791-3111
Email:
sschutz@preti.com
aharriman@preti.com

J. Wylie Donald
MCCARTER & ENGLISH LLP
1301 K Street N.W.
Suite 1000 West
Washington, DC 20005
(202) 753-3400
Email:
jdonald@McCarter.com

*Attorneys for Defendants EIDP, Inc., Chemours Company, Chemours Company FC LLC, Corteva Inc., and DuPont De Nemours Inc.*

Randy J. Creswell
CRESWELL LAW
PO BOX 7340
Portland, ME 04412
(207) 358-1010
Email:
rcreswell@creswelllaw.com

*Attorneys for Defendants EIDP, Inc., Corteva Inc., and DuPont De Nemours Inc.*

Adam S. Taylor
Andre G. Duchette
TAYLOR, MCCORMACK & FRAME, LLC
267 Commercial Street

2

Portland, ME 04101
(207) 828-2005
Email:
ataylor@tmfattorneys.com
aduchette@tmfattorneys.com

*Attorneys for Defendants Chemours Company and Chemours Company FC LLC*

Dated: September 24, 2025                    /s/ Daniel L. Ring
                                             Daniel L. Ring

3

# EXHIBIT 1

| EGAD # | MCD (MUNICIPALITY/TERRITORY) | SITE NAME (FROM EGAD) | RESOURCE(S) AND OTHER ENVIRONMENTAL MEDIA AT ISSUE | TRUSTEE OF RESOURCE AT ISSUE | SITE LATITUDE | SITE LONGITUDE |
|---|---|---|---|---|---|---|
| 65321 | BRUNSWICK | ANDROSCOGGIN RIVER - ARB | FISH FILLET | STATE OF MAINE - FISH | 43.92110085 | -69.96343000 |
| 148571 | PRESQUE ISLE | AROOSTOOK RIVER - API | SURFACE WATER \| FISH FILLET | STATE OF MAINE - SURFACE WATER & FISH | 46.77626000 | -67.97028700 |
| 30018 | UNITY TWP | HAWKRIDGE COMPOST FACILITY | SURFACE WATER | STATE OF MAINE - SURFACE WATER | 44.61065756 | -69.41524047 |
| 31339 | OLD TOWN | JUNIPER RIDGE LANDFILL | GROUNDWATER | STATE OF MAINE - GROUNDWATER | 44.98026797 | -68.72671893 |
| 148550 | CONNOR TWP | LITTLE MADAWASKA RIVER - LMU | SURFACE WATER \| FISH FILLET | STATE OF MAINE - SURFACE WATER & FISH | 46.96632900 | -68.01350100 |
| 65408 | VEAZIE | PENOBSCOT RIVER - PBV | SURFACE WATER \| FISH FILLET | STATE OF MAINE - SURFACE WATER & FISH | 44.84136401 | -68.69887902 |

# EXHIBIT 2

| EGAD # | MCD (MUNICIPALITY/TERRITORY) | SITE NAME (FROM EGAD) | RESOURCE(S) AND OTHER ENVIRONMENTAL MEDIA AT ISSUE | TRUSTEE OF RESOURCE AT ISSUE | SITE LATITUDE | SITE LONGITUDE |
|---|---|---|---|---|---|---|
| 65321 | BRUNSWICK | ANDROSCOGGIN RIVER - ARB | FISH FILLET | STATE OF MAINE - FISH | 43.92110085 | -69.96343000 |
| 148571 | PRESQUE ISLE | AROOSTOOK RIVER - API | SURFACE WATER \| FISH FILLET | STATE OF MAINE - SURFACE WATER & FISH | 46.77626000 | -67.97028700 |
| 30018 | UNITY TWP | HAWKRIDGE COMPOST FACILITY | SURFACE WATER | STATE OF MAINE - SURFACE WATER | 44.61065756 | -69.41524047 |
| 31339 | OLD TOWN | JUNIPER RIDGE LANDFILL | GROUNDWATER | STATE OF MAINE - GROUNDWATER | 44.98026797 | -68.72671893 |
| 148550 | CONNOR TWP | LITTLE MADAWASKA RIVER - LMU | SURFACE WATER \| FISH FILLET | STATE OF MAINE - SURFACE WATER & FISH | 46.96632900 | -68.01350100 |
| 65408 | VEAZIE | PENOBSCOT RIVER - PBV | SURFACE WATER \| FISH FILLET | STATE OF MAINE - SURFACE WATER & FISH | 44.84136401 | -68.69887902 |

# EXHIBIT 3

Electronically Filed: 9/8/2025 6:09 PM

STATE OF MAINE                          BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.                         BCD-CIV-2023-00065

STATE OF MAINE,                    )
                                   )
                Plaintiff,         )
                                   )
v.                                 )          **DEFENDANT 3M COMPANY'S**
                                   )          <u>**NOTICE OF FILING OF**</u>
3M COMPANY, et al.,                )          <u>**NOTICE OF REMOVAL**</u>
                                   )
                Defendants.        )
                                   )

PLEASE TAKE NOTICE that on September 8, 2025, Defendant 3M Company, pursuant to 28 U.S.C. §§ 1442(a)(1), filed a Notice of Removal with the Clerk of the United States District Court for the District of Maine via electronic mail. A true and correct copy of the Notice of Removal is attached hereto as Exhibit A. 3M has not yet received a file-stamped copy of the Notice of Removal or notification of the federal court case number. 3M will file an amended or supplemental notice of filing of notice of removal upon receipt of the federal case number and file-stamped Notice of Removal.

Dated: September 8, 2025                 Respectfully submitted,

                                         */s/ Russell B. Pierce, Jr.*
                                         Russell B. Pierce (Maine Bar No. 7322)
                                         NORMAN HANSON & DETROY LLC
                                         Two Canal Plaza
                                         P.O. Box 4600
                                         Portland, ME 04112-4600
                                         (207) 774-7000
                                         rpierce@nhdlaw.com

                                         /s/ *Jay S. Geller*
                                         Jay S. Geller (Maine Bar No. 9022)
                                         LAW OFFICE OF JAY S. GELLER
                                         Lunt Professional Building
                                         74 Lunt Road, Suite 206

Falmouth, ME 04105
(207) 899-1477
jgeller@jaysgellerlaw.com

*Counsel for 3M Company*

EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

STATE OF MAINE,

                Plaintiff,

    v.

3M COMPANY, ET AL.,

                Defendants.

Civil Action No. _____

**NOTICE OF REMOVAL**

Defendant 3M Company ("3M"), by undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the State of Maine Business and Consumer Docket ("Business Court") to the United States District Court for the District of Maine. As grounds for removal, 3M alleges as follows:

## PRELIMINARY STATEMENT

1.    Plaintiff State of Maine ("State") seeks to hold 3M and other Defendants liable for their alleged conduct in designing, manufacturing, and/or selling per- and polyfluoroalkyl substances ("PFAS") and PFAS-containing products, which purportedly have resulted in alleged contamination of the State's natural resources and property, including drinking water supplies.

2.    However, at least some of the PFAS that plausibly gives rise to the State's claims was released by the use, storage, or disposal of PFAS-containing aqueous film-forming foam ("AFFF") that was manufactured for and sold to the U.S. military and other users by a select group of suppliers (including 3M) in accordance with the military's rigorous specifications ("MilSpec"). AFFF is a firefighting foam that is highly effective for extinguishing fuel-based fires. Over time,

3M's MilSpec AFFF products have been used by personnel at military facilities (among others) across the United States, including in Maine.

3.      In a sworn response to an interrogatory requesting that the State provide information about each location for which it is asserting a claim against any of the Defendants in this action, the State produced a spreadsheet identifying hundreds of claimed sites, including public water systems, a number of which are linked to AFFF exposure. And at least one of these public water systems, the Brunswick/Topsham Water District ("BTWD") water system, is reported to have been contaminated by MilSpec AFFF.

4.      Under the federal government contractor defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), 3M is not subject to tort liability for its design and manufacture of MilSpec AFFF and its provision of warnings for the product. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is entitled to remove this action in its entirety to have its federal defense adjudicated in a federal forum. *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016). Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *See Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

5.      Although the State purports to disclaim damages related to AFFF in this case, the State's responses to Defendants' interrogatories demonstrate that the State *does* seek damages for PFAS contamination from AFFF, including MilSpec AFFF, in this case. The State's disclaimer is a pretense, and artful pleading should not permit the State to deprive 3M of the federal forum to which it is entitled.

6.      As discussed below, 3M previously removed this case on similar grounds in May 2023, and the Court's decision to remand the case back to state court is the subject of a pending appeal. *Infra* ¶¶ 11–12. While a favorable ruling by the First Circuit on that appeal would moot the present removal, 3M is filing the present Notice of Removal to preserve its right to a federal forum based upon the new facts presented by the State's responses to Defendants' interrogatories in the event the First Circuit affirms the original remand order.

## **BACKGROUND**

7.      This action is one of two actions filed by the State against 3M and other Defendants based on substantially similar allegations concerning PFAS contamination of natural resources and property across Maine, both of which were filed on March 29, 2023.

8.      In this action, which is proceeding in the early stages of written discovery in the Business Court, Docket No. BCD-CIV-2023-00065, the State generally alleges that Defendants, including 3M, have designed, manufactured, marketed, distributed, and/or sold PFAS and PFAS-containing products, including in Maine. *See, e.g.*, Complaint ¶¶ 1, 5, 20–21, 66–77.[1] The State further alleges that Defendants' PFAS have caused contamination of the State's natural resources and property in Maine, including the State's groundwater, surface waters, soils, sediments, and wildlife "throughout Maine." *Id.* ¶ 133; *see also id.* ¶¶ 134–158. The Complaint asserts that "there is PFAS contamination in public water systems, private drinking water wells, at many dairy farms where sludge containing PFAS have been spread, [and] in leachate from municipal and industrial landfills . . . ." *Id.* ¶ 11; *see also id.* ¶ 134 (alleging PFAS contamination of "drinking water," "private drinking wells," "wastewater treatment plants," "many dairy farms," "landfill leachate at municipal, state-owned, and other landfills," and "landfill leachate at landfills associated with the

---

[1] A true and correct copy of the Complaint ("Compl.") is attached as Exhibit 1.

3

paper industry"). The State brings claims against 3M and other Defendants for public nuisance, private nuisance, statutory nuisance, trespass, strict liability for design defect and/or defective product, strict liability for failure to warn, and negligence. *Id.* ¶¶ 243–321.[2] Among other relief, the Complaint seeks "compensatory damages, including natural resources restoration and loss-of-use damages, and costs to investigate, monitor, abate, contain, prevent, treat, and remove PFAS from the State's natural resources and property." *Id.* ¶ 14; *see also id.* at pp. 87–88.

9.      In addition to this action, the State previously filed a separate action that is now proceeding in the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation ("MDL") based on substantially similar allegations of PFAS contamination of natural resources throughout Maine (the "Maine AFFF Action"), and it asserts the same causes of action and requests for relief. *See, e.g.*, Maine AFFF Action Amended Complaint ("AFFF Compl.") ¶¶ 206–249, 357–428.[2] The State generally alleges that Defendants, including 3M, have designed, manufactured, marketed, distributed, and/or sold PFAS-containing AFFF products which have caused contamination of the State's natural resources and property. *Id.* ¶¶ 2, 9–13. The AFFF Complaint explicitly alleges that Defendants (including 3M) sold AFFF for use by the U.S. military in Maine, *id.* ¶¶ 106, 110, and that sites of AFFF-related PFAS contamination in the State include military installations. *Id.* ¶ 212. The AFFF Complaint specifically identifies military installations in Maine where there is allegedly PFAS contamination from AFFF, including "the Naval Air Station in Brunswick, the Portsmouth Naval Shipyard in Kittery, Loring Air Force Base in Limestone, the Cutler Navy radio facility, and the Maine Air National Guard Base in Bangor." *Id.* ¶ 207.

---

[2] A true and correct copy of the operative complaint filed in the Maine AFFF Action is attached as Exhibit 2.

10.    Both actions seek to recover for damages from six of the same PFAS chemicals that the State alleges to have been used by Defendants in the manufacture of AFFF: perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorononanoic acid ("PFNA"), perfluorohexanesulfonic acid ("PFHxS"), perfluoroheptanoic acid ("PFHpA"), and perfluorodecanoic acid ("PFDA"). *See* Compl. ¶ 1; AFFF Compl. ¶ 2. Critically, PFOS and PFOA from AFFF are chemically indistinguishable in the ground from PFOA or PFOS from other sources.

11.    3M originally removed this action to this Court on May 17, 2023, asserting federal officer jurisdiction and federal enclave jurisdiction. *See* Notice of Removal, No. 2:23-cv-00210-JAW, ECF No. 1 (D. Me. May 17, 2023). As relevant to 3M's instant notice of removal, 3M alleged that PFAS from MilSpec AFFF and non-AFFF sources comingled across Maine, so the State's claims "encompass[ed] alleged PFAS contamination that plausibly derives at least in part from MillSpec AFFF use." *See id.* at 10–14.

12.    The State moved to remand this action to state court. *See* Mot. to Remand, No. 2:23-cv-00210-JAW, ECF No. 10 (D. Me. May 25, 2023). The State argued that no federal officer jurisdiction existed because 3M failed to identify any sites where commingling occurred and because, even if 3M had identified such sites, the State had "expressly disclaim[ed] seeking relief for any AFFF-related injuries." *See id.* at 2–9. Indeed, in its reply brief in support of remand, the State sought to bolster its disclaimer argument with what it claimed was a "sworn declaration from the state demonstrating that [AFFF products] are not" at issue. Reply in Supp. of Mot. to Remand, No. 2:23-cv-00210-JAW, ECF No. 38 at 1–3 & at n.1 (D. Me. June 22, 2023). This Court granted the State's motion to remand, reasoning that "because of the State's express disclaimer, the Court concludes that this case must be remanded to the state of Maine Superior Court since the federal

5

officer defense is not applicable." Order on Mots. to Stay and Remand, No. 2:23-cv-00210-JAW, ECF No. 47 at 22 (D. Me. July 26, 2023).[3]

13.    On August 12, 2025, the State served its responses to Defendants' First Set of Interrogatories (the "Interrogatory Responses"). In response to a request to identify certain information about "each Claimed Site and Resource at Issue in Your Complaint," the State responded by "producing a spreadsheet bates stamped as MEPLTF_NonAFFF_001595698 . . . that identifies by location sites where the State is aware of PFAS contamination and for which it seeks recovery in this case."[4] That spreadsheet, in turn, identified "BRUNSWICK/TOPSHAM WATER DISTRICT" with PWSID #ME0090260 on a tab entitled "CLAIMED PUBLIC WATER SYSTEMS."[5] On September 5, 2025, the State served supplemental responses to Defendants' First Set of Interrogatories ("Supplemental Responses") and produced a "supplemental spreadsheet at MEPLTF_NonAFFF_002764615" to replace MEPLTF_NonAFFF_00159568. [6]  In the Supplemental Responses and accompanying spreadsheet, the State continues to identify BTWD as a site for which it seeks recovery in this case.  BTWD is reported to have been contaminated with PFAS from MilSpec AFFF. The State's responses and supplemental responses make clear that the disclaimer upon which the prior remand order was based is pretextual at best.

---

[3] 3M has appealed the remand order, with oral argument set for October 6, 2025.

[4] A true and correct copy of the Interrogatory Responses and relevant excerpts of MEPLTF_NonAFFF_001595698 are attached as Exhibits 3 and 4.

[5] *See* Exhibit 3 at 5.

[6] A true and correct copy of the Supplemental Responses and relevant excerpts of MEPLTF_NonAFFF_002764615 are attached as Exhibits 5 and 6.

## THE PROCEDURAL REQUIREMENTS FOR REMOVAL
## UNDER 28 U.S.C. §§ 1442(a)(1) AND 1446 ARE MET

14.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 99 and 1442(a) because the

Business Court is located within the District of Maine

15.     3M is not required to notify or obtain the consent of any other defendant to remove

this action under § 1442(a)(1). *See, e.g.*, *Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 357 n.9

(1st Cir. 2009) ("Removal under [§ 1442(a)(1)] does not require that all defendants agree to

removal."); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Hilbert v.

McDonnell Douglas Corp.*, 529 F. Supp. 2d 187, 195 (D. Mass. 2008).

16.     Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of the operative complaint

is attached as Exhibit 1, and true and correct copies of the documents on file in this case prior to

the filing of this notice of removal are attached to the Prior Case Record Affidavit that is attached

to this notice of removal as Exhibit 8.

17.     Removal is timely under 28 U.S.C. § 1446(b). A defendant removing a case is

required to file a notice of removal within thirty days of service on it by the plaintiff of an initial

pleading (28 U.S.C. § 1446(b)(1)) or other paper (*id*., § 1446(b)(3)) that, considering "the four

corners" of the document, "informs the reader, to a substantial degree of specificity, [that] all the

elements of federal jurisdiction are present." *McLaren v. UPS Store, Inc.*, 32 F.4th 232, 236 (3d

Cir. 2022). Although neither the Complaint nor any other paper served by the State (including the

Interrogatory Responses), separately or together in combination, contain the information necessary

to inform 3M that all of the elements of federal jurisdiction are present, 3M has nevertheless filed

this notice of removal within 30 days of service of Plaintiff's Interrogatory Responses. Thus, this

Notice of Removal is timely.

18.     Pursuant to 28 U.S.C. § 1446(d), 3M is serving a copy of this Notice of Removal upon all other parties to this case and is also filing a copy with the Clerk of the Business Court.

19.     By filing a Notice of Removal in this matter, 3M does not waive the rights of any Defendant to object to service of process, the sufficiency of process, and/or jurisdiction over the person, or venue, and 3M specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

20.     3M reserves the right to amend or supplement this Notice of Removal.

21.     If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

### REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

22.     Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) its actions taken pursuant to a federal officer's direction have a causal nexus with plaintiff's claims or injuries or are otherwise related to the lawsuit; and (d) it can assert a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *see also Moore v. Elec. Boat Co.*, 25 F.4th 30, 34 (1st Cir. 2022); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson*, 517 F.3d at 135.

23.     Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423,

431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, § 1442 as a whole must be "liberally construe[d]" in favor of removal. *Durham*, 445 F.3d at 1252 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); *Maryland v. 3M Co.*, 130 F.4th 380, 388 (4th Cir. 2025) (noting that "'the ordinary presumption against removal does not apply' to federal officer removal" and that "[g]eneral removal principles are . . . inverted when § 1442(a)(1) is at issue") (*quoting Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021)).

24.    All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's injuries are—at least in part—caused by or related to MilSpec AFFF. *See, e.g.*, *Nessel*, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in PFAS case against AFFF manufacturers because, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF, . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against AFFF manufacturers of MilSpec AFFF); *The City of Irondale v. 3M Company, Inc., et al.*, No. 2:23-cv-01327-AMM, 2025 WL 2419238, at *6 (N.D. Ala. Aug. 19, 2025) (denying motion to remand and noting that for federal officer removal purposes, removal is proper so long as 3M has "put forth a **plausible** case that MilSpec AFFF is a **potential** source of [the plaintiff's] complained-of injury") (emphasis in

9

original). The court overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation ("MDL") has also found on multiple occasions that removal under § 1442 is proper where the notice of removal alleges that the plaintiff's injuries are caused, at least in part, by MilSpec AFFF. *See In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *2–3 (D.S.C. May 24, 2019) ("MDL Order 1"); Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3"), at 3–6. Given its experience with the claims and defenses in the AFFF litigation, the MDL Court's holdings demonstrate that this case, too, has been properly removed to federal court.[7]

## A.    **MilSpec AFFF**

25.    Since the late 1960s/early 1970s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. In fact, the United States Naval Research Laboratory developed AFFF—its researchers were granted the first AFFF patent in 1966.[8] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[9]

26.    The design and manufacture of MilSpec AFFF are governed by rigorous military specifications created and administered by Naval Sea Systems Command, part of the Department of Defense ("DoD"). The applicable specification, Mil-F-24385, was first promulgated in 1969,

---

[7] Following removal, 3M intends to designate this action for transfer to the MDL.

[8] U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[9] U.S. Navy, NRL/MR/1001-06-8951, U.S. Naval Research Lab., *The U.S. Naval Research Laboratory (1923-2005): Fulfilling the Roosevelts' Vision for American Naval Power*, at 37 (June 30, 2006) ("*Fulfilling the Roosevelts' Vision*"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

and has been revised several times since.[10] All MilSpec AFFF products must be "qualified for listing on the applicable Qualified Products List" prior to military procurement.[11] Prior to such listing, a "manufacturer's . . . products are examined, tested, and approved to be in conformance with specification requirements."[12] The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.[13] After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[14] Naval Sea Systems Command "reserves the right to perform any of the [quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[15]

27.    From its inception until 2019, the MilSpec for AFFF included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their precursors—among the compounds expressly alleged to be at issue in this action.[16] *See* Compl. ¶¶ 62, 64, 103–04. The current MilSpec

---

[10] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[11] MIL-PRF-24385F(4) § 3.1 (2020).

[12] DoD SD-6, Provisions Governing Qualification at 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[13] *See, e.g.*, MIL-PRF-24385F(4) at 18 (2020). The cited MilSpec designates Naval Sea Systems Command as the "Preparing Activity." The "Preparing Activity" is responsible for qualification. (*See* DoD SD-6, *supra* n.12, at 3.)

[14] DoD SD-6, *supra* n.12, at 1.

[15] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

[16] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed

expressly contemplates the presence of PFOA and PFOS (subject to recently imposed limits) in AFFF formulations.[17] Indeed, the current MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS "while still meeting all other military specification requirements."[18]

28.     3M manufactured and sold PFAS-containing MilSpec AFFF to the U.S. military for over three decades pursuant to contracts with the United States. One or more of 3M's AFFF products were on the Navy's Qualified Products List for AFFF from 1970 until 2010 (even though 3M had phased out production of AFFF beginning in 2000).[19] Over time, the U.S. military used MilSpec AFFF manufactured by 3M throughout the United States, including in Maine.

### B.     MilSpec AFFF Plausibly Contributed to PFAS Contamination Alleged By The State.

29.     As set forth below, the contamination of natural resources alleged by the State was plausibly caused by MilSpec AFFF, including at the BTWD water system. The State's claims thus relate to or arise in part from PFAS-containing MilSpec AFFF.

30.     Since this Court granted the State's motion to remand, the parties have litigated this action in Maine state court. On June 13, 2025, 3M and other Defendants served their First Set of Interrogatories ("3M's Interrogatories") to the State.[20] 3M's Interrogatories consisted of a single interrogatory that requested the State provide certain information "about each Claimed Site and

---

on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

[17] See MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[18] MIL-PRF-24385F(4) § 6.6.

[19] See MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014) & MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (available at In re AFFF Prods. Liab. Litig., No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

[20] A true and correct copy of 3M's Interrogatories is attached as Exhibit 7.

Resource at Issue in Your Complaint."[21] 3M's Interrogatories defined "Claimed Site" as "each and every location for which the State asserts a claim against any of the Defendants in this Action."[22]

31.     In response to 3M's Interrogatories, on August 12, 2025, the State "produc[ed] a spreadsheet bates stamped as MEPLTF_NonAFFF_001595698 contemporaneous with this response that identifies by location sites where the State is aware of PFAS contamination and for which it seeks recovery in this case."[23] The spreadsheet identifies 910 sites, which include "claimed public water systems."

32.     One of the "claimed public water systems" that the State identified in response to 3M's Interrogatories is the BTWD water system. In connection with its identification of the BTWD water system, the State also identified drinking water as the "resource at issue" and provided a public water system ID number: ME0090260.

33.     The BTWD water system is reported to have been contaminated by MilSpec AFFF. In the fall of 2024, BTWD released a "Special Edition Water Quality Report" (the "Report").[24] The Report was provided "as a recap and update of the Brunswick & Topsham Water District's (BTWD) ongoing work on PFAS (Per- and polyfluoroalkyl substances)."[25] The Report identifies

---

[21] 3M's Interrogatories at 4.

[22] *Id.* at 1.

[23] *See* Interrogatory Responses at 5.

[24] *See Special Edition Water Quality Report Fall 2024*, Brunswick & Topsham Water District, available at https://www.btwater.org/special-edition-wq-report (the "Report").

[25] *Id.* at 2.

the BTWD water system with the same public water system ID number that Maine disclosed in its spreadsheet in response to 3M's Interrogatories.[26]

34.    The Report contains PFAS testing results, noting that both PFOS and PFOA have been detected in water at its Jordan Avenue Station.[27] According to the report, BTWD "undertook an investigation that ultimately cost more than $600,000" that "included collaboration with the MEDWP, US Navy, USEPA and Maine Department of Environmental Protection (MEDEP)."[28] This investigation ultimately determined "that the source was coming from the former Naval Air Station Brunswick (NASB)." In turn, the U.S. EPA explains that the PFAS found at NASB "were used in the formation of aircraft firefighting foams that were historically used by the Navy when Brunswick was an active air station."[29]

35.    On September 5, 2025, in further response to 3M's Interrogatories, the State served its Supplemental Responses and produced a new spreadsheet to replace the original spreadsheet it had produced contemporaneously with its Interrogatory Responses. Like the old spreadsheet, the new spreadsheet identifies BTWD as a "claimed public water system," identifies drinking water as the "resource at issue," and provides the same public water system ID number: ME0090260. The State's Supplemental Responses confirm its intent to recover for AFFF-related injuries.

36.    Moreover, in the AFFF Complaint, the State alleges that "[n]umerous locations in Maine are contaminated and injured by AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA,

---

[26] *Id.* at 2.

[27] *Id.* at 3.

[28] *Id.* at 3.

[29] *Brunswick Naval Air State Brunswick, ME*, United States Environmental Protection Agency, available at https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0101073.

and/or PFDA, including . . . the Naval Air Station in Brunswick." AFFF Compl. ¶ 207. The State specifically alleges that the levels of PFAS found in the groundwater at Brunswick Naval Air Station are "extremely high." *Id.*

37.    The State alleges that the U.S. military created MilSpec requirements beginning in the late 1960s and that, "3M sold AFFF products containing PFAS to the United States Department of Defense (DOD) and others from approximately 1964 through at last 2000." *See Id.* ¶¶ 106–108. The State further alleges that the Department of Defense "purchased AFFF *exclusively* from 3M" and another company from the 1960s through 2001. *Id.* ¶ 110 (emphasis added).

38.    For those reasons, the alleged contamination of the State's natural resources plausibly derived from use of MilSpec AFFF. Because the alleged PFAS exposure at issue in this action is, at least in part, plausibly attributable and/or related to MilSpec AFFF use at the former Naval Air Station in Brunswick, 3M is entitled to remove this case as a whole pursuant to federal officer jurisdiction and can satisfy each of the elements of federal officer jurisdiction as set forth below.

      **C.**      **<u>All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied.</u>**

          **1.**    *The "Person" Requirement Is Satisfied.*

39.    The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) meets the definition of "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes corporations. *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *accord Isaacson*, 517 F.3d at 135-36.

          **2.**    *The "Acting Under" Requirement Is Satisfied.*

40.    The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 152 (2007); *Papp*, 842 F.3d at 812. The phrase "acting under" is to be "liberally

construed in favor of the entity seeking removal." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249, 255 (4th Cir. 2017) (internal quotation marks omitted). "[C]ourts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it *manufactured for the government*." *Id.*

41.     The requirement of "acting under" a federal officer is met here because the alleged PFAS contamination at issue in this action stems in part from MilSpec AFFF, a vital product provided by 3M that otherwise "the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[30] Accordingly, the military has long depended upon outside contractors like 3M to develop and supply AFFF. *See Nessel*, 2021 WL 744683, at *3 (holding that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *see also* MDL Order 1, 2019 WL 2807266, at *2 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL Order 2, at 3–5; MDL Order 3, at 3–6.

---

[30] Fulfilling the Roosevelts' Vision, *supra* note 9, at 37.

16

42.    In designing, manufacturing, and supplying the MilSpec AFFF at issue, 3M acted under the direction and control of federal officers. Specifically, 3M acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling. Further, MilSpec AFFF products were subject to various tests by the U.S. Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[31]  3M has satisfied the "acting under" requirement. *See, e.g.*, *Nessel*, 2021 WL 744683, at *3; *Ayo*, 2018 WL 4781145, at *8–9.

### 3.    *The "Under Color Of Federal Office" Requirement Is Satisfied.*

43.    The third requirement, that the defendant's actions were taken "under color of federal office," is satisfied where there is a "nexus" between "the allegations in the complaint and conduct undertaken at the behest of a federal officer." *Moore*, 25 F.4th at 34 n.2 (quoting *R.I. v. Shell Oil Prods. Co., L.L.C.*, 979 F.3d 50, 59 (1st Cir. 2020)). As with the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137. To meet this requirement, "there need be only *a connection or association* between the act in question and the federal office." *Sawyer*, 860 F.3d at 258 (internal quotation marks omitted).[32]

44.    Here, the State's claims against 3M for alleged PFAS contamination of natural resources and property are for or relate to (at least in part) 3M's design, manufacture, and sale of MilSpec AFFF—which was designed and manufactured according to DoD military specifications, and which has been used, stored, and/or released at military facilities (and elsewhere) in Maine.

---

[31] *See* DoD, SD-6, *supra* note 12, at 1.

[32] The "acting under" and "under color of" prongs overlap. Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

*See supra* ¶¶ 22–36. As a result, the State's claims against 3M relate to their acts taken under color

of federal office. *See Maryland*, 130 F.4th at 391 (nexus element satisfied where 3M "plausibly

alleged that PFAS intermingled to the point that it is impossible to identify their source," such that

MilSpec AFFF "contributed to at least" part of the contamination); *Ayo*, 2018 WL 4781145, at *9

("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and

manufacture of AFFF for the government."); MDL Order 1, 2019 WL 2807266, at *3 (nexus

element satisfied where "[Plaintiff]'s claims arise out of use of AFFF products . . . for which the

U.S. military imposes MilSpec standards"); MDL Order 2, at 5 (nexus element satisfied where

AFFF products, "for which the military imposes MilSpec standards," were the alleged cause of

plaintiff's injuries); MDL Order 3, at 5–6 (same).

45.    It is immaterial that the State disclaims recovery for alleged contamination

stemming from AFFF. Courts "credit Defendants' theory of the case when determining whether

[the] causal connection exists." *Isaacson*, 517 F.3d at 137; *see also Maryland*, 130 F.4th at 389;

*Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 192 (1st Cir. 2024); *Nessel*, 2021 WL 744683,

at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present"); Case

Management Order No. 36, *In re: Aqueous Film-Forming Foams Prod. Liab. Litig.*, No. 2:18-mn-

02873-RMG, ECF No. 7891 (D.S.C. Aug. 22, 2025) (finding efforts "to avoid the MDL and/or

federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF"

to be "contrary to law" under *Maryland*). In any case, the State undermined the veracity of its

disclaimer—upon which this Court relied in remanding this action after the first removal—when

18

it identified the BTWD water system as one of the sites for which it is seeking damages in this
case.

46.    As averred in this Notice of Removal, the alleged injuries arise at least in part from
alleged exposure to MilSpec AFFF. Accordingly, the State's claims are "for or relating to" 3M's
actions under color of federal office (28 U.S.C. § 1442(a)(1)), and 3M is entitled to remove this
case as a whole pursuant to § 1442(a)(1). *See, e.g.*, *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.6
(6th Cir. 2010) ("[S]ection 1442(a)(1) authorizes removal of the entire case even if only one of the
controversies it raises involves a federal officer or agency.").

### 4.    *The "Colorable Federal Defense" Requirement Is Satisfied.*

47.    The fourth requirement ("colorable federal defense") is satisfied by 3M's assertion
of the government contractor defense.

48.    At the removal stage, a defendant need only show that its government contractor
defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted,
given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original)
(citation omitted). "A defendant 'need not win his case before he can have it removed.'" *Id.*
(quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the
defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity
of the defense will be tried in federal court.") (citation omitted); *O'Connell v. Foster Wheeler
Energy Corp.*, 544 F. Supp. 2d 51, 54 (D. Mass. 2008) (upon removal, defendant must raise
"colorable federal defense"). At the removal stage, the inquiry "is purely jurisdictional, and neither
the parties nor the district courts should be required to engage in fact-intensive motion practice,
pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116; *see also
Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court
does not 'determine credibility, weigh the quantum of evidence or discredit the source of the

19

defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.") (internal citation omitted). Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

49.    Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

50.    The requirement of "reasonably precise specifications" can be met by evidence showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not a mere "rubber stamping." It created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling.[33] Those specifications are "reasonably precise," including in requiring the use of PFAS.[34] In addition, in the past and

---

[33] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 10, supra.

[34] As noted earlier, until 2019 the specification expressly required that MilSpec AFFF contain "fluorocarbon surfactants," all of which are members of the PFAS family. Even since that express

continuing to the present, the DoD has purchased and used MilSpec AFFF with awareness of the

product's PFAS content and of the alleged risks associated with PFAS in the product. *See Ayo*,

2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products

but continues to purchase them supports the position that the government approved reasonably

precise specifications for the claimed defective design.").

51.    With respect to the second requirement, 3M's products have appeared on the DoD

Qualified Products List,[35] which could have happened only if Naval Sea Systems Command had

first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at *13 ("There

is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the

government's reasonably precise specifications."); MDL Order 1, 2019 WL 2807266, at *3

(finding that defendant demonstrated a colorable defense "where it contends that its AFFF products

were manufactured according to the U.S. military's MilSpec specifications").

52.    Regarding the third requirement, the U.S. government was sufficiently informed

regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary

authority in specifying and procuring MilSpec AFFF. The military specifications have long

included testing protocols and requirements for toxicity, chemical oxygen, and biological demand.

Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may

contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the

soil and potentially reach groundwater; and that it has been reported that this may raise

---

requirement was removed from the specification, the use of PFAS has been implicitly mandated
because PFAS-containing surfactants are the only kind that enable AFFF to meet the performance
requirements of the specification.

[35] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014); MIL-F-24385 QPL/QPD
History for Type 6 AFFF (Oct. 24, 2014) (both available at *In re AFFF Prods. Liab. Litig.*, No.
2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

environmental or human health issues.[36] For example, as early as October 1980, a report supported

by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and

the U.S. Army Medical Research and Development Command stated that AFFF contained

fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered

to have adverse effects environmentally."[37] In June 1991, the Air Force stated that past Air Force

fire training activities resulted in "adverse environmental impact," including "soil contamination"

and the "potential" for "groundwater contamination."[38] By no later than 2001, DoD was aware of

data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."[39] In

2002, the United States Environmental Protection Agency issued a draft hazard assessment for

PFOA, which reviewed in detail, among other data, human epidemiological studies and animal

toxicology studies pertaining to alleged associations between PFOA and cancer.[40] More recently,

in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA

regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a

"mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-

---

[36] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1-6 (Nov. 4, 2002).

[37] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[38] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

[39] EPA Presentation on Activities/Issues on Fluorosurfactants, March 16, 2001 (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1971-2 (D.S.C.)).

[40] *See* EPA, Revised Draft Hazard Assessment, *supra* note 36.

based fires."[41] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF

contain "surfactants,"[42] and recognizes that PFAS, including PFOS and PFOA, will be present

(subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[43] *See Ayo*, 2018

WL 4781145, at \*12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but

continues to purchase them supports the position that the government approved reasonably precise

specifications for the claimed defective design."); MDL Order 1, 2019 WL 2807266, at \*3 ("As

to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF

products of which the military was not already aware, [defendant] points to materials such as a

November 2017 Department of Defense report to Congress, in which the agency acknowledged

the [EPA]'s stated concerns with PFOS/PFOA in drinking water").

53.    At minimum, these facts constitute colorable evidence that Naval Sea Systems

Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after

weighing the fire-suppression benefits against the alleged risks. *See In re "Agent Orange" Prod.*

*Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at \*5 ("A

defendant is not required to warn the government where 'the government knew as much or more

than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as

here, the government has exercised "discretionary authority over areas of significant federal

interest such as military procurement," the government contractor defense applies. *In re "Agent*

*Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at \*13.

---

[41] DoD, *Aqueous Film Forming Foam Report to Congress* 1–2 (Oct. 2017) (pub. Nov. 3, 2017),
https://tinyurl.com/wshcww4.

[42] MIL-PRF-24385F(4) § 3.2 (2020).

[43] *Id.* § 6.6 & Tables I, III; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam
Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

54.     3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries to the State that were caused at least in part by 3M's compliance with military specifications, the State is attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

55.     The MDL Court, based on an extensive record, has found that the government contractor defense asserted by 3M and other AFFF manufacturers presents genuine issues of fact for trial. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues necessarily is "colorable."

56.     Accordingly, 3M is entitled to remove this action to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

WHEREFORE, 3M hereby removes this action from the Business Court to this Court.


Dated: September 8, 2025                          Respectfully submitted,


                                                  /s/ *Jay S. Geller*
                                                  Jay S. Geller (Maine Bar No. 9022)
                                                  LAW OFFICE OF JAY S. GELLER
                                                  Lunt Professional Building
                                                  74 Lunt Road, Suite 206
                                                  Falmouth, ME 04105
                                                  (207) 899-1477
                                                  jgeller@jaysgellerlaw.com

                                                  *Counsel for 3M Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2025, I caused the foregoing to be filed with the Clerk of the Court via electronic mail, and I also caused a true and correct copy of the foregoing to be served on the following parties by Mail and Email as indicated below:

<u>By Mail and Email:</u>

Scott Boak
Robert Martin
Assistant Attorneys General
6 State House Station
Augusta, Maine 04333
(207) 626-8566
Email:
Scott.Boak@maine.gov
Robert.Martin@maine.gov

Matthew F. Pawa
Benjamin A. Krass
Gillian C.A. Cowley
PAWA LAW GROUP P.C.
1280 Centre Street, Suite 230
Newton Centre, MA 02459
(617) 641-9550
Email:
mp@pawalaw.com
bkrass@pawalaw.com
gcowley@pawalaw.com

Kyle J. McGee
Viola Vetter
Jason H. Wilson
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
(302) 622-7000
Email:
kmcgee@gelaw.com
vvetter@gelaw.com
jwilson@gelaw.com

*Attorneys for Plaintiff*

<u>By mail:</u>

EIDP, Inc.
974 Centre Road
Wilmington, DE 19805

*Defendant*

The Chemours Company
1007 Market Street
Wilmington, DE 19899

*Defendant*

The Chemours Company FC, LLC
1007 Market Street
Wilmington, DE 19898

*Defendant*

Dow Inc.
2211 H.H. Dow Way
Midland, MI 48674

*Defendant*

Corteva, Inc.
974 Centre Road
Wilmington, DE 19805

*Defendant*

DuPont de Nemours, Inc.
974 Centre Road
Wilmington, DE 19805

*Defendant*

Dated: September 8, 2025                      */s/ Jay s. Geller*
                                             Jay S. Geller

# EXHIBIT 4

Electronically Filed: 9/9/2025 2:56 PM

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER COURT
BCD-CIV-2023-00065

STATE OF MAINE,

              Plaintiff,

v.

3M COMPANY, et al.,

              Defendants.

)
)
)
)
)
)
)
)
)
)

**DEFENDANT 3M COMPANY'S**
**SUPPLEMENT TO NOTICE**
**FILED ON 9/8/2025**

As previously noted, on September 8, 2025, Defendant 3M Company filed a Notice of Removal with the Clerk of the United States District Court for the District of Maine. 3M previously filed a Notice of Filing of Notice of Removal in this case attaching a copy of the Notice of Removal that had not yet been file-stamped. Attached to this Supplement as Exhibit A is a true and correct copy of the file-stamped Notice of Removal bearing the federal court case information.

Dated: September 9, 2025

Respectfully submitted,

*/s/ Russell B. Pierce, Jr.*
Russell B. Pierce (Maine Bar No. 7322)
NORMAN HANSON & DETROY LLC
220 Middle Street
P.O. Box 4600
Portland, ME 04112-4600
(207) 774-7000
rpierce@nhdlaw.com

*/s/ Jay S. Geller*
Jay S. Geller (Maine Bar No. 9022)
LAW OFFICE OF JAY S. GELLER
Lunt Professional Building
74 Lunt Road, Suite 206
Falmouth, ME 04105
(207) 899-1477
jgeller@jaysgellerlaw.com

*Counsel for 3M Company*

Electronically Filed: 9/9/2025 2:56 PM

EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

STATE OF MAINE,

        Plaintiff,

    v.

3M COMPANY, ET AL.,

        Defendants.

Civil Action No. _____

**NOTICE OF REMOVAL**

       Defendant 3M Company ("3M"), by undersigned counsel, hereby gives notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the State of Maine Business and Consumer Docket ("Business Court") to the United States District Court for the District of Maine. As grounds for removal, 3M alleges as follows:

## PRELIMINARY STATEMENT

       1.    Plaintiff State of Maine ("State") seeks to hold 3M and other Defendants liable for their alleged conduct in designing, manufacturing, and/or selling per- and polyfluoroalkyl substances ("PFAS") and PFAS-containing products, which purportedly have resulted in alleged contamination of the State's natural resources and property, including drinking water supplies.

       2.    However, at least some of the PFAS that plausibly gives rise to the State's claims was released by the use, storage, or disposal of PFAS-containing aqueous film-forming foam ("AFFF") that was manufactured for and sold to the U.S. military and other users by a select group of suppliers (including 3M) in accordance with the military's rigorous specifications ("MilSpec"). AFFF is a firefighting foam that is highly effective for extinguishing fuel-based fires. Over time,

3M's MilSpec AFFF products have been used by personnel at military facilities (among others) across the United States, including in Maine.

3.      In a sworn response to an interrogatory requesting that the State provide information about each location for which it is asserting a claim against any of the Defendants in this action, the State produced a spreadsheet identifying hundreds of claimed sites, including public water systems, a number of which are linked to AFFF exposure. And at least one of these public water systems, the Brunswick/Topsham Water District ("BTWD") water system, is reported to have been contaminated by MilSpec AFFF.

4.      Under the federal government contractor defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), 3M is not subject to tort liability for its design and manufacture of MilSpec AFFF and its provision of warnings for the product. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), 3M is entitled to remove this action in its entirety to have its federal defense adjudicated in a federal forum. *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016). Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *See Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

5.      Although the State purports to disclaim damages related to AFFF in this case, the State's responses to Defendants' interrogatories demonstrate that the State *does* seek damages for PFAS contamination from AFFF, including MilSpec AFFF, in this case. The State's disclaimer is a pretense, and artful pleading should not permit the State to deprive 3M of the federal forum to which it is entitled.

6. As discussed below, 3M previously removed this case on similar grounds in May 2023, and the Court's decision to remand the case back to state court is the subject of a pending appeal. *Infra* ¶¶ 11–12. While a favorable ruling by the First Circuit on that appeal would moot the present removal, 3M is filing the present Notice of Removal to preserve its right to a federal forum based upon the new facts presented by the State's responses to Defendants' interrogatories in the event the First Circuit affirms the original remand order.

## **BACKGROUND**

7. This action is one of two actions filed by the State against 3M and other Defendants based on substantially similar allegations concerning PFAS contamination of natural resources and property across Maine, both of which were filed on March 29, 2023.

8. In this action, which is proceeding in the early stages of written discovery in the Business Court, Docket No. BCD-CIV-2023-00065, the State generally alleges that Defendants, including 3M, have designed, manufactured, marketed, distributed, and/or sold PFAS and PFAS-containing products, including in Maine. *See, e.g.*, Complaint ¶¶ 1, 5, 20–21, 66–77.[1] The State further alleges that Defendants' PFAS have caused contamination of the State's natural resources and property in Maine, including the State's groundwater, surface waters, soils, sediments, and wildlife "throughout Maine." *Id.* ¶ 133; *see also id.* ¶¶ 134–158. The Complaint asserts that "there is PFAS contamination in public water systems, private drinking water wells, at many dairy farms where sludge containing PFAS have been spread, [and] in leachate from municipal and industrial landfills . . . ." *Id.* ¶ 11; *see also id.* ¶ 134 (alleging PFAS contamination of "drinking water," "private drinking wells," "wastewater treatment plants," "many dairy farms," "landfill leachate at municipal, state-owned, and other landfills," and "landfill leachate at landfills associated with the

---

[1] A true and correct copy of the Complaint ("Compl.") is attached as Exhibit 1.

paper industry"). The State brings claims against 3M and other Defendants for public nuisance, private nuisance, statutory nuisance, trespass, strict liability for design defect and/or defective product, strict liability for failure to warn, and negligence. *Id.* ¶¶ 243–321.[2] Among other relief, the Complaint seeks "compensatory damages, including natural resources restoration and loss-of-use damages, and costs to investigate, monitor, abate, contain, prevent, treat, and remove PFAS from the State's natural resources and property." *Id.* ¶ 14; *see also id.* at pp. 87–88.

9.     In addition to this action, the State previously filed a separate action that is now proceeding in the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation ("MDL") based on substantially similar allegations of PFAS contamination of natural resources throughout Maine (the "Maine AFFF Action"), and it asserts the same causes of action and requests for relief. *See, e.g.*, Maine AFFF Action Amended Complaint ("AFFF Compl.") ¶¶ 206–249, 357–428.[2] The State generally alleges that Defendants, including 3M, have designed, manufactured, marketed, distributed, and/or sold PFAS-containing AFFF products which have caused contamination of the State's natural resources and property. *Id.* ¶¶ 2, 9–13. The AFFF Complaint explicitly alleges that Defendants (including 3M) sold AFFF for use by the U.S. military in Maine, *id.* ¶¶ 106, 110, and that sites of AFFF-related PFAS contamination in the State include military installations. *Id.* ¶ 212. The AFFF Complaint specifically identifies military installations in Maine where there is allegedly PFAS contamination from AFFF, including "the Naval Air Station in Brunswick, the Portsmouth Naval Shipyard in Kittery, Loring Air Force Base in Limestone, the Cutler Navy radio facility, and the Maine Air National Guard Base in Bangor." *Id.* ¶ 207.

---

[2] A true and correct copy of the operative complaint filed in the Maine AFFF Action is attached as Exhibit 2.

10.     Both actions seek to recover for damages from six of the same PFAS chemicals that the State alleges to have been used by Defendants in the manufacture of AFFF: perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), perfluorononanoic acid ("PFNA"), perfluorohexanesulfonic acid ("PFHxS"), perfluoroheptanoic acid ("PFHpA"), and perfluorodecanoic acid ("PFDA"). *See* Compl. ¶ 1; AFFF Compl. ¶ 2. Critically, PFOS and PFOA from AFFF are chemically indistinguishable in the ground from PFOA or PFOS from other sources.

11.     3M originally removed this action to this Court on May 17, 2023, asserting federal officer jurisdiction and federal enclave jurisdiction. *See* Notice of Removal, No. 2:23-cv-00210-JAW, ECF No. 1 (D. Me. May 17, 2023). As relevant to 3M's instant notice of removal, 3M alleged that PFAS from MilSpec AFFF and non-AFFF sources comingled across Maine, so the State's claims "encompass[ed] alleged PFAS contamination that plausibly derives at least in part from MillSpec AFFF use." *See id.* at 10–14.

12.     The State moved to remand this action to state court. *See* Mot. to Remand, No. 2:23-cv-00210-JAW, ECF No. 10 (D. Me. May 25, 2023). The State argued that no federal officer jurisdiction existed because 3M failed to identify any sites where commingling occurred and because, even if 3M had identified such sites, the State had "expressly disclaim[ed] seeking relief for any AFFF-related injuries." *See id.* at 2–9. Indeed, in its reply brief in support of remand, the State sought to bolster its disclaimer argument with what it claimed was a "sworn declaration from the state demonstrating that [AFFF products] are not" at issue. Reply in Supp. of Mot. to Remand, No. 2:23-cv-00210-JAW, ECF No. 38 at 1–3 & at n.1 (D. Me. June 22, 2023). This Court granted the State's motion to remand, reasoning that "because of the State's express disclaimer, the Court concludes that this case must be remanded to the state of Maine Superior Court since the federal

5

officer defense is not applicable." Order on Mots. to Stay and Remand, No. 2:23-cv-00210-JAW, ECF No. 47 at 22 (D. Me. July 26, 2023).[3]

13.    On August 12, 2025, the State served its responses to Defendants' First Set of Interrogatories (the "Interrogatory Responses"). In response to a request to identify certain information about "each Claimed Site and Resource at Issue in Your Complaint," the State responded by "producing a spreadsheet bates stamped as MEPLTF_NonAFFF_001595698 . . . that identifies by location sites where the State is aware of PFAS contamination and for which it seeks recovery in this case."[4] That spreadsheet, in turn, identified "BRUNSWICK/TOPSHAM WATER DISTRICT" with PWSID #ME0090260 on a tab entitled "CLAIMED PUBLIC WATER SYSTEMS."[5] On September 5, 2025, the State served supplemental responses to Defendants' First Set of Interrogatories ("Supplemental Responses") and produced a "supplemental spreadsheet at MEPLTF_NonAFFF_002764615" to replace MEPLTF_NonAFFF_00159568.[6] In the Supplemental Responses and accompanying spreadsheet, the State continues to identify BTWD as a site for which it seeks recovery in this case.  BTWD is reported to have been contaminated with PFAS from MilSpec AFFF. The State's responses and supplemental responses make clear that the disclaimer upon which the prior remand order was based is pretextual at best.

---

[3] 3M has appealed the remand order, with oral argument set for October 6, 2025.

[4] A true and correct copy of the Interrogatory Responses and relevant excerpts of MEPLTF_NonAFFF_001595698 are attached as Exhibits 3 and 4.

[5] *See* Exhibit 3 at 5.

[6] A true and correct copy of the Supplemental Responses and relevant excerpts of MEPLTF_NonAFFF_002764615 are attached as Exhibits 5 and 6.

## THE PROCEDURAL REQUIREMENTS FOR REMOVAL
## UNDER 28 U.S.C. §§ 1442(a)(1) AND 1446 ARE MET

14.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 99 and 1442(a) because the Business Court is located within the District of Maine

15.     3M is not required to notify or obtain the consent of any other defendant to remove this action under § 1442(a)(1). *See, e.g.*, *Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 357 n.9 (1st Cir. 2009) ("Removal under [§ 1442(a)(1)] does not require that all defendants agree to removal."); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Hilbert v. McDonnell Douglas Corp.*, 529 F. Supp. 2d 187, 195 (D. Mass. 2008).

16.     Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of the operative complaint is attached as Exhibit 1, and true and correct copies of the documents on file in this case prior to the filing of this notice of removal are attached to the Prior Case Record Affidavit that is attached to this notice of removal as Exhibit 8.

17.     Removal is timely under 28 U.S.C. § 1446(b). A defendant removing a case is required to file a notice of removal within thirty days of service on it by the plaintiff of an initial pleading (28 U.S.C. § 1446(b)(1)) or other paper (*id.*, § 1446(b)(3)) that, considering "the four corners" of the document, "informs the reader, to a substantial degree of specificity, [that] all the elements of federal jurisdiction are present." *McLaren v. UPS Store, Inc.*, 32 F.4th 232, 236 (3d Cir. 2022). Although neither the Complaint nor any other paper served by the State (including the Interrogatory Responses), separately or together in combination, contain the information necessary to inform 3M that all of the elements of federal jurisdiction are present, 3M has nevertheless filed this notice of removal within 30 days of service of Plaintiff's Interrogatory Responses. Thus, this Notice of Removal is timely.

18.    Pursuant to 28 U.S.C. § 1446(d), 3M is serving a copy of this Notice of Removal upon all other parties to this case and is also filing a copy with the Clerk of the Business Court.

19.    By filing a Notice of Removal in this matter, 3M does not waive the rights of any Defendant to object to service of process, the sufficiency of process, and/or jurisdiction over the person, or venue, and 3M specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

20.    3M reserves the right to amend or supplement this Notice of Removal.

21.    If any question arises as to the propriety of the removal of this action, 3M requests the opportunity to present a brief and oral argument in support of removal.

<div align="center">

**REMOVAL IS PROPER UNDER THE FEDERAL
OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)**

</div>

22.    Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) its actions taken pursuant to a federal officer's direction have a causal nexus with plaintiff's claims or injuries or are otherwise related to the lawsuit; and (d) it can assert a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *see also Moore v. Elec. Boat Co.*, 25 F.4th 30, 34 (1st Cir. 2022); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson*, 517 F.3d at 135.

23.    Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441. Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423,

<div align="center">8</div>

431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969). To the contrary, § 1442 as a whole must be "liberally construe[d]" in favor of removal. *Durham*, 445 F.3d at 1252 (quoting *Colorado v. Symes*, 286 U.S. 510, 517 (1932)); *Maryland v. 3M Co.*, 130 F.4th 380, 388 (4th Cir. 2025) (noting that "'the ordinary presumption against removal does not apply' to federal officer removal" and that "[g]eneral removal principles are . . . inverted when § 1442(a)(1) is at issue") (*quoting Cnty. Bd. of Arlington Cnty., Virginia v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021)).

24.    All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's injuries are—at least in part—caused by or related to MilSpec AFFF.  *See, e.g.*, *Nessel*, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in PFAS case against AFFF manufacturers because, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF, . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against AFFF manufacturers of MilSpec AFFF); *The City of Irondale v. 3M Company, Inc., et al.*, No. 2:23-cv-01327-AMM, 2025 WL 2419238, at *6 (N.D. Ala. Aug. 19, 2025) (denying motion to remand and noting that for federal officer removal purposes, removal is proper so long as 3M has "put forth a **plausible** case that MilSpec AFFF is a **potential** source of [the plaintiff's] complained-of injury") (emphasis in

original). The court overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation ("MDL") has also found on multiple occasions that removal under § 1442 is proper where the notice of removal alleges that the plaintiff's injuries are caused, at least in part, by MilSpec AFFF. *See In re AFFF Prods. Liab. Litig.*, 2019 WL 2807266, at *2–3 (D.S.C. May 24, 2019) ("MDL Order 1"); Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept. 27, 2019) ("MDL Order 2"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3"), at 3–6. Given its experience with the claims and defenses in the AFFF litigation, the MDL Court's holdings demonstrate that this case, too, has been properly removed to federal court.[7]

A.    **MilSpec AFFF**

25.    Since the late 1960s/early 1970s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property. In fact, the United States Naval Research Laboratory developed AFFF—its researchers were granted the first AFFF patent in 1966.[8] Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[9]

26.    The design and manufacture of MilSpec AFFF are governed by rigorous military specifications created and administered by Naval Sea Systems Command, part of the Department of Defense ("DoD"). The applicable specification, Mil-F-24385, was first promulgated in 1969,

---

[7] Following removal, 3M intends to designate this action for transfer to the MDL.

[8] U.S. Patent No. 3,258,423 (filed Sept. 4, 1963; published June 28, 1966).

[9] U.S. Navy, NRL/MR/1001-06-8951, U.S. Naval Research Lab., *The U.S. Naval Research Laboratory (1923-2005): Fulfilling the Roosevelts' Vision for American Naval Power*, at 37 (June 30, 2006) ("*Fulfilling the Roosevelts' Vision*"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

and has been revised several times since.[10] All MilSpec AFFF products must be "qualified for

listing on the applicable Qualified Products List" prior to military procurement.[11] Prior to such

listing, a "manufacturer's . . . products are examined, tested, and approved to be in conformance

with specification requirements."[12] The MilSpec designates Naval Sea Systems Command as the

agency responsible for applying these criteria and determining whether AFFF products satisfy the

MilSpec's requirements.[13] After a product is added to the Qualified Products List, "[c]riteria for

retention of qualification are applied on a periodic basis to ensure continued integrity of the

qualification status."[14] Naval Sea Systems Command "reserves the right to perform any of the

[quality assurance] inspections set forth in the specification where such inspections are deemed

necessary to ensure supplies and services conform to prescribed requirements."[15]

27.     From its inception until 2019, the MilSpec for AFFF included the express

requirement that MilSpec AFFF contain "fluorocarbon surfactants." All fluorocarbon surfactants

are PFAS, and that category includes PFOA, PFOS, and their precursors—among the compounds

expressly alleged to be at issue in this action.[16] *See* Compl. ¶¶ 62, 64, 103–04. The current MilSpec

---

[10] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

[11] MIL-PRF-24385F(4) § 3.1 (2020).

[12] DoD SD-6, Provisions Governing Qualification at 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[13] *See, e.g.*, MIL-PRF-24385F(4) at 18 (2020). The cited MilSpec designates Naval Sea Systems Command as the "Preparing Activity." The "Preparing Activity" is responsible for qualification. (*See* DoD SD-6, *supra* n.12, at 3.)

[14] DoD SD-6, *supra* n.12, at 1.

[15] *See, e.g.*, MIL-PRF-24385F(4) § 4.1 (2020).

[16] *See* Mil-F-24385 § 3.2 (1969); MIL-PRF-24385F(2) § 3.2 (2017). In May 2019, the MilSpec was revised to drop the explicit requirement that the surfactants in the product be "fluorocarbon." *See* MIL-PRF-24385F(3) § 3.2 (2019). But under current technology, the only AFFF products capable of meeting the MilSpec's stringent performance requirements—and the only ones listed

Case 2:25-cv-00453-JAW Document 1 Filed 09/24/25 Page 12 of 26 PageID #: 12

expressly contemplates the presence of PFOA and PFOS (subject to recently imposed limits) in AFFF formulations.[17] Indeed, the current MilSpec recognizes that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS "while still meeting all other military specification requirements."[18]

28. 3M manufactured and sold PFAS-containing MilSpec AFFF to the U.S. military for over three decades pursuant to contracts with the United States. One or more of 3M's AFFF products were on the Navy's Qualified Products List for AFFF from 1970 until 2010 (even though 3M had phased out production of AFFF beginning in 2000).[19] Over time, the U.S. military used MilSpec AFFF manufactured by 3M throughout the United States, including in Maine.

**B. <u>MilSpec AFFF Plausibly Contributed to PFAS Contamination Alleged By The State.</u>**

29. As set forth below, the contamination of natural resources alleged by the State was plausibly caused by MilSpec AFFF, including at the BTWD water system. The State's claims thus relate to or arise in part from PFAS-containing MilSpec AFFF.

30. Since this Court granted the State's motion to remand, the parties have litigated this action in Maine state court. On June 13, 2025, 3M and other Defendants served their First Set of Interrogatories ("3M's Interrogatories") to the State.[20] 3M's Interrogatories consisted of a single interrogatory that requested the State provide certain information "about each Claimed Site and

---

on the military's Qualified Product List—are those containing fluorocarbon surfactants. Thus, as a practical matter, the MilSpec still requires fluorocarbon surfactants.

[17] *See* MIL-PRF-24385F(4) § 6.6 & Tables 1, 3 (2020).

[18] MIL-PRF-24385F(4) § 6.6.

[19] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014) & MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

[20] A true and correct copy of 3M's Interrogatories is attached as Exhibit 7.

Resource at Issue in Your Complaint."[21] 3M's Interrogatories defined "Claimed Site" as "each and every location for which the State asserts a claim against any of the Defendants in this Action."[22]

31.     In response to 3M's Interrogatories, on August 12, 2025, the State "produc[ed] a spreadsheet bates stamped as MEPLTF_NonAFFF_001595698 contemporaneous with this response that identifies by location sites where the State is aware of PFAS contamination and for which it seeks recovery in this case."[23] The spreadsheet identifies 910 sites, which include "claimed public water systems."

32.     One of the "claimed public water systems" that the State identified in response to 3M's Interrogatories is the BTWD water system. In connection with its identification of the BTWD water system, the State also identified drinking water as the "resource at issue" and provided a public water system ID number: ME0090260.

33.     The BTWD water system is reported to have been contaminated by MilSpec AFFF. In the fall of 2024, BTWD released a "Special Edition Water Quality Report" (the "Report").[24] The Report was provided "as a recap and update of the Brunswick & Topsham Water District's (BTWD) ongoing work on PFAS (Per- and polyfluoroalkyl substances)."[25] The Report identifies

---

[21] 3M's Interrogatories at 4.

[22] *Id.* at 1.

[23] *See* Interrogatory Responses at 5.

[24] *See Special Edition Water Quality Report Fall 2024*, Brunswick & Topsham Water District, available at https://www.btwater.org/special-edition-wq-report (the "Report").

[25] *Id.* at 2.

the BTWD water system with the same public water system ID number that Maine disclosed in its spreadsheet in response to 3M's Interrogatories.[26]

34.      The Report contains PFAS testing results, noting that both PFOS and PFOA have been detected in water at its Jordan Avenue Station.[27] According to the report, BTWD "undertook an investigation that ultimately cost more than $600,000" that "included collaboration with the MEDWP, US Navy, USEPA and Maine Department of Environmental Protection (MEDEP)."[28] This investigation ultimately determined "that the source was coming from the former Naval Air Station Brunswick (NASB)." In turn, the U.S. EPA explains that the PFAS found at NASB "were used in the formation of aircraft firefighting foams that were historically used by the Navy when Brunswick was an active air station."[29]

35.      On September 5, 2025, in further response to 3M's Interrogatories, the State served its Supplemental Responses and produced a new spreadsheet to replace the original spreadsheet it had produced contemporaneously with its Interrogatory Responses. Like the old spreadsheet, the new spreadsheet identifies BTWD as a "claimed public water system," identifies drinking water as the "resource at issue," and provides the same public water system ID number: ME0090260. The State's Supplemental Responses confirm its intent to recover for AFFF-related injuries.

36.      Moreover, in the AFFF Complaint, the State alleges that "[n]umerous locations in Maine are contaminated and injured by AFFF-related PFOS, PFOA, PFNA, PFHxS, PFHpA,

---

[26] *Id.* at 2.

[27] *Id.* at 3.

[28] *Id.* at 3.

[29] *Brunswick Naval Air State Brunswick, ME*, United States Environmental Protection Agency, available at https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.cleanup&id=0101073.

and/or PFDA, including . . . the Naval Air Station in Brunswick." AFFF Compl. ¶ 207. The State specifically alleges that the levels of PFAS found in the groundwater at Brunswick Naval Air Station are "extremely high." *Id.*

37.     The State alleges that the U.S. military created MilSpec requirements beginning in the late 1960s and that, "3M sold AFFF products containing PFAS to the United States Department of Defense (DOD) and others from approximately 1964 through at last 2000." *See Id.* ¶¶ 106–108. The State further alleges that the Department of Defense "purchased AFFF *exclusively* from 3M" and another company from the 1960s through 2001. *Id.* ¶ 110 (emphasis added).

38.     For those reasons, the alleged contamination of the State's natural resources plausibly derived from use of MilSpec AFFF. Because the alleged PFAS exposure at issue in this action is, at least in part, plausibly attributable and/or related to MilSpec AFFF use at the former Naval Air Station in Brunswick, 3M is entitled to remove this case as a whole pursuant to federal officer jurisdiction and can satisfy each of the elements of federal officer jurisdiction as set forth below.

    **C.**     **All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied.**

        **1.**     *The "Person" Requirement Is Satisfied.*

39.     The first requirement for removal under the federal officer removal statute is satisfied here because 3M (a corporation) meets the definition of "person" under the statute. For purposes of § 1442(a)(1), the term "person" includes corporations. *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *accord Isaacson*, 517 F.3d at 135-36.

        **2.**     *The "Acting Under" Requirement Is Satisfied.*

40.     The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out the duties or tasks of a federal officer. *Watson v. Philip Morris Co., Inc.*, 551 U.S. 142, 152 (2007); *Papp*, 842 F.3d at 812. The phrase "acting under" is to be "liberally

construed in favor of the entity seeking removal." *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249,

255 (4th Cir. 2017) (internal quotation marks omitted). "[C]ourts have unhesitatingly treated the

'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries

arising from equipment that it *manufactured for the government*." *Id.*

    41.    The requirement of "acting under" a federal officer is met here because the alleged

PFAS contamination at issue in this action stems in part from MilSpec AFFF, a vital product

provided by 3M that otherwise "the Government would have had to produce itself." *Isaacson*, 517

F.3d at 137. MilSpec AFFF is a mission-critical military and aviation safety product that, without

the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018

WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product"

used by all branches of the U.S. armed forces and NATO members (internal quotation marks

omitted)); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough

[it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of

the chemical industry to synthesize the fluorinated intermediates and agents to achieve

improvements in formulations."[30] Accordingly, the military has long depended upon outside

contractors like 3M to develop and supply AFFF. *See Nessel*, 2021 WL 744683, at *3 (holding

that AFFF manufacturers were "acting under" a federal officer in connection with the manufacture

and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *see also* MDL Order 1, 2019

WL 2807266, at *2 (finding that the "acting under" requirement was satisfied because defendant

demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL

Order 2, at 3–5; MDL Order 3, at 3–6.

---

[30] Fulfilling the Roosevelts' Vision, *supra* note 9, at 37.

42.     In designing, manufacturing, and supplying the MilSpec AFFF at issue, 3M acted

under the direction and control of federal officers. Specifically, 3M acted in accordance with

detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF

formulation, performance, testing, storage, inspection, packaging, and labeling.  Further, MilSpec

AFFF products were subject to various tests by the U.S. Navy before and after being approved for

use by the military and for inclusion on the Qualified Products List maintained by the DoD.[31]  3M

has satisfied the "acting under" requirement. *See, e.g.*, *Nessel*, 2021 WL 744683, at *3; *Ayo*, 2018

WL 4781145, at *8–9.

### *3.     The "Under Color Of Federal Office" Requirement Is Satisfied.*

43.     The third requirement, that the defendant's actions were taken "under color of

federal office," is satisfied where there is a "nexus" between "the allegations in the complaint and

conduct undertaken at the behest of a federal officer." *Moore*, 25 F.4th at 34 n.2 (quoting *R.I. v.*

*Shell Oil Prods. Co., L.L.C.*, 979 F.3d 50, 59 (1st Cir. 2020)). As with the "acting under"

requirement, "[t]he hurdle erected by this requirement is quite low." *Isaacson*, 517 F.3d at 137.

To meet this requirement, "there need be only *a connection or association* between the act in

question and the federal office." *Sawyer*, 860 F.3d at 258 (internal quotation marks omitted).[32]

44.     Here, the State's claims against 3M for alleged PFAS contamination of natural

resources and property are for or relate to (at least in part) 3M's design, manufacture, and sale of

MilSpec AFFF—which was designed and manufactured according to DoD military specifications,

and which has been used, stored, and/or released at military facilities (and elsewhere) in Maine.

---

[31] *See* DoD, SD-6, *supra* note 12, at 1.

[32] The "acting under" and "under color of" prongs overlap.  Both "are satisfied if the actions subject
to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532,
at *5.

*See supra* ¶¶ 22–36. As a result, the State's claims against 3M relate to their acts taken under color

of federal office. *See Maryland*, 130 F.4th at 391 (nexus element satisfied where 3M "plausibly

alleged that PFAS intermingled to the point that it is impossible to identify their source," such that

MilSpec AFFF "contributed to at least" part of the contamination); *Ayo*, 2018 WL 4781145, at *9

("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and

manufacture of AFFF for the government."); MDL Order 1, 2019 WL 2807266, at *3 (nexus

element satisfied where "[Plaintiff]'s claims arise out of use of AFFF products . . . for which the

U.S. military imposes MilSpec standards"); MDL Order 2, at 5 (nexus element satisfied where

AFFF products, "for which the military imposes MilSpec standards," were the alleged cause of

plaintiff's injuries); MDL Order 3, at 5–6 (same).

  45. It is immaterial that the State disclaims recovery for alleged contamination

stemming from AFFF. Courts "credit Defendants' theory of the case when determining whether

[the] causal connection exists." *Isaacson*, 517 F.3d at 137; *see also Maryland*, 130 F.4th at 389;

*Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 192 (1st Cir. 2024); *Nessel*, 2021 WL 744683,

at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present"); Case

Management Order No. 36, *In re: Aqueous Film-Forming Foams Prod. Liab. Litig.*, No. 2:18-mn-

02873-RMG, ECF No. 7891 (D.S.C. Aug. 22, 2025) (finding efforts "to avoid the MDL and/or

federal jurisdiction by denying, disclaiming, or omitting allegations concerning exposure to AFFF"

to be "contrary to law" under *Maryland*). In any case, the State undermined the veracity of its

disclaimer—upon which this Court relied in remanding this action after the first removal—when

it identified the BTWD water system as one of the sites for which it is seeking damages in this

case.

46.     As averred in this Notice of Removal, the alleged injuries arise at least in part from

alleged exposure to MilSpec AFFF. Accordingly, the State's claims are "for or relating to" 3M's

actions under color of federal office (28 U.S.C. § 1442(a)(1)), and 3M is entitled to remove this

case as a whole pursuant to § 1442(a)(1). *See, e.g.*, *Bennett v. MIS Corp.*, 607 F.3d 1076, 1084 n.6

(6th Cir. 2010) ("[S]ection 1442(a)(1) authorizes removal of the entire case even if only one of the

controversies it raises involves a federal officer or agency.").

### *4.        The "Colorable Federal Defense" Requirement Is Satisfied.*

47.     The fourth requirement ("colorable federal defense") is satisfied by 3M's assertion

of the government contractor defense.

48.     At the removal stage, a defendant need only show that its government contractor

defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted,

given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original)

(citation omitted). "A defendant 'need not win his case before he can have it removed.'" *Id.*

(quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the

defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity

of the defense will be tried in federal court.") (citation omitted); *O'Connell v. Foster Wheeler*

*Energy Corp.*, 544 F. Supp. 2d 51, 54 (D. Mass. 2008) (upon removal, defendant must raise

"colorable federal defense"). At the removal stage, the inquiry "is purely jurisdictional, and neither

the parties nor the district courts should be required to engage in fact-intensive motion practice,

pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116; *see also*

*Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court

does not 'determine credibility, weigh the quantum of evidence or discredit the source of the

defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense.") (internal citation omitted). Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

49. Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

50. The requirement of "reasonably precise specifications" can be met by evidence showing either (a) that the government's participation in the design of the product "amount[ed] to more than a rubber stamping," or (b) that the government continued to purchase or use a product after the government became aware that the product contained the alleged defect. *Ramey v. Martin-Baker Aircraft Co. Ltd.*, 874 F.2d 946, 950 (4th Cir. 1989). Naval Sea Systems Command participated in the design of MilSpec AFFF, and its role was not a mere "rubber stamping." It created (and has updated) detailed specifications governing the product's formulation, performance, testing, storage, inspection, packaging, and labeling.[33] Those specifications are "reasonably precise," including in requiring the use of PFAS.[34] In addition, in the past and

---

[33] *See* Mil-F-24385 (1969) and subsequent revisions and amendments, cited in note 10, supra.

[34] As noted earlier, until 2019 the specification expressly required that MilSpec AFFF contain "fluorocarbon surfactants," all of which are members of the PFAS family. Even since that express

continuing to the present, the DoD has purchased and used MilSpec AFFF with awareness of the product's PFAS content and of the alleged risks associated with PFAS in the product. *See Ayo*, 2018 WL 4781145, at \*12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

51.     With respect to the second requirement, 3M's products have appeared on the DoD Qualified Products List,[35] which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec. *See Ayo*, 2018 WL 4781145, at \*13 ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); MDL Order 1, 2019 WL 2807266, at \*3 (finding that defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications").

52.     Regarding the third requirement, the U.S. government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF. The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand. Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise

---

requirement was removed from the specification, the use of PFAS has been implicitly mandated because PFAS-containing surfactants are the only kind that enable AFFF to meet the performance requirements of the specification.

[35] *See* MIL-F-24385 QPL/QPD History for Type 3 AFFF (Oct. 24, 2014); MIL-F-24385 QPL/QPD History for Type 6 AFFF (Oct. 24, 2014) (both available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1969-24 (D.S.C.)).

environmental or human health issues.[36] For example, as early as October 1980, a report supported

by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and

the U.S. Army Medical Research and Development Command stated that AFFF contained

fluorocarbons and that "[a]ll of the constituents resulting from firefighting exercises are considered

to have adverse effects environmentally."[37] In June 1991, the Air Force stated that past Air Force

fire training activities resulted in "adverse environmental impact," including "soil contamination"

and the "potential" for "groundwater contamination."[38] By no later than 2001, DoD was aware of

data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."[39] In

2002, the United States Environmental Protection Agency issued a draft hazard assessment for

PFOA, which reviewed in detail, among other data, human epidemiological studies and animal

toxicology studies pertaining to alleged associations between PFOA and cancer.[40] More recently,

in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA

regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a

"mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-

---

[36] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1-6 (Nov. 4, 2002).

[37] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[38] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas 2 (June 14, 1991).

[39] EPA Presentation on Activities/Issues on Fluorosurfactants, March 16, 2001 (available at *In re AFFF Prods. Liab. Litig.*, No. 2:18-mn-02873, ECF No. 1971-2 (D.S.C.)).

[40] *See* EPA, Revised Draft Hazard Assessment, *supra* note 36.

based fires."[41] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF

contain "surfactants,"[42] and recognizes that PFAS, including PFOS and PFOA, will be present

(subject to recently imposed limits for PFOS and PFOA) in AFFF formulations.[43] *See Ayo*, 2018

WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but

continues to purchase them supports the position that the government approved reasonably precise

specifications for the claimed defective design."); MDL Order 1, 2019 WL 2807266, at *3 ("As

to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF

products of which the military was not already aware, [defendant] points to materials such as a

November 2017 Department of Defense report to Congress, in which the agency acknowledged

the [EPA]'s stated concerns with PFOS/PFOA in drinking water").

    53.    At minimum, these facts constitute colorable evidence that Naval Sea Systems

Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after

weighing the fire-suppression benefits against the alleged risks. *See In re "Agent Orange" Prod.*

*Liab. Litig.*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A

defendant is not required to warn the government where 'the government knew as much or more

than the defendant contractor about the hazards of the product.'") (citation omitted). Where, as

here, the government has exercised "discretionary authority over areas of significant federal

interest such as military procurement," the government contractor defense applies. *In re "Agent*

*Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

---

[41] DoD, *Aqueous Film Forming Foam Report to Congress* 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

[42] MIL-PRF-24385F(4) § 3.2 (2020).

[43] *Id.* § 6.6 & Tables I, III; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

54. 3M's use of PFAS in MilSpec AFFF was required by military specifications. By seeking to impose tort liability on 3M for alleged injuries to the State that were caused at least in part by 3M's compliance with military specifications, the State is attempting to use state tort law to attack design choices dictated by the military. The government contractor defense precludes such an attack. *See Boyle*, 487 U.S. at 509.

55. The MDL Court, based on an extensive record, has found that the government contractor defense asserted by 3M and other AFFF manufacturers presents genuine issues of fact for trial. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2022 WL 4291357, at *12, 15 (D.S.C. Sept. 16, 2022). A defense that presents triable issues necessarily is "colorable."

56. Accordingly, 3M is entitled to remove this action to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1).

WHEREFORE, 3M hereby removes this action from the Business Court to this Court.

Dated: September 8, 2025

Respectfully submitted,

/s/ *Jay S. Geller*
Jay S. Geller (Maine Bar No. 9022)
LAW OFFICE OF JAY S. GELLER
Lunt Professional Building
74 Lunt Road, Suite 206
Falmouth, ME 04105
(207) 899-1477
jgeller@jaysgellerlaw.com

*Counsel for 3M Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 8, 2025, I caused the foregoing to be filed with the Clerk of the Court via electronic mail, and I also caused a true and correct copy of the foregoing to be served on the following parties by Mail and Email as indicated below:

By Mail and Email:

Scott Boak
Robert Martin
Assistant Attorneys General
6 State House Station
Augusta, Maine 04333
(207) 626-8566
Email:
Scott.Boak@maine.gov
Robert.Martin@maine.gov

Matthew F. Pawa
Benjamin A. Krass
Gillian C.A. Cowley
PAWA LAW GROUP P.C.
1280 Centre Street, Suite 230
Newton Centre, MA 02459
(617) 641-9550
Email:
mp@pawalaw.com
bkrass@pawalaw.com
gcowley@pawalaw.com

Kyle J. McGee
Viola Vetter
Jason H. Wilson
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
(302) 622-7000
Email:
kmcgee@gelaw.com
vvetter@gelaw.com
jwilson@gelaw.com

*Attorneys for Plaintiff*

By mail:

EIDP, Inc.
974 Centre Road
Wilmington, DE 19805

*Defendant*

The Chemours Company
1007 Market Street
Wilmington, DE 19899

*Defendant*

The Chemours Company FC, LLC
1007 Market Street
Wilmington, DE 19898

*Defendant*

Dow Inc.
2211 H.H. Dow Way
Midland, MI 48674

*Defendant*

Corteva, Inc.
974 Centre Road
Wilmington, DE 19805

*Defendant*

DuPont de Nemours, Inc.
974 Centre Road
Wilmington, DE 19805

*Defendant*

Dated: September 8, 2025                    */s/ Jay s. Geller*
                                            Jay S. Geller